# **<u>EXHIBIT A</u>**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

ARGONAUT INSURANCE COMPANY,

Plaintiff,

v.

DRIVETRAIN, LLC;
ABC CORPORATIONS 1-10; and
JOHN DOES 1-10,

Defendants.

**SUMMONS**

**Index No.:**
**Date Filed:** November 4, 2020

**Basis of Venue**
C.P.L.R. § 503(a)
Residence of defendant

TO THE ABOVE-NAMED DEFENDANTS

You are hereby summoned to answer the Complaint in this action and to serve a copy of your answer, or, if the Complaint is not served with this Summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: November 4, 2020
New York, New York

RIKER DANZIG SCHERER
HYLAND & PERRETTI LLP


Curtis M. Plaza, Esq.
Tod S. Chasin, Esq.
Agostino A. Zammiello, Esq.
500 Fifth Avenue
New York, New York 10110
Tel: (212) 302-6574
Fax: (212) 302-6628

TO:     Drivetrain, LLC
        410 Park Avenue, Ste. 900
        New York, NY 10022

**IMMEDIATELY FORWARD TO YOUR ATTORNEY OR INSURANCE COMPANY**

1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

ARGONAUT INSURANCE COMPANY,

                              Plaintiff,

v.

DRIVETRAIN, LLC. ABC
CORPORATIONS 1-10, and
JOHN DOES 1-10,

                              Defendants.

---

Index No.:

**VERIFIED COMPLAINT**

Plaintiff, Argonaut Insurance Company ("Argonaut"), by and through its attorneys, Riker

Danzig Scherer Hyland & Perretti LLP, by way of this Verified Complaint ("Complaint") against

the defendants, Drivetrain, LLC, ABC Corporations 1-10, and John Does 1-10, hereby alleges

and says:

## PARTIES

1. At all relevant times hereinafter mentioned, Argonaut was and is a corporation organized and

   existing under the laws of the State of Illinois, with its principal place of business in Chicago,

   Illinois.

2. Upon information and belief, Drivetrain, LLC ("Drivetrain"), is organized and existing under

   the laws of the State of New York and has its principal place. of business in New York.

3. Upon information and belief, Defendants ABC Corporations 1 - 10 (the "ABC Corps") are

   corporations, the names and addresses of residences of which are unknown. The ABC Corps

   are comprised of any entity or entities, other than the Plan Administrator, that may be liable

   or may have assumed liability as successors to the Indemnitors under the Indemnity

1

Agreements pursuant to the Joint Plan as alleged hereinafter. Argonaut hereby reserves the rights to amend the Complaint to name the ABC Corps upon discovering their identity.

4. Upon information and belief, Defendants John Does 1 through 10 (the "John Does") are individuals whose names and addresses of residences are unknown. The John Does are comprised of any individual(s), other than the Plan Administrator, who may be liable or may have assumed liability as a successor to the Indemnitors under the Indemnity Agreements pursuant to the Joint Plan as alleged hereinafter. Argonaut hereby reserves the rights to amend the Complaint to name the John Does upon discovering their identity.

## ARGONAUT'S BONDS AND EXPOSURE

5. Argonaut provides bonding services to satisfy certain import duties to U.S. Customs and Border Protection ("U.S. Customs"), allowing goods to flow through customs before duties are calculated and fully paid.

6. Specifically, Argonaut issued two Customs Bonds to Hollander Sleep Products, LLC ("Hollander Sleep") as principal, totaling $1,950,000.00, Customs Bond Nos. 9914L2864 and 9914L2875 (collectively, the "Bonds"). True and correct copies of the Bonds are attached hereto as Exhibits A and B, respectively.

7. The Bonds were initially issued on June 17, 2014 and renewed annually for one-year periods thereafter through June 16, 2018.

8. The Bonds were terminated on June 16, 2018.

9. The Bonds secured the obligations of Hollander Sleep to the U.S. Customs as beneficiary, for customs, duties, fees, and other charges while the Bonds were in effect.

10. The first Bond, Bond No. 9914L2864, requires Argonaut to secure up to $50,000.00 in customs liabilities that may become due subject to the terms of the Bond in any one-year

2

period.  Argonaut's potential and future liability under Bond No. 9914L2864 is cumulative so that its total potential and future liability is $50,000.00 multiplied by the number of years that Bond No. 9914L2864 was in effect.  Here, the Bond was in effect for four (4) years, resulting in a potential and future liability of $50,000 x 4 = $200,000.

11. The second Bond, Bond No. 9914L2875,  requires Argonaut to secure up to $1,900,000.00 in custom liabilities that may become due subject to the terms of the Bond in any one-year period.  Argonaut's potential and future liability under Bond No. 9914L2875 is cumulative so that its total potential and future liability is $1,900,000.00 multiplied by the number of years that Bond No. 9914L2875 was in effect.  Here, the Bond was in effect for four (4) years, resulting in a potential and future liability of $1,900,000 x 4 = $7,600,000.

12. Accordingly, Argonaut's total potential and future liability under the Bonds for the applicable four (4) years is $200,000 + $7,600,000 = $7,800,000.00, in the aggregate.

### THE INDEMNITY AGREEMENT

13. In connection with the Bonds, Indemnity Agreements were executed in May 2014, whereby Hollander Sleep, Dream II Holdings, LLC ("Dream Holdings"), and Hollander Home Fashions Holdings, LLC ("Hollander Home" and, collectively, "Indemnitors") agreed to, among other things, indemnify and save harmless Argonaut from and against all claims and liabilities in any way arising from the Bonds.

14. The Indemnitors were required to pay for all payments made under the Bonds to U.S. Customs

15. In the event that Argonaut makes payments to U.S. Customs on the Bonds, the Indemnitors are required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees

3

Case 1:20-cv-10434 Document 1-1 Filed 12/10/20 Page 6 of 208

and interest. A true and accurate copy of the Indemnity Agreements requiring such payments

to Argonaut are attached as Exhibits C, D, and E.

16. In the Indemnity Agreements, the Indemnitors agreed to indemnify Argonaut from any and

all liability:

> [I]ndemnify and save harmless Company [Argonaut] from and
> against any and all liability, claim, demand, loss, damage, expense,
> cost, attorney's fees and expenses, included without limitation,
> fees and disbursements of counsel incurred by the Company
> [Argonaut] in any action or proceeding between the indemnitor[s]
> and the Company [Argonaut], or between the Company [Argonaut]
> and any third party, which Company [Argonaut] shall at any time
> incur by reason of its execution of any bond or its payment of or its
> liability to pay any claim, irrespective of whether the claim is made
> against the Company [Argonaut] as a joint or several obligor and
> whether the indemnitor[s] is then liable to make such payment, and
> to place the Company [Argonaut] in funds to meet all its liability
> under any bond, promptly upon request and before Company may
> be required to make any payment thereunder…

See Indemnity Agreements at ¶ 2.

17. Furthermore, the Indemnity Agreements provide that the Indemnitors need to provide funds

upon a demand by U.S. Customs:

> Any demand upon the Company [Argonaut] by the Obligee [the
> United States of America] shall be sufficient to conclude that a
> liability exists and the Indemnitor[s] shall then place the Company
> [Argonaut] with sufficient funds in a form and amount deemed
> acceptable in the Company's [Argonaut's] sole discretion, as
> collateral security to cover the liability.

Id.

18. The Indemnity Agreements also state that any successors to the original Indemnitors are

equally bound:

> Each Indemnity and the heirs, legal representatives, successors and
> assigns of each Indemnitor[s] are, jointly and severally, bound by
> the provisions of this agreement and the liability of each
> Indemnitor[s] shall not be dependent upon the execution of this

4

agreement or any instrument referred to by any other Indemnitor, and that if the Company [Argonaut] procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

See id.

## THE HOLLANDER SLEEP CHAPTER 11 BANKRUPTCY ACTION

19. On May 19, 2019, Hollander Sleep and certain affiliates (collectively "Debtors") filed for bankruptcy protection under Chapter 11 of the federal Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court").

20. The Debtors were New York-based manufacturers of bed pillows, mattress pads, comforter and other bedding products.

21. Argonaut filed three proofs of claims in the Bankruptcy Case against Hollander Sleep, Dream II Holdings, LLC, and Hollander Home Fashions Holdings, LLC in the aggregate amount of $7,800,000.00. True and correct copies of the Proofs of Claims are attached hereto as Exhibits F, G, and H, respectively.

22. A Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code ("Joint Plan") confirmed by the Bankruptcy Court on September 5, 2019. A true and correct copy of the Joint Plan is attached hereto as Exhibit I.

23. Through the Joint Plan, the Debtors transferred substantially all of their assets to a new owner, Bedding Acquisition, LLC ("Bedding Acquisition").

24. Pursuant to the Joint Plan, Drivetrain was appointed as the Plan Administrator.

25. As the Plan Administrator, Drivetrain is responsible for administrating the estate, assisting the Debtors in liquidating its assets, administering claims and making payments to creditors, like Argonaut.

26. As such, Drivetrain assumed all debts and liabilities under the Joint Plan as the Debtors' successor.

27. John Does and ABC Corps. are individuals and/or entities that may have also assumed debts and liabilities under the Indemnity Agreements pursuant to the Joint Plan.

28. Under the terms of the Joint Plan, the Debtors' obligations with respect to the Bonds were reaffirmed:

> [O]n the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Plan Administrator or the Winning Bidder, as applicable, (2) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Post-Effective Date Debtor or the Winning Bidder, as applicable, and will survive and remain unaffected by entry of the Confirmation Order . . .

See Article V, Part E.

29. The Indemnitors, as well as their "heirs, legal representatives, successors and assigns," are jointly and severally bound by the terms and provisions of the Indemnity Agreements.

30. The Indemnitors' obligations under the Indemnity Agreements were reaffirmed by Drivetrain as the Plan Administrator of the post-confirmation Chapter 11 estates of the Debtors.

31. Accordingly, the Debtors and/or their successors, Drivetrain, are required to make the payments to U.S. Customs as well as honor the Bonds and related Indemnification Agreements.

## ARGONAUT'S DEMAND FOR COLLATERAL AGAINST DRIVETRAIN

32. As a result of Drivetrain's failure to pay the Bonds, Argonaut has received a number of claims from U.S. Customs under the Bonds.

6

33. Specifically, U.S. Customs has made multiple demands to Argonaut for payment under the Bonds, including case numbers: 2019550120033301; 2019550120033401; 2020170320031501; 2020170320031601; 2020550120005201; and 2020550120005301.

34. Due to the bankruptcy filing, Hollander Sleep defaulted on certain import duties owed, causing U.S. Customs to assert claims against the Bonds provided by Argonaut.

35. In turn, Argonaut made numerous demands to Drivetrain for indemnification pursuant to the terms of the Bonds and the Indemnity Agreements.

36. By way of letters dated November 1, 2019, December 6, 2019, February 21, 2020, and March 26, 2020, Argonaut invoked the provisions of the Indemnity Agreements by requesting, among other things, proof of discharge of all liability or potential liability incurred in connection with the Bonds. True and correct copies of the November 1, 2019, December 6, 2019, February 21, 2020, and March 26, 2020 letters are attached hereto as Exhibits J, K, L, and M, respectively.

37. On June 19, 2020, Argonaut issued its final demand letter whereby Argonaut requested that $132,355.72 be placed in funds pursuant to the Indemnity Agreements on or before July 6, 2020. A true and correct copy of the June 19, 2020 letter is attached hereto as Exhibit N.

38. The $132,355.72 demanded in the June 19, 2020 letter was to be held by Argonaut as collateral under the Indemnity Agreements until such time as adequate proof of discharge of liability for the Bonds has been provided and verified with U.S. Customs, or used as the collateral funds to satisfy any amounts that are or may become due or owing in connection with the Bonds.

39. Despite Argonaut's demands, the Indemnitors have failed and refused to reimburse Argonaut or place with it collateral as demanded in material breach of their joint and several obligations under the Indemnity Agreements.

40. As of October 1, 2020, U.S. Customs has made demands for $111,303.46, which reflects the current amount asserted as owed by the Debtor and secured by Argonaut under the Bonds ("Open Duty Bill"). A true and correct copy of the October 2020 Open Duty Bill is attached hereto as Exhibit O.

41. Moreover, as of October 1, 2020, U.S. Customs has made demands for additional liquidated damages in the amount of $195,696.34 ("Liquidated Damages"). A true and correct copy of the October 2020 Liquidated Damages is attached hereto as Exhibit P.

42. The Liquidated Damages consist of violations for not paying the estimated duty at the time the goods enter into the United States.

43. Therefore, as of October 1, 2020, Argonaut's current obligations under the Bonds totals $306,999.80, which consists of the Open Duty Bill and the Liquidated Damages.

## FIRST COUNT

### Specific Performance of the Indemnity Agreements to
### Enforce Argonaut's Demand for Collateral Security

44. Argonaut repeats the allegations of paragraphs 1 through 44 of its Complaint as if set forth at length herein.

45. Under the terms of the Indemnity Agreements, the Indemnitors agreed, among other things, to deposit with Argonaut an amount of money equal to the claims received or to any reserve set by Argonaut in connection with the Bonds and to convey collateral as security for the full performance of the Indemnity Agreement.

8

46. As a result of the several claims against the Bonds, Argonaut has demanded collateral from the Indemnitors in the amount of $306,999.80.

47. The Indemnitors have failed and refused to deposit collateral with Argonaut as security for the full performance of the Indemnity Agreement.

48. By reason of the foregoing breach of the Indemnity Agreement, Argonaut has suffered, and will continue to suffer, injury and damage for which there is no adequate remedy at law.

## SECOND COUNT
### Contractual Indemnification

49. Argonaut repeats the allegations of paragraphs 1 through 49 of its Complaint as if set forth at length herein.

50. Pursuant to the Indemnity Agreement, the Indemnitors agreed to indemnify Argonaut from any and all liability:

> [I]ndemnify and save harmless Company [Argonaut] from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company [Argonaut] in any action or proceeding between the indemnitor[s] and the Company [Argonaut], or between the Company [Argonaut] and any third party, which Company [Argonaut] shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company [Argonaut] as a joint or several obligor and whether the indemnitor[s] is then liable to make such payment, and to place the Company [Argonaut] in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder…

See Indemnity Agreements at ¶ 2.

51. Furthermore, the Indemnity Agreements provide that the Indemnitors need to provide funds upon a demand by U.S. Customs:

> Any demand upon the Company [Argonaut] by the Obligee [the United States of America] shall be sufficient to conclude that a

9

> liability exists and the Indemnitor[s] shall then place the Company [Argonaut] with sufficient funds in a form and amount deemed acceptable in the Company's [Argonaut's] sole discretion, as collateral security to cover the liability.

Id.

52. The Indemnity Agreements also state that any successors to the original Indemnitors are equally bound:

> Each Indemnity and the heirs, legal representatives, successors and assigns of each Indemnitor[s] are, jointly and severally, bound by the provisions of this agreement and the liability of each Indemnitor[s] shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company [Argonaut] procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

See id.

53. Argonaut has demanded on multiple occasions that Drivetrain honor their obligations under the Indemnity Agreements to, among other things, indemnify and hold Argonaut harmless for any and all liability, loss, demand, fees and costs incurred and to be incurred.

54. Despite demand, Drivetrain has failed and refused to honor their obligations under the Indemnity Agreements and have otherwise breached the Indemnity Agreements.

55. As a result of the Indemnitors' breach of the Indemnity Agreement, Argonaut has sustained damages, costs and expenses, and will continue to sustain damages, costs and expenses.

## **THIRD COUNT**

### **Exoneration**

56. Argonaut repeats the allegations of paragraphs 1 through 56 of its Complaint as if set forth at length herein.

10

57. As between Argonaut and Drivetrain, Argonaut is secondarily obligated under the Bonds, while Drivetrain is primarily obligated under the Bonds, and otherwise owes a duty to Argonaut to procure the discharge of all obligations arising under the Bonds.

58. Drivetrain has failed and refused, and continues to fail and refuse to satisfy its obligations to Argonaut arising under the Bonds.

59. Argonaut is entitled to be exonerated and indemnified by Drivetrain for any and all loss incurred and to be incurred under the Bonds.

60. As a result of Drivetrain's failure to honor its obligations arising under the Bonds, Argonaut has sustained and will continue to sustain damages.

## FOURTH COUNT
### *Quia Timet*

61. Argonaut repeats the allegations of paragraphs 1 through 61 of its Complaint as if set forth at length herein.

62. Argonaut anticipates that it will be required to make payments to various claimants to cure the defaults of Drivetrain and the Indemnitors under the Bonds and the Indemnity Agreements.

63. The continued failure of Drivetrain to place Argonaut with funds equal to its reserve results in Argonaut's continuous and increasing risk of loss under the Bonds.

64. Argonaut also fears that unless the relief sought is granted, Drivetrain and/or the Indemnitors will liquidate and otherwise dissipate their assets thereby insuring that funds that ought to be applied to satisfy Argonaut's obligations under the Bonds and Drivetrain and/or the Indemnitors obligations under the Indemnity Agreements will not be available at the conclusion of this litigation.

11

## FIFTH COUNT

### Common Law Indemnification

65. Argonaut repeats the allegations of paragraphs 1 through 65 of its Complaint as if set forth at length herein.

66. As between Argonaut and Drivetrain under the Bonds, the liability of Drivetrain to Argonaut and any of the claimants is primary and Argonaut's liability is secondary. Accordingly, Drivetrain should be required to pay any claims made on the Bonds and to place in Argonaut's possession funds or property sufficient to satisfy all such claims before Argonaut is required to make a payment thereon.

67. Based on the foregoing, Drivetrain should be required to pay any claims made against the Bonds issued by Argonaut on behalf of Drivetrain.

**WHEREFORE**, Plaintiff demands judgment as follows:

1. On its First Cause of Action:

   a. restraining and enjoining Drivetrain and their agents from transferring, encumbering or otherwise disposing of, and from concealing and secreting any of their property and assets, real, personal and mixed, whether jointly or solely owned, which might serve as collateral so as to secure Argonaut from liability herein until proof of record satisfactory to the Court is presented to establish that all claims to which Argonaut is exposed have been liquidated and discharged;

   b. ordering and directing Drivetrain, and each of them, and their officers, agents, employees, attorneys and other persons acting on their behalf, immediately to deposit collateral in the amount of $306,999.80, the amount of reserves set by Argonaut;

12

  c. requiring Drivetrain to render to Argonaut a full and complete accounting of all assets owned by them or anyone or any of them in which they or any one of them may have an interest;

  d. for damages in an amount equal to any and all liability, loss, cost, expense, and attorneys' fees incurred or to be incurred by Argonaut as a result of its having executed the Bonds, together with the appropriate interest thereon; and

  e. for reasonable attorneys' fees, costs of suit, interest, and any other relief that the Court deems just and proper.

  f. awarding Argonaut such other and further relief as the Court deems just, equitable and proper;

2. On its Second Cause of Action:

  a. for contractual indemnification for all losses incurred and to be incurred by Argonaut, and any and all liability, loss, cost, expense, and attorneys' fees to be incurred by Argonaut, together with appropriate interest thereon;

  b. for declaratory relief, declaring Drivetrain and/or the Indemnitors jointly and severally liable to Argonaut for all loss, liability, cost or expense to which Argonaut may be exposed or which it may sustain;

  c. for attorneys' fees and costs of suit; and

  d. for such other and further relief, legal or otherwise that this Court may deem just and proper.

3. On its Third Cause of Action:

  a. for an Order requiring Drivetrain to exonerate Argonaut for any and all damages in an amount equal to any and all liability, loss, cost, expense, and attorneys' fees

13

incurred or to be incurred by Argonaut, together with the appropriate interest thereon;

b.  for attorneys' fees and costs of suit; and

c.  for such other and further relief, legal or otherwise that this Court may deem just and proper.

4.  On its Fourth Cause of Action:

a.  ordering and directing the Indemnitors to discharge any claims asserted against Argonaut and to reimburse Argonaut for any outlays which it may have had to make in connection therewith;

b.  ordering and directing the Indemnitors, and each of them, and their officers, agents, employees, attorneys and other persons acting on their behalf, immediately to deposit collateral in the amount of the reserves set by Argonaut for $306,999.80;

c.  directing, ordering, and adjudging that, pursuant to the common law doctrine of qu*ia timet*, Drivetrain and their agents are restrained and enjoined from transferring, encumbering or otherwise disposing of and from concealing and secreting any of their property and assets, real, personal and mixed, whether jointly or solely owned, which might serve as collateral so as to secure Argonaut from liability herein until proof of record satisfactory to the Court is presented to establish that all claims to which Argonaut is exposed have been liquidated and discharged;

14

    d.   requiring Drivetrain to render to Argonaut a full and complete accounting of all assets owned by them or anyone or any of them in which they or any one of them may have an interest;

    e.   awarding in favor of Argonaut, and against Drivetrain, damages in the amount of all expenditures, and outlays made by Argonaut, including attorneys' fees, consultant's fees, litigation expenses, interest and court costs; and

    f.   for such other and further relief, legal or otherwise that this Court may deem just and proper.

5.   On its Fifth Cause of Action:

    a.   ordering  to discharge any claims asserted against Argonaut and to reimburse Argonaut for any outlays which it may have had to make in connection therewith;

    b.   ordering and directing Drivetrain and its officers, agents, employees, attorneys and other persons acting on their behalf, immediately to deposit collateral in the amount of the reserves set by Argonaut for $306,999.80;

    c.   requiring Drivetrain to render to Argonaut a full and complete accounting of all assets owned by it or anyone in which it may have an interest;

    d.   requiring Drivetrain to allow Argonaut full and complete access to all of the financial books, records, documents and accounts maintained by it or anyone in which it may have an interest;

    e.   awarding in favor of Argonaut, and against Drivetrain, damages in the amount of all expenditures, and outlays made by Argonaut, including attorneys' fees, consultant's fees, litigation expenses, interest and court costs; and

15

f.   for such other and further relief, legal or otherwise that this Court may deem just

and proper.

Dated: November 4, 2020
New York, New York

RIKER DANZIG SCHERER
HYLAND & PERRETTI LLP

_____
Curtis M. Plaza, Esq.
Tod S. Chasin, Esq.
Agostino A. Zammiello, Esq.
500 Fifth Avenue
New York, New York 10110
Tel: (212) 302-6574
Fax: (212) 302-6628

16

## VERIFICATION

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF NEW YORK         )

Tod S. Chasin, an attorney admitted to practice in the courts of the State of New York, and not a party to this action, hereby affirms the following to be true under the penalties of perjury, pursuant to CPLR § 2106:

I am the attorney for Plaintiff ARGONAUT INSURANCE COMPANY in this action. I have read the annexed Complaint, and its factual contents are true to my personal knowledge, except as to the matters alleged on information and belief, and as to those matters, I believe them to be true.

The grounds for my belief as to all matters not stated upon my personal knowledge are correspondence and other writings furnished to me by Plaintiff ARGONAUT INSURANCE COMPANY and interviews with officers and employees of Plaintiff ARGONAUT INSURANCE COMPANY, as well as officers and employees of C.A. Shea & Company, Inc., a bond wholesaler that provides bond filing and claim handling services for Plaintiff ARGONAUT INSURANCE COMPANY.

The reason why this verification is not made by Plaintiff ARGONAUT INSURANCE COMPANY is that Plaintiff ARGONAUT INSURANCE COMPANY is a foreign corporation, and, as such, is not in the county where I have my office.

Dated: November 4, 2020
       New York, New York

RIKER DANZIG SCHERER
HYLAND & PERRETTI LLP

_Tod S. Chasin, Esq._

Sworn to me before this

4th day of November, 2020.

Notary Public

SILVA DECHOYAN
A Notary Public of New Jersey
My Commission Expires August 27, 2022

17

# EXHIBIT A

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB No. 1651-0050 Exp. 03/31/2014

**CUSTOMS BOND**

19 CFR Part 113

| CBP USE ONLY | BOND NUMBER (Assigned by CBP) |
|---|---|
| | **9914L2864** |

Broker Filer Code: WY6          Surety Reference Number: ███003/SUR███88

| In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below name principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below. | Execution Date 05/29/2014 |
|---|---|

**SECTION I** – Select Single Transaction OR Continuous Bond (not both) and fill in the applicable blank spaces.

| | | | Transaction Date | Port Code |
|---|---|---|---|---|
| ☐ SINGLE TRANSACTION BOND | Identification of transaction secured by this bond (e.g., entry number, seizure number, etc.) XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | | XXXXXXXXXXXX | |
| ☒ CONTINUOUS BOND | Effective Date 06/17/2014 | This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated. This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period. The intention to terminate this bond must be conveyed within the period and manner prescribed in the CBP Regulations. | | |

**SECTION II** – This bond includes the following agreements. Check one box only. (Except 3a may be checked independently or with 3.)

| Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability | Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability |
|---|---|---|---|---|---|
| ☐ 1 | Importer or broker .................§113.62 | XXXXXXXXXXXX | ☐ 8 | Detention of Copyrighted Material .................§113.70 -Single Transaction Only- | XXXXXXXXXXXX |
| ☒ 1a | Drawback Payments Refunds .........§113.65 | 50,000.00 | ☐ 9 | Neutrality .................§113.71 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 2 | Custodian of Bonded Merchandise §113.63 (includes bonded carriers, freight forwarders, cartmen and lightermen, all classes of warehouse, container station operators) -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 10 | Court Costs for Condemned Goods .................§113.72 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 3 | International Carrier.................§113.64 | XXXXXXXXXXXX | ☐ 11 | Airport Security Bond......Part 113 App A | XXXXXXXXXXXX |
| ☐ 3a | Instruments of International Traffic... §113.66 -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 12 | International Trade Commission (ITC) Exclusion Bond.............Part 113 App B | XXXXXXXXXXXX |
| ☐ 4 | Foreign Trade Zone.................§113.73 -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 14 | In-Bond Export Consolidation Bond | XXXXXXXXXXXX |
| ☐ 5 | Public Gauger.................§113.67 | XXXXXXXXXXXX | ☐ 15 | Intellectual Property Rights (IPR) | XXXXXXXXXXXX |
| ☐ 6 | Wool & Fur Products.................§113.68 Labeling Acts Importation -Single Transaction Only- | XXXXXXXXXXXX | ☐ 16 | Importer Security Filing (ISF) .................Part 113 App D | XXXXXXXXXXXX |
| ☐ 7 | Bill of Lading.................§113.69 -Single Transaction Only- | XXXXXXXXXXXX | ☐ 17 | Marine Terminal Operator -Continuous Bond Only- | XXXXXXXXXXXX |

**PRINCIPAL**

| Name and Physical Address (including legal description and state of incorporation) Hollander Sleep Products, LLC 6501 Congress Avenue Suite 300 Boca Raton, FL 33487 (FL Corporation) | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 ▶ CBP Identification Number: 27-███████00 Signature [signature] Viral Gandhi Vice President of Finance | AFFIX SEAL or Check Box ☒ Check Box |
|---|---|---|

| Principal and surety agree that any charge against the bond under any of the listed names is as though it was made by the principal(s). Principal and surety agree that they are bound to the same extent as if they executed a separate bond covering each set of conditions incorporated by reference to the CBP regulations into this bond. If the surety fails to appoint an agent under Title 31, United States Code, Section 9306, surety consents to service on the Clerk of any United States District Court or the U.S. Court of International Trade, where suit is brought on this bond. That clerk is to send notice of the service to the surety at: ▶ | Mailing Address Requested by the Surety 6 Mill Ridge Lane Chester, NJ 07930 |
|---|---|

**SURETY**

| Name and Physical Address (including legal description and state of incorporation) Argonaut Insurance Company 225 West Washington 6th Floor Chicago, IL 60606 (IL Corporation) | Surety Number 110 Signature [signature] Kevin J. Daily, Atty-in-Fact | Agent ID Number ███████06 | [SEAL] ARGONAUT INSURANCE CORPORATE SEAL ILLINOIS |
|---|---|---|---|

Broker Filer Code: **WY8**

Surety Reference Number: [REDACTED]**002/SUR**[REDACTED]**8**

Principal Name: **Hollander Sleep Products, LLC**  CBP Identification Number: **27-**[REDACTED]**00**

| | **AFFIX SEAL** or **Check Box** By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 |

**CO-PRINCIPAL**

| Name and Physical Address (including legal description and state of incorporation) | CBP Identification Number: N/A | |
|---|---|---|
| | Signature | |
| N/A | N/A | N/A |
| | | ☐ Check Box |

---

**SECTION III** – List below the complete name of all trade names or unincorporated divisions that will be permitted to obligate this bond in the principal's name including their CBP Identification Number(s).

| CBP Identification Number | Name | CBP Identification Number | Name |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | Total Number of Importer Names listed in Section III: | 00 |

**CO-SURETY**

| Name and Physical Address (including legal description and state of incorporation) | Surety Number N/A | Agent ID Number N/A | |
|---|---|---|---|
| | Signature | | |
| N/A | | N/A | N/A |
| | | | ☐ Check Box |

# EXHIBIT B

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB No. 1651-0050 Exp. 03/31/2014

## CUSTOMS BOND
19 CFR Part 113

| CBP USE ONLY | BOND NUMBER (Assigned by CBP) |
|---|---|
| | **9914L2875** |

Broker Filer Code: **WY8**  Surety Reference Number: 14_____/SUR_____

| In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below name principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below. | Execution Date 05/29/2014 |
|---|---|

**SECTION I** – Select Single Transaction OR Continuous Bond (not both) and fill in the applicable blank spaces.

| ☐ SINGLE TRANSACTION BOND | Identification of transaction secured by this bond (e.g., entry number, seizure number, etc.) XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | Transaction Date XXXXXXXXXXXX | Port Code |
|---|---|---|---|
| ☒ CONTINUOUS BOND | Effective Date 06/17/2014 | This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated. This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period. The intention to terminate this bond must be conveyed within the period and manner prescribed in the CBP Regulations. | |

**SECTION II** – This bond includes the following agreements. Check one box only. (Except 3a may be checked independently or with 3.)

| Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability | Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability |
|---|---|---|---|---|---|
| ☒ 1 | Importer or broker .........................§113.62 | 1,900,000.00 | ☐ 8 | Detention of Copyrighted Material ...........................................§113.70 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 1a | Drawback Payments Refunds .........§113.65 | XXXXXXXXXXXX | ☐ 9 | Neutrality .............................§113.71 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 2 | Custodian of Bonded Merchandise §113.63 (Includes bonded carriers, freight forwarders, cartmen and lightermen, all classes of warehouse, container station operators) -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 10 | Court Costs for Condemned Goods ...........................................§113.72 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 3 | International Carrier.........................§113.64 | XXXXXXXXXXXX | ☐ 11 | Airport Security Bond......Part 113 App A | XXXXXXXXXXXX |
| ☐ 3a | Instruments of International Traffic... §113.66 -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 12 | International Trade Commission (ITC) Exclusion Bond.............Part 113 App B | XXXXXXXXXXXX |
| ☐ 4 | Foreign Trade Zone.........................§113.73 -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 14 | In-Bond Export Consolidation Bond | XXXXXXXXXXXX |
| ☐ 5 | Public Gauger.............................§113.67 | XXXXXXXXXXXX | ☐ 15 | Intellectual Property Rights (IPR) | XXXXXXXXXXXX |
| ☐ 6 | Wool & Fur Products.....................§113.68 Labeling Acts Importation -Single Transaction Only- | XXXXXXXXXXXX | ☐ 16 | Importer Security Filing (ISF) ...........................................Part 113 App D | XXXXXXXXXXXX |
| ☐ 7 | Bill of Lading.............................§113.69 -Single Transaction Only- | XXXXXXXXXXXX | ☐ 17 | Marine Terminal Operator -Continuous Bond Only- | XXXXXXXXXXXX |

| **PRINCIPAL** | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 ▶ | **AFFIX SEAL or Check Box** |
|---|---|---|

| Name and Physical Address (including legal description and state of incorporation) Hollander Sleep Products, LLC 6501 Congress Avenue Suite 300 Boca Raton, FL 33487 (FL Corporation) | CBP Identification Number: 27-_____0 Signature _Viral Gandhi_ Viral Gandhi Vice President of Finance ☒ Check Box | |
|---|---|---|

| Principal and surety agree that any charge against the bond under any of the listed names is as though it was made by the principal(s). Principal and surety agree that they are bound to the same extent as if they executed a separate bond covering each set of conditions incorporated by reference to the CBP regulations into this bond. If the surety fails to appoint an agent under Title 31, United States Code, Section 9306, surety consents to service on the Clerk of any United States District Court or the U.S. Court of International Trade, where suit is brought on this bond. That clerk is to send notice of the service to the surety at: ▶ | Mailing Address Requested by the Surety 6 Mill Ridge Lane Chester, NJ 07930 |
|---|---|

**SURETY**

| Name and Physical Address (including legal description and state of incorporation) Argonaut Insurance Company 225 West Washington 6th Floor Chicago, IL 60606 (IL Corporation) | Surety Number 110 Signature _____ Kevin J. Daily, Atty-in-Fact | Agent ID Number _____06 [SEAL] ☐ Check Box |
|---|---|---|

Page 1 of 2   CBP Form 301 (06/11)

Broker Filer Code: **WY8**      Surety Reference Number: 14▮▮▮▮/SUR▮▮▮▮7

Principal Name: <u>**Hollander Sleep Products,**</u> CBP Identification Number: 27-▮▮▮▮▮00
                 **LLC**

| | **AFFIX SEAL** or **Check Box** |
|---|---|
| | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 |

**CO-PRINCIPAL**

| Name and Physical Address *(including legal description and state of incorporation)* | CBP Identification Number: | |
|---|---|---|
| | N/A | |
| | Signature | |
| N/A | N/A | N/A |
| | | ☐ Check Box |

**SECTION III** – List below the complete name of all trade names or unincorporated divisions that will be permitted to obligate this bond in the principal's name including their CBP Identification Number(s).

| CBP Identification Number | Name | CBP Identification Number | Name |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | Total Number of Importer Names listed in Section III: | 00 |

**CO-SURETY**

| Name and Physical Address *(including legal description and state of incorporation)* | Surety Number | Agent ID Number | |
|---|---|---|---|
| | N/A | N/A | |
| | Signature | | |
| N/A | N/A | | N/A |
| | | | ☐ Check Box |

Page 2 of 2 CBP Form 301 (06/11)

# EXHIBIT C

INDEMNITY TO:

| | |
|---|---|
| AMERICAN CASUALTY CO. OF READING, PA | ARGONAUT INSURANCE COMPANY |
| ASPEN AMERICAN INSURANCE COMPANY | ATLANTIC SPECIALTY INSURANCE COMPANY |
| CONTINENTAL CASUALTY COMPANY | FEDERAL INSURANCE COMPANY |
| PHILADELPHIA INDEMNITY INSURANCE CO. | RLI INSURANCE COMPANY |
| TRAVELERS CASUALTY AND SURETY COMPANY | WESTCHESTER FIRE INSURANCE COMPANY |
| WESTERN SURETY COMPANY | |

By  Hollander Sleep Products, LLC                          , Address  6501 Congress Avenue, Suite 300

                                                                                         Boca Raton, FL 33487

on behalf of  Hollander Sleep Products, LLC            , Address  6501 Congress Avenue, Suite 300

                                                                                         Boca Raton, FL 33487

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ 21 _____ day of _____ May _____ 20 14

| WITNESS | SIGNATURE(S) OF INDEMNITOR(S) | Affix Corp Seal |
|---|---|---|
| | Hollander Sleep Products, LLC | (L.S.) |
| _____ | Viral Gandhi | (L.S.) |
| _____ | Vice President of Finance | (L.S.) |

*(This form is to be notarized or signed by two witnesses)*

NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

Dena Fisher  5/21/14

140516002

# EXHIBIT D

INDEMNITY TO:

| | |
|---|---|
| **AMERICAN CASUALTY CO. OF READING, PA**<br>**ATLANTIC SPECIALTY INSURANCE COMPANY**<br>**MASSACHUSETTS BAY INSURANCE CO**<br>**NATIONALWIDE MUTUAL INS. CO.**<br>**RLI INSURANCE COMPANY**<br>**WESTCHESTER FIRE INSURANCE COMPANY** | **ARGONAUT INSURANCE COMPANY**<br>**FEDERAL INSURANCE COMPANY**<br>**NATIONAL CASUALTY COMPANY**<br>**PHILADELPHIA INDEMNITY INSURANCE CO.**<br>**TRAVELERS CASUALTY AND SURETY COMPANY**<br>**WESTERN SURETY COMPANY** |

By **Dream II Holdings, LLC** _____ . Address **6501 CONGRESS AVE, # 300, BOCA RATON 33487 FL**

on behalf of **Dream II Holdings, LLC** _____ , Address **6501 CONGRESS AVE, # 300, BOCA RATON 33487 FL**

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ day of ____ J U L y ____ 20 15

WITNESS

(This form is to be notarized or signed by two witnesses)

Signature: _____

Name: _Dena Fisher_

Signature: _____

Name: NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

SIGNATURE OF INDEMNITOR

Dream II Holdings, LLC

Signature: _____

Name: JAMES ALLEN

Corporate Title: CFO

Affix
Corp
Seal

140516002

# EXHIBIT E

INDEMNITY TO:

| | |
|---|---|
| **AMERICAN CASUALTY CO. OF READING, PA**<br>**ASPEN AMERICAN INSURANCE COMPANY**<br>**CONTINENTAL CASUALTY COMPANY**<br>**PHILADELPHIA INDEMNITY INSURANCE CO.**<br>**TRAVELERS CASUALTY AND SURETY COMPANY**<br>**WESTERN SURETY COMPANY** | **ARGONAUT INSURANCE COMPANY**<br>**ATLANTIC SPECIALTY INSURANCE COMPANY**<br>**FEDERAL INSURANCE COMPANY**<br>**RLI INSURANCE COMPANY**<br>**WESTCHESTER FIRE INSURANCE COMPANY** |

By **Hollander Home Fashions Holdings, LLC** . Address 6501 Congress Avenue, Suite 300

Boca Raton, FL 33487

on behalf of **Hollander Sleep Products, LLC** , Address 6501m Congress Avenue, Suite 300

Boca Raton, FL 33487

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration of the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ 21 _____ day of ____ May ____ 20 17

| WITNESS | SIGNATURE(S) OF INDEMNITOR(S)<br>**Hollander Home Fashions Holdings, LLC** | Affix<br>Corp<br>Seal<br>(L.S.) |
|---|---|---|
| _____ | Viral Gandhi<br>Vice President of Finance | (L.S.)<br>(L.S.) |

*(This form is to be notarized or signed by two witnesses)*

NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

X _____ 140516002

Dena Fisher 5/21/14

# EXHIBIT F

Debtor: Hollander Sleep Products, LLC.

UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

Case Number: 19-11608

| FILED |
| :---: |
| Claim No. 309 |
| **July 26, 2019** |
| By Omni Claims Agent |
| For U.S. Bankruptcy Court |
| Southern District of New York |

**Official Form 410**

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

Carefully read instructions included with this Proof of Claim before completing.

| Part 1: | Identify the Claim |
| :--- | :--- |

**1. Who is the current creditor?**

Argonaut Insurance Company

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No
[ ] Yes    From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Law Office of Michael W. Starr, LLC

1 Mill Ridge Lane

Suite 206

Chester, NJ 07930

Contact Phone  9088882513

Contact email  mstarr@michaelstarrlaw.com

**Where should payments to the creditor be sent? (if different)**

Contact Phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one)

_____

**4. Does this claim amend one already filed?**

[X] No
[ ] Yes    Claim Number on court claims registry (if known) _____    Filed On _____
                                                                          MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No
[ ] Yes    Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6.** **Do you have any number you use to identify the debtor?**

[X] No

[ ] Yes    Last 4 digits of the debtor's account or any number you use to identify the debtor:  _____

**7.** **How much is the claim?**    $ __$7,800,000.00__    **Does this amount include interest or other charges?**

[X] No

[ ] Yes    Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information

Claimant was surety on U.S. Customs Bond

**9.** **Is all or part of the claim secured?**

[X] No

[ ] Yes    The claim is secured by a lien on property

**Nature of property:**

[ ] Real Estate    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*

[ ] Motor Vehicle

[ ] Other    Describe:  _____

**Basis for perfection:**  _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.

**Value of Property:**    $ _____

**Amount of the claim that is secured:**    $ _____

**Amount of the claim that is unsecured:**    $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7).

**Amount necessary to cure any default as of the date of the petition:**    $ _____

**Annual Interest Rate:**    (when case was filed)  _____ %

[X] Fixed

[ ] Variable

**10.** **Is this claim based on a lease?**

[X] No

[ ] Yes    **Amount necessary to cure any default as of the date of the petition.**    $ _____

**11.** **Is this claim subject to a right of setoff?**

[X] No

[ ] Yes    Identify the property:  _____

**12.** **Is this claim for the value of goods received by the debtor within 20 days before the commencement  date of this case (11 U.S.C. § 503(b)(9)).?**

[X] No

[ ] Yes    Amount of 503(b)(9) Claim:  $ _____

Case 1:20-cv-10434 Document 1-1 Filed 12/10/20 Page 35 of 208

**13. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☐ No
☒ Yes    *Check all that apply*

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5). | $_____ |
| ☒ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it.**

**FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am the guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  7/26/2019
                  _____
                  MM / DD / YYYY

Christopher C. Flagg
_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name          Christopher C. Flagg
              _____
              First Name          Middle Name          Last Name

Title         Attorney-in-Fact for Argonaut Insurance Company
              _____

Company       _____
              Identify the corporate servicer as the company if the authorized agent is a servicer.

              6 Mill Ridge Lane

Address       Suite 206

              Chester, NJ 07930

Contact Phone  9088882513          Email  chrisflagg@cashea.com

---

Official Form 410                    **Proof of Claim**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td></td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>**Chapter 11**</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>**In re:**</td><td>:</td><td>**Case No. 19-11608**</td></tr>
<tr><td></td><td>:</td><td>**(Hollander Sleep Products, LLC)**</td></tr>
<tr><td>**HOLLANDER SLEEP PRODUCTS, LLC,**</td><td>:</td><td></td></tr>
<tr><td>*et al.*,</td><td>:</td><td>**Case No 19-11607**</td></tr>
<tr><td></td><td>:</td><td>**(Dream II Holdings, LLC)**</td></tr>
<tr><td>**Debtors.**</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td>**Case No. 19-11609**</td></tr>
<tr><td></td><td>:</td><td>**(Hollander Home Fashions Holdings, LLC)**</td></tr>
<tr><td></td><td>:</td><td></td></tr>
</table>

**ATTACHMENT TO PROOF OF CLAIM ON**
**BEHALF OF ARGONAUT INSURANCE COMPANY**

1.     Prior to the commencement of the above-captioned Chapter 11 case, Argonaut Insurance Company ("Argonaut") issued U.S. Customs Bond Nos. 9914L2864 and 9914L2875 (together, the "Bonds") to Debtor Hollander Sleep Products, LLC ("Hollander Sleep"). True and accurate copies of the Bonds are attached as **Exhibit A**.

2.     In the event that Hollander Sleep fails to make payments to U.S. Customs and Border Protection ("CBP") covered by the Bonds, Argonaut is required to make such payments on behalf of Hollander Sleep to the CBP subject to the terms of the Bonds.

3.     The Bonds were initially issued on June 17, 2014 and renewed annually for one-year periods thereafter through June 16, 2018.

4.     The Bonds were terminated on June 16, 2018.

5.     Bond No. 9914L2864 requires Argonaut to pay up to Fifty Thousand Dollars ($50,000.00) that may become due subject to the terms of the Bond in any one-year period. Argonaut's potential and future liability under Bond No. 9914L2864 is

cumulative so that its total potential and future liability is Fifty Thousand Dollars ($50,000.00) multiplied by the number of years that Bond 9914L2864 was in effect.

6.      Bond No. 9914L2875 requires Argonaut to pay up to One Million and Nine Hundred Thousand Dollars ($1,900,000.00) that may become due subject to the terms of the Bond in any one-year period. Argonaut's potential and future liability under Bond No. 9914L2875 is cumulative so that its total potential and future liability is One Million and Nine Hundred Thousand Dollars ($1,900,000.00) multiplied by the number of years that Bond No. 9914L2875 was in effect.

7.      Argonaut's total potential and future liability under the Bonds is Seven Million and Eight Hundred Thousand Dollars ($7,800,000.00).

8.      In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Hollander Sleep is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest. A true and accurate copy of the Indemnity Agreement requiring Hollander Sleep to make such payments to Argonaut is attached as **Exhibit B**.

9.      In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Dream II Holdings, LLC ("Dream II") is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest. A true and accurate copy of the Indemnity Agreement requiring Dream II to make such payments to Argonaut is attached as **Exhibit C**.

10.     In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Hollander Hope Fashions Holdings, LLC ("Hollander Hope") is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees

2

and interest. A true and accurate copy of the Indemnity Agreement requiring Hollander Hope to make such payments to Argonaut is attached as **Exhibit D**.

11. As of July 25, 2019, the CBP has made demands for liquidated damages in the amount of Thirty-Eight Thousand, Nine Hundred and Forty-Seven Dollars and 65/100 ($38,947.65), which has been mitigated to Four Hundred and Forty-Eight Dollars and 86/100 ($448.86). Argonaut will be obligated to and will pay this amount on behalf of Hollander Sleep. As a result, this amount is due and owing from Hollander Sleep, Dream II and Hollander Hope to Argonaut pursuant to the terms of the Indemnity Agreements.

12. In addition to the demands received to date, there may be additional entries and/or other obligations owed by Hollander Sleep to the CBP and covered by the Bonds that are not known or certain at this time. Argonaut's total potential and contingent liability under the Bonds is Seven Million and Eight Hundred Thousand Dollars ($7,800,000.00). In the event that any payments are made by Argonaut to the CBP under the Bonds, Hollander Sleep, Dream II and Hollander Hope are required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest.

13. No judgment has been rendered on this claim.

14. This claim is not subject to any setoff or counterclaim.

15. No security interest is held for this claim.

16. The amount of all payments on this claim, if any, has been credited and deducted for the purpose of making this Proof of Claim.

17. This claim may be, in whole or part, a priority claim pursuant to section 503 and/or 507 of Title 11 of the United States Bankruptcy Code, depending on the events which give rise to claims under the Bond.

18.     Argonaut reserves the right to amend this Proof of Claim from time to time to the extent that there is any further liquidation of this claim, and for any other lawful or permitted purpose.

19.     The filing of this Proof of Claim is not intended as, and shall not be construed as, (i) an admission of liability or waiver of any defense by Argonaut with respect to the Bonds or Indemnity Agreements; (ii) a waiver or release by Argonaut of any right of exoneration and/or other right it may have against Hollander Sleep, Dream II and/or Hollander Hope; and/or (iii) a waiver or release by Argonaut of its right to be subrogated to the rights of any party pursuant to the terms of the Bonds and/or applicable law.

20.     All notices and communications regarding this Proof of Claim shall be addressed to the Law Office of Michael W. Starr, 1 Mill Ridge Lane, Suite 206, Chester, New Jersey 07930.

/s/ Christopher C. Flagg

DATED: July 26, 2019          Christopher C. Flagg, Attorney-in Fact for Argonaut Insurance Company

4

Case 1:20-cv-10434   Document 1-1   Filed 12/10/20   Page 40 of 208

# EXHIBIT A

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB No. 1651-0050 Exp. 03/31/2014

**CUSTOMS BOND**

19 CFR Part 113

| CBP USE ONLY | BOND NUMBER (Assigned by CBP) |
|---|---|
| | **9914L2864** |

Broker Filer Code: WY8    Surety Reference Number: ████003/SUR████58

| In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below name principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below. | Execution Date 05/29/2014 |
|---|---|

**SECTION I** – Select Single Transaction OR Continuous Bond (not both) and fill in the applicable blank spaces.

| ☐ SINGLE TRANSACTION BOND | Identification of transaction secured by this bond (e.g., entry number, seizure number, etc.) XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | Transaction Date XXXXXXXXXXXXX | Port Code |
|---|---|---|---|
| ☒ CONTINUOUS BOND | Effective Date 06/17/2014 | This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated. This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period. The intention to terminate this bond must be conveyed within the period and manner prescribed in the CBP Regulations. | | |

**SECTION II** – This bond includes the following agreements. Check one box only. (Except 3a may be checked independently or with 3.)

| Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability | Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability |
|---|---|---|---|---|---|
| ☐ 1 | Importer or broker .................§113.62 | XXXXXXXXXXXX | ☐ 8 | Detention of Copyrighted Material .................................§113.70 -Single Transaction Only- | XXXXXXXXXXXX |
| ☒ 1a | Drawback Payments Refunds .........§113.65 | 50,000.00 | ☐ 9 | Neutrality ...........................§113.71 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 2 | Custodian of Bonded Merchandise §113.63 (includes bonded carriers, freight forwarders, cartmen and lightermen, all classes of warehouse, container station operators) -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 10 | Court Costs for Condemned Goods .................................§113.72 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 3 | International Carrier....................§113.64 | XXXXXXXXXXXX | ☐ 11 | Airport Security Bond......Part 113 App A | XXXXXXXXXXXX |
| ☐ 3a | Instruments of International Traffic.. §113.66 -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 12 | International Trade Commission (ITC) Exclusion Bond..............Part 113 App B | XXXXXXXXXXXX |
| ☐ 4 | Foreign Trade Zone....................§113.73 -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 14 | In-Bond Export Consolidation Bond | XXXXXXXXXXXX |
| ☐ 5 | Public Gauger.........................§113.67 | XXXXXXXXXXXX | ☐ 15 | Intellectual Property Rights (IPR) | XXXXXXXXXXXX |
| ☐ 6 | Wool & Fur Products....................§113.68 Labeling Acts Importation -Single Transaction Only- | XXXXXXXXXXXX | ☐ 16 | Importer Security Filing (ISF) ...........................Part 113 App D | XXXXXXXXXXXX |
| ☐ 7 | Bill of Lading...........................§113.69 -Single Transaction Only- | XXXXXXXXXXXX | ☐ 17 | Marine Terminal Operator -Continuous Bond Only- | XXXXXXXXXXXX |

| **PRINCIPAL** | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 ▶ | AFFIX SEAL or Check Box |
|---|---|---|
| *Name and Physical Address (including legal description and state of incorporation)* Hollander Sleep Products, LLC 6501 Congress Avenue Suite 300 Boca Raton, FL 33487 (FL Corporation) | CBP Identification Number: 27-████00 Signature *[signature]* Viral Gandhi Vice President of Finance | ☒ Check Box |
| Principal and surety agree that any charge against the bond under any of the listed names is as though it was made by the principal(s). Principal and surety agree that they are bound to the same extent as if they executed a separate bond covering each set of conditions incorporated by reference to the CBP regulations into this bond. If the surety fails to appoint an agent under Title 31, United States Code, Section 9306, surety consents to service on the Clerk of any United States District Court or the U.S. Court of International Trade, where suit is brought on this bond. That clerk is to send notice of the service to the surety at: ▶ | Mailing Address Requested by the Surety 6 Mill Ridge Lane Chester, NJ 07930 | |

| **SURETY** | | | |
|---|---|---|---|
| *Name and Physical Address (including legal description and state of incorporation)* Argonaut Insurance Company 225 West Washington 6th Floor Chicago, IL 60606 (IL Corporation) | Surety Number 110 Signature *[signature]* Kevin J. Daily, Atty-in-Fact | Agent ID Number ████06 | *[SEAL]* ☐ Check Box |

Page 1 of 2    CBP Form 301 (06/11)

Broker Filer Code: **WY8**  Surety Reference Number: ████002/SUR████8

Principal Name: **Hollander Sleep Products, LLC** CBP Identification Number: 27-█████00

| | | **AFFIX SEAL** or **Check Box** |
|---|---|---|
| | | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 |

**CO-PRINCIPAL**

| Name and Physical Address (including legal description and state of incorporation) | CBP Identification Number: | |
|---|---|---|
| | N/A | |
| | Signature | |
| N/A | N/A | N/A |
| | | ☐ Check Box |

**SECTION III** – List below the complete name of all trade names or unincorporated divisions that will be permitted to obligate this bond in the principal's name including their CBP Identification Number(s).

| CBP Identification Number | Name | CBP Identification Number | Name |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | Total Number of Importer Names listed in Section III: | 00 |

**CO-SURETY**

| Name and Physical Address (including legal description and state of incorporation) | Surety Number | Agent ID Number | |
|---|---|---|---|
| | N/A | N/A | |
| | Signature | | |
| N/A | | N/A | N/A |
| | | | ☐ Check Box |

Page 2 of 2 CBP Form 301 (06/11)

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB No. 1651-0050 Exp. 03/31/2014

## CUSTOMS BOND

19 CFR Part 113

| CBP USE ONLY | BOND NUMBER (Assigned by CBP) |
|---|---|
| | **9914L2875** |

Broker Filer Code: **WY8**    Surety Reference Number: 14XXXX/SURXXXXX7

| In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below name principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below. | Execution Date 05/29/2014 |
|---|---|

**SECTION I –** Select Single Transaction OR Continuous Bond (not both) and fill in the applicable blank spaces.

| ☐ SINGLE TRANSACTION BOND | Identification of transaction secured by this bond (e.g., entry number, seizure number, etc.) XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | Transaction Date XXXXXXXXXXX | Port Code |
|---|---|---|---|
| ☒ CONTINUOUS BOND | Effective Date 06/17/2014 | This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated. This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period. The intention to terminate this bond must be conveyed within the period and manner prescribed in the CBP Regulations. | | |

**SECTION II –** This bond includes the following agreements. Check one box only. (Except 3a may be checked independently or with 3.)

| Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability | Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability |
|---|---|---|---|---|---|
| ☒ 1 | Importer or broker ...............§113.62 | 1,900,000.00 | ☐ 8 | Detention of Copyrighted Material ...............§113.70 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 1a | Drawback Payments Refunds ........§113.65 | XXXXXXXXXXX | ☐ 9 | Neutrality ...............§113.71 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 2 | Custodian of Bonded Merchandise §113.63 (Includes bonded carriers, freight forwarders, cartmen and lightermen, all classes of warehouse, container station operators) -Continuous Bond Only- | XXXXXXXXXXX | ☐ 10 | Court Costs for Condemned Goods ...............§113.72 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 3 | International Carrier.....................§113.64 | XXXXXXXXXXX | ☐ 11 | Airport Security Bond......Part 113 App A | XXXXXXXXXXX |
| ☐ 3a | Instruments of International Traffic... §113.66 -Continuous Bond Only- | XXXXXXXXXXX | ☐ 12 | International Trade Commission (ITC) Exclusion Bond..............Part 113 App B | XXXXXXXXXXX |
| ☐ 4 | Foreign Trade Zone.....................§113.73 -Continuous Bond Only- | XXXXXXXXXXX | ☐ 14 | In-Bond Export Consolidation Bond | XXXXXXXXXXX |
| ☐ 5 | Public Gauger............................§113.67 | XXXXXXXXXXX | ☐ 15 | Intellectual Property Rights (IPR) | XXXXXXXXXXX |
| ☐ 6 | Wool & Fur Products....................§113.68 Labeling Acts Importation -Single Transaction Only- | XXXXXXXXXXX | ☐ 16 | Importer Security Filing (ISF) ...............Part 113 App D | XXXXXXXXXXX |
| ☐ 7 | Bill of Lading...............................§113.69 -Single Transaction Only- | XXXXXXXXXXX | ☐ 17 | Marine Terminal Operator -Continuous Bond Only- | XXXXXXXXXXX |

| PRINCIPAL | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 ▶ | AFFIX SEAL or Check Box |
|---|---|---|

| Name and Physical Address (including legal description and state of incorporation) Hollander Sleep Products, LLC 6501 Congress Avenue Suite 300 Boca Raton, FL 33487 (FL Corporation) | CBP Identification Number: 27-XXXXXXX0 Signature [signature] Viral Gandhi Vice President of Finance  ☒ Check Box | |

| Principal and surety agree that any charge against the bond under any of the listed names is as though it was made by the principal(s). Principal and surety agree that they are bound to the same extent as if they executed a separate bond covering each set of conditions incorporated by reference to the CBP regulations into this bond. If the surety fails to appoint an agent under Title 31, United States Code, Section 9306, surety consents to service on the Clerk of any United States District Court or the U.S. Court of International Trade, where suit is brought on this bond. That clerk is to send notice of the service to the surety at: ▶ | Mailing Address Requested by the Surety 6 Mill Ridge Lane Chester, NJ 07930 |
|---|---|

**SURETY**

| Name and Physical Address (including legal description and state of incorporation) Argonaut Insurance Company 225 West Washington 6th Floor Chicago, IL 60606 (IL Corporation) | Surety Number 110 Signature [signature] Kevin J. Daily, Atty-in-Fact | Agent ID Number WY8 0LS 006 [SEAL] ☐ Check Box |
|---|---|---|

Page 1 of 2    CBP Form 301 (06/11)

Broker Filer Code: **WY8** _____    Surety Reference Number: 14■■■■/SUR■■■■7

Principal Name: <u>**Hollander Sleep Products,**</u>  CBP Identification Number: 27-■■■■■00
<u>**LLC**</u>

| | | **AFFIX SEAL**<br>**or**<br>**Check Box** |
|---|---|---|

By checking the box you agree that you have a seal in accordance with 19 CFR 113.25

**CO-PRINCIPAL**

| Name and Physical Address *(including legal description and state of incorporation)* | CBP Identification Number:<br><br>N/A | |
|---|---|---|
| | Signature | |
| N/A | N/A | N/A |
| | | ☐ Check Box |

**SECTION III** – List below the complete name of all trade names or unincorporated divisions that will be permitted to obligate this bond in the principal's name including their CBP Identification Number(s).

| CBP Identification Number | Name | CBP Identification Number | Name |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | Total Number of Importer Names listed in Section III:    00 | |

**CO-SURETY**

| Name and Physical Address *(including legal description and state of incorporation)* | Surety Number<br>N/A | Agent ID Number<br>N/A | |
|---|---|---|---|
| | Signature | | |
| N/A | N/A | | N/A |
| | | | ☐ Check Box |

Page 2 of 2  CBP Form 301 (06/11)

# EXHIBIT B

INDEMNITY TO:

| | |
|---|---|
| AMERICAN CASUALTY CO. OF READING, PA | ARGONAUT INSURANCE COMPANY |
| ASPEN AMERICAN INSURANCE COMPANY | ATLANTIC SPECIALTY INSURANCE COMPANY |
| CONTINENTAL CASUALTY COMPANY | FEDERAL INSURANCE COMPANY |
| PHILADELPHIA INDEMNITY INSURANCE CO. | RLI INSURANCE COMPANY |
| TRAVELERS CASUALTY AND SURETY COMPANY | WESTCHESTER FIRE INSURANCE COMPANY |
| WESTERN SURETY COMPANY | |

By  **Hollander Sleep Products, LLC**                    , Address  **6501 Congress Avenue, Suite 300**

                                                            **Boca Raton, FL 33487**

on behalf of  **Hollander Sleep Products, LLC**           , Address  **6501 Congress Avenue, Suite 300**

                                                            **Boca Raton, FL 33487**

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1.  To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2.  To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ 2\ _____ day of ___ May ___ 20 14

WITNESS                                SIGNATURE(S) OF INDEMNITOR(S)

                                       **Hollander Sleep Products, LLC**                 Affix Corp Seal (L.S.)

_____                       Viral Gandhi                                      (L.S.)

_____                       Vice President of Finance                          (L.S.)

*(This form is to be notarized or signed by two witnesses)*   NOTARY PUBLIC-STATE OF FLORIDA
                                       **Dena Fisher**
                                       Commission # EE118756
                                       Expires: AUG. 19, 2015
                                       BONDED THRU ATLANTIC BONDING CO., INC.

                                                            Dena Fisher   5/21/14       140516002

# EXHIBIT C

INDEMNITY TO:

| | |
|---|---|
| **AMERICAN CASUALTY CO. OF READING, PA**<br>**ATLANTIC SPECIALTY INSURANCE COMPANY**<br>**MASSACHUSETTS BAY INSURANCE CO**<br>**NATIONALWIDE MUTUAL INS. CO.**<br>**RLI INSURANCE COMPANY**<br>**WESTCHESTER FIRE INSURANCE COMPANY** | **ARGONAUT INSURANCE COMPANY**<br>**FEDERAL INSURANCE COMPANY**<br>**NATIONAL CASUALTY COMPANY**<br>**PHILADELPHIA INDEMNITY INSURANCE CO.**<br>**TRAVELERS CASUALTY AND SURETY COMPANY**<br>**WESTERN SURETY COMPANY** |

By **Dream II Holdings, LLC** . Address **6501 CONGRESS AVE, # 300, BOCA RATON 33487 FL**

on behalf of **Dream II Holdings, LLC** , Address **6501 CONGRESS AVE, # 300, BOCA RATON 33487 FL**

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ day of _____ JULY _____ 20 15

| WITNESS | SIGNATURE OF INDEMNITOR |
|---|---|
| (This form is to be notarized or signed by two witnesses) | Dream II Holdings, LLC |
| Signature: | Signature: |
| Name: Dena Fisher | Name: JAMES ALLEN |
| Signature: | Corporate Title: CFO |

Affix
Corp
Seal

Name:

NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

140516002

# EXHIBIT D

INDEMNITY TO:

| | |
|---|---|
| AMERICAN CASUALTY CO. OF READING, PA<br>ASPEN AMERICAN INSURANCE COMPANY<br>CONTINENTAL CASUALTY COMPANY<br>PHILADELPHIA INDEMNITY INSURANCE CO.<br>TRAVELERS CASUALTY AND SURETY COMPANY<br>WESTERN SURETY COMPANY | ARGONAUT INSURANCE COMPANY<br>ATLANTIC SPECIALTY INSURANCE COMPANY<br>FEDERAL INSURANCE COMPANY<br>RLI INSURANCE COMPANY<br>WESTCHESTER FIRE INSURANCE COMPANY |

By  Hollander Home Fashions Holdings, LLC  , Address 6501 Congress Avenue, Suite 300
Boca Raton, FL 33487

on behalf of  Hollander Sleep Products, LLC  , Address 6501m Congress Avenue, Suite 300
Boca Raton, FL 33487

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this  21  day of  May  20 14

| WITNESS | SIGNATURE(S) OF INDEMNITOR(S)<br>Hollander Home Fashions Holdings, LLC | Affix<br>Corp<br>Seal |
|---|---|---|
| | | (L.S.) |
| | Viral Gandhi | (L.S.) |
| | Vice President of Finance | (L.S.) |

NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

(This form is to be notarized or signed by two witnesses)

X Dena Fisher 5/21/14

140516002

# EXHIBIT G

Debtor: Dream 11 Holdings, LLC.

UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

Case Number: 19-11607

> **FILED**
>
> Claim No. 22
>
> **July 26, 2019**
>
> By Omni Claims Agent
> For U.S. Bankruptcy Court
> Southern District of New York

**Official Form 410**

## Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

Carefully read instructions included with this Proof of Claim before completing.

| **Part 1:** | **Identify the Claim** |
| --- | --- |

**1. Who is the current creditor?**

Argonaut Insurance Company
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No
[ ] Yes    From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Law Office of Michael W. Starr, LLC

1 Mill Ridge Lane

Suite 206

Chester, NJ 07930

Where should payments to the creditor be sent? (if different)

Contact Phone   9088882513        Contact Phone _____

Contact email   mstarr@michaelstarrlaw.com        Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one) _____

**4. Does this claim amend one already filed?**

[X] No
[ ] Yes    Claim Number on court claims registry (if known) _____    Filed On _____
                                                                              MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No
[ ] Yes    Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |

**6.** **Do you have any number you use to identify the debtor?**
☒ No
☐ Yes   Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7.** **How much is the claim?**   $  $7,800,000.00

**Does this amount include interest or other charges?**
☒ No
☐ Yes   Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information

Claimant was surety on U.S. Customs Bond

**9.** **Is all or part of the claim secured?**
☒ No
☐ Yes   The claim is secured by a lien on property

**Nature of property:**
☐ Real Estate   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*
☐ Motor Vehicle
☐ Other   Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.

**Value of Property:**   $ _____
**Amount of the claim that is secured:**   $ _____
**Amount of the claim that is unsecured:**   $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7).

**Amount necessary to cure any default as of the date of the petition:**   $ _____

**Annual Interest Rate:**   (when case was filed) _____%
☒ Fixed
☐ Variable

**10.** **Is this claim based on a lease?**
☒ No
☐ Yes   **Amount necessary to cure any default as of the date of the petition.**   $ _____

**11.** **Is this claim subject to a right of setoff?**
☒ No
☐ Yes   Identify the property: _____

**12.** **Is this claim for the value of goods received by the debtor within 20 days before the commencement date of this case (11 U.S.C. § 503(b)(9)).?**
☒ No
☐ Yes   Amount of 503(b)(9) Claim: $ _____

Case 1:20-cv-10434 Document 1-1 Filed 12/10/20 Page 54 of 208

**13. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☐ No
☒ Yes    *Check all that apply*

| | Amount entitled to priority |
|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$ _____

☐ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5).

$ _____

☒ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.

$ _____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it.**

**FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am the guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    7/26/2019
                     MM / DD / YYYY

Christopher C. Flagg
Signature

**Print the name of the person who is completing and signing this claim:**

Name    Christopher C. Flagg
         First Name          Middle Name          Last Name

Title    Attorney-in-Fact for Argonaut Insurance Company

Company  
         Identify the corporate servicer as the company if the authorized agent is a servicer.
         6 Mill Ridge Lane

Address  
         Chester, NJ 07930

Contact Phone  9088882513    Email    chrisflagg@cashea.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | **Chapter 11** |
| | : | |
| **In re:** | : | **Case No. 19-11608** |
| | : | **(Hollander Sleep Products, LLC)** |
| **HOLLANDER SLEEP PRODUCTS, LLC,** | : | |
| ***et al.*,** | : | **Case No 19-11607** |
| | : | **(Dream II Holdings, LLC)** |
| **Debtors.** | : | |
| | : | **Case No. 19-11609** |
| | : | **(Hollander Home Fashions Holdings, LLC)** |
| | : | |

**ATTACHMENT TO PROOF OF CLAIM ON**
**BEHALF OF ARGONAUT INSURANCE COMPANY**

1.    Prior to the commencement of the above-captioned Chapter 11 case, Argonaut Insurance Company ("Argonaut") issued U.S. Customs Bond Nos. 9914L2864 and 9914L2875 (together, the "Bonds") to Debtor Hollander Sleep Products, LLC ("Hollander Sleep"). True and accurate copies of the Bonds are attached as **Exhibit A**.

2.    In the event that Hollander Sleep fails to make payments to U.S. Customs and Border Protection ("CBP") covered by the Bonds, Argonaut is required to make such payments on behalf of Hollander Sleep to the CBP subject to the terms of the Bonds.

3.    The Bonds were initially issued on June 17, 2014 and renewed annually for one-year periods thereafter through June 16, 2018.

4.    The Bonds were terminated on June 16, 2018.

5.    Bond No. 9914L2864 requires Argonaut to pay up to Fifty Thousand Dollars ($50,000.00) that may become due subject to the terms of the Bond in any one-year period. Argonaut's potential and future liability under Bond No. 9914L2864 is

1

cumulative so that its total potential and future liability is Fifty Thousand Dollars ($50,000.00) multiplied by the number of years that Bond 9914L2864 was in effect.

6. Bond No. 9914L2875 requires Argonaut to pay up to One Million and Nine Hundred Thousand Dollars ($1,900,000.00) that may become due subject to the terms of the Bond in any one-year period. Argonaut's potential and future liability under Bond No. 9914L2875 is cumulative so that its total potential and future liability is One Million and Nine Hundred Thousand Dollars ($1,900,000.00) multiplied by the number of years that Bond No. 9914L2875 was in effect.

7. Argonaut's total potential and future liability under the Bonds is Seven Million and Eight Hundred Thousand Dollars ($7,800,000.00).

8. In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Hollander Sleep is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest. A true and accurate copy of the Indemnity Agreement requiring Hollander Sleep to make such payments to Argonaut is attached as **Exhibit B**.

9. In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Dream II Holdings, LLC ("Dream II") is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest. A true and accurate copy of the Indemnity Agreement requiring Dream II to make such payments to Argonaut is attached as **Exhibit C**.

10. In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Hollander Hope Fashions Holdings, LLC ("Hollander Hope") is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees

and interest. A true and accurate copy of the Indemnity Agreement requiring Hollander Hope to make such payments to Argonaut is attached as **Exhibit D**.

11. As of July 25, 2019, the CBP has made demands for liquidated damages in the amount of Thirty-Eight Thousand, Nine Hundred and Forty-Seven Dollars and 65/100 ($38,947.65), which has been mitigated to Four Hundred and Forty-Eight Dollars and 86/100 ($448.86). Argonaut will be obligated to and will pay this amount on behalf of Hollander Sleep. As a result, this amount is due and owing from Hollander Sleep, Dream II and Hollander Hope to Argonaut pursuant to the terms of the Indemnity Agreements.

12. In addition to the demands received to date, there may be additional entries and/or other obligations owed by Hollander Sleep to the CBP and covered by the Bonds that are not known or certain at this time. Argonaut's total potential and contingent liability under the Bonds is Seven Million and Eight Hundred Thousand Dollars ($7,800,000.00). In the event that any payments are made by Argonaut to the CBP under the Bonds, Hollander Sleep, Dream II and Hollander Hope are required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest.

13. No judgment has been rendered on this claim.

14. This claim is not subject to any setoff or counterclaim.

15. No security interest is held for this claim.

16. The amount of all payments on this claim, if any, has been credited and deducted for the purpose of making this Proof of Claim.

17. This claim may be, in whole or part, a priority claim pursuant to section 503 and/or 507 of Title 11 of the United States Bankruptcy Code, depending on the events which give rise to claims under the Bond.

18.    Argonaut reserves the right to amend this Proof of Claim from time to time to the extent that there is any further liquidation of this claim, and for any other lawful or permitted purpose.

19.    The filing of this Proof of Claim is not intended as, and shall not be construed as, (i) an admission of liability or waiver of any defense by Argonaut with respect to the Bonds or Indemnity Agreements; (ii) a waiver or release by Argonaut of any right of exoneration and/or other right it may have against Hollander Sleep, Dream II and/or Hollander Hope; and/or (iii) a waiver or release by Argonaut of its right to be subrogated to the rights of any party pursuant to the terms of the Bonds and/or applicable law.

20.    All notices and communications regarding this Proof of Claim shall be addressed to the Law Office of Michael W. Starr, 1 Mill Ridge Lane, Suite 206, Chester, New Jersey 07930.

/s/ Christopher C. Flagg

DATED: July 26, 2019

Christopher C. Flagg, Attorney-in Fact for Argonaut Insurance Company

4

Case 1:20-cv-10434   Document 1-1   Filed 12/10/20   Page 59 of 208

# EXHIBIT A

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB No. 1651-0050 Exp. 03/31/2014

**CUSTOMS BOND**

19 CFR Part 113

| CBP USE ONLY | BOND NUMBER (Assigned by CBP) |
|---|---|
| | **9914L2864** |

Broker Filer Code: **WY8**    Surety Reference Number: ███**003/SUR**███**88**

| In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below name principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below. | Execution Date 05/29/2014 |
|---|---|

**SECTION I** – Select Single Transaction OR Continuous Bond (not both) and fill in the applicable blank spaces.

| ☐ SINGLE TRANSACTION BOND | Identification of transaction secured by this bond (e.g., entry number, seizure number, etc.) XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | Transaction Date XXXXXXXXXXXXX | Port Code |
|---|---|---|---|
| ☒ CONTINUOUS BOND | Effective Date 06/17/2014 | This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated. This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period. The intention to terminate this bond must be conveyed within the period and manner prescribed in the CBP Regulations. | |

**SECTION II** – This bond includes the following agreements. Check one box only. (Except 3a may be checked independently or with 3.)

| Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability | Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability |
|---|---|---|---|---|---|
| ☐ 1 | Importer or broker .................§113.62 | XXXXXXXXXXXX | ☐ 8 | Detention of Copyrighted Material ..............................................§113.70 -Single Transaction Only- | XXXXXXXXXXXX |
| ☒ 1a | Drawback Payments Refunds .........§113.65 | 50,000.00 | ☐ 9 | Neutrality ............................§113.71 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 2 | Custodian of Bonded Merchandise §113.63 (includes bonded carriers, freight forwarders, cartmen and lightermen, all classes of warehouse, container station operators) -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 10 | Court Costs for Condemned Goods ..............................................§113.72 -Single Transaction Only- | XXXXXXXXXXXX |
| ☐ 3 | International Carrier..................§113.64 | XXXXXXXXXXXX | ☐ 11 | Airport Security Bond......Part 113 App A | XXXXXXXXXXXX |
| ☐ 3a | Instruments of International Traffic... §113.66 -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 12 | International Trade Commission (ITC) Exclusion Bond.............Part 113 App B | XXXXXXXXXXXX |
| ☐ 4 | Foreign Trade Zone....................§113.73 -Continuous Bond Only- | XXXXXXXXXXXX | ☐ 14 | In-Bond Export Consolidation Bond | XXXXXXXXXXXX |
| ☐ 5 | Public Gauger.........................§113.67 | XXXXXXXXXXXX | ☐ 15 | Intellectual Property Rights (IPR) | XXXXXXXXXXXX |
| ☐ 6 | Wool & Fur Products...................§113.68 Labeling Acts Importation -Single Transaction Only- | XXXXXXXXXXXX | ☐ 16 | Importer Security Filing (ISF) ..............................Part 113 App D | XXXXXXXXXXXX |
| ☐ 7 | Bill of Lading.........................§113.69 -Single Transaction Only- | XXXXXXXXXXXX | ☐ 17 | Marine Terminal Operator -Continuous Bond Only- | XXXXXXXXXXXX |

**PRINCIPAL**

| *Name and Physical Address (including legal description and state of incorporation)* Hollander Sleep Products, LLC 6501 Congress Avenue Suite 300 Boca Raton, FL 33487 (FL Corporation) | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 ▶ CBP Identification Number: 27-███████00 Signature [signature] Viral Gandhi Vice President of Finance | AFFIX SEAL or Check Box ☒ Check Box |
|---|---|---|

| Principal and surety agree that any charge against the bond under any of the listed names is as though it was made by the principal(s). Principal and surety agree that they are bound to the same extent as if they executed a separate bond covering each set of conditions incorporated by reference into this bond. If the surety fails to appoint an agent under Title 31, United States Code, Section 9306, surety consents to service on the Clerk of any United States District Court or the U.S. Court of International Trade, where suit is brought on this bond. That clerk is to send notice of the service to the surety at: ▶ | Mailing Address Requested by the Surety 6 Mill Ridge Lane Chester, NJ 07930 |
|---|---|

**SURETY**

| *Name and Physical Address (including legal description and state of incorporation)* Argonaut Insurance Company 225 West Washington 6th Floor Chicago, IL 60606 (IL Corporation) | Surety Number 110 Signature [signature] Kevin J. Daily, Atty-in-Fact | Agent ID Number ███████06 | [SEAL] ☐ Check Box |
|---|---|---|---|

Page 1 of 2    CBP Form 301 (06/11)

Broker Filer Code: **WY8**                    Surety Reference Number: ▓▓▓▓▓002/SUR▓▓▓▓▓8

| Principal Name: **Hollander Sleep Products, LLC** | CBP Identification Number: 27-▓▓▓▓▓▓00 | **AFFIX SEAL**<br>or<br>**Check Box**<br>By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 |
|---|---|---|

**CO-PRINCIPAL**

| Name and Physical Address (including legal description and state of incorporation) | CBP Identification Number:<br><br>N/A | |
|---|---|---|
| N/A | Signature<br><br>N/A | N/A |
| | | ☐ Check Box |

---

**SECTION III** – List below the complete name of all trade names or unincorporated divisions that will be permitted to obligate this bond in the principal's name including their CBP Identification Number(s).

| CBP Identification Number | Name | CBP Identification Number | Name |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | Total Number of Importer Names listed in Section III:  00 | |

**CO-SURETY**

| Name and Physical Address (including legal description and state of incorporation) | Surety Number<br>N/A | Agent ID Number<br>N/A | |
|---|---|---|---|
| N/A | Signature<br>N/A | | N/A |
| | | | ☐ Check Box |

Page 2 of 2   CBP Form 301 (06/11)

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB No. 1651-0050 Exp. 03/31/2014

**CUSTOMS BOND**

19 CFR Part 113

| CBP USE ONLY | BOND NUMBER (Assigned by CBP) |
|---|---|
| | **9914L2875** |

Broker Filer Code: **WY8**          Surety Reference Number: 14___/SUR_____

In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below name principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below.

Execution Date: 05/29/2014

**SECTION I –** Select Single Transaction OR Continuous Bond (not both) and fill in the applicable blank spaces.

| ☐ SINGLE TRANSACTION BOND | Identification of transaction secured by this bond (e.g., entry number, seizure number, etc.) XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | Transaction Date XXXXXXXXXXXX | Port Code |
|---|---|---|---|

| ☒ CONTINUOUS BOND | Effective Date 06/17/2014 | This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated. This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period. The intention to terminate this bond must be conveyed within the period and manner prescribed in the CBP Regulations. |
|---|---|---|

**SECTION II –** This bond includes the following agreements. Check one box only. (Except 3a may be checked independently or with 3.)

| Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability | Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability |
|---|---|---|---|---|---|
| ☒ 1 | Importer or broker ....................§113.62 | 1,900,000.00 | ☐ 8 | Detention of Copyrighted Material ....................§113.70 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 1a | Drawback Payments Refunds ........§113.65 | XXXXXXXXXXX | ☐ 9 | Neutrality .............................§113.71 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 2 | Custodian of Bonded Merchandise §113.63 (Includes bonded carriers, freight forwarders, cartmen and lightermen, all classes of warehouse, container station operators) -Continuous Bond Only- | XXXXXXXXXXX | ☐ 10 | Court Costs for Condemned Goods ....................§113.72 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 3 | International Carrier........................§113.64 | XXXXXXXXXXX | ☐ 11 | Airport Security Bond......Part 113 App A | XXXXXXXXXXX |
| ☐ 3a | Instruments of International Traffic... §113.66 -Continuous Bond Only- | XXXXXXXXXXX | ☐ 12 | International Trade Commission (ITC) Exclusion Bond.............Part 113 App B | XXXXXXXXXXX |
| ☐ 4 | Foreign Trade Zone.......................§113.73 -Continuous Bond Only- | XXXXXXXXXXX | ☐ 14 | In-Bond Export Consolidation Bond | XXXXXXXXXXX |
| ☐ 5 | Public Gauger.............................§113.67 | XXXXXXXXXXX | ☐ 15 | Intellectual Property Rights (IPR) | XXXXXXXXXXX |
| ☐ 6 | Wool & Fur Products...................§113.68 Labeling Acts Importation -Single Transaction Only- | XXXXXXXXXXX | ☐ 16 | Importer Security Filing (ISF) ....................Part 113 App D | XXXXXXXXXXX |
| ☐ 7 | Bill of Lading............................§113.69 -Single Transaction Only- | XXXXXXXXXXX | ☐ 17 | Marine Terminal Operator -Continuous Bond Only- | XXXXXXXXXXX |

**PRINCIPAL**

By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 ▶

AFFIX SEAL or Check Box

Name and Physical Address (including legal description and state of incorporation)
Hollander Sleep Products, LLC
6501 Congress Avenue
Suite 300
Boca Raton, FL 33487
(FL Corporation)

CBP Identification Number:
27-_____0
Signature

Viral Gandhi
Vice President of Finance   ☒ Check Box

Principal and surety agree that any charge against the bond under any of the listed names is as though it was made by the principal(s). Principal and surety agree that they are bound to the same extent as if they executed a separate bond covering each set of conditions incorporated by reference to the CBP regulations into this bond. If the surety fails to appoint an agent under Title 31, United States Code, Section 9306, surety consents to service on the Clerk of any United States District Court or the U.S. Court of International Trade, where suit is brought on this bond. That clerk is to send notice of the service to the surety at: ▶

Mailing Address Requested by the Surety
6 Mill Ridge Lane
Chester, NJ 07930

**SURETY**

| Name and Physical Address (including legal description and state of incorporation) Argonaut Insurance Company 225 West Washington 6th Floor Chicago, IL 60606 (IL Corporation) | Surety Number 110 Signature | Agent ID Number WY1 OR 14906 Kevin J. Daily, Atty-in-Fact |
|---|---|---|

ARGONAUT INSURANCE CORPORATE SEAL ILLINOIS

☐ Check Box

Broker Filer Code: **WY8**  Surety Reference Number: 14█████/SUR█████7

Principal Name: <u>**Hollander Sleep Products,**</u> CBP Identification Number: 27-█████00
<u>**LLC**</u>

| | | **AFFIX SEAL** or **Check Box** |
| --- | --- | --- |

By checking the box you agree that you have a seal in accordance with 19 CFR 113.25

**CO-PRINCIPAL**

| Name and Physical Address (including legal description and state of incorporation) | CBP Identification Number: | |
| --- | --- | --- |
| | N/A | |
| | Signature | |
| N/A | N/A | N/A |
| | | ☐ Check Box |

---

**SECTION III –** List below the complete name of all trade names or unincorporated divisions that will be permitted to obligate this bond in the principal's name including their CBP Identification Number(s).

| CBP Identification Number | Name | CBP Identification Number | Name |
| --- | --- | --- | --- |
| N/A | N/A | N/A | N/A |
| | | Total Number of Importer Names listed in Section III: 00 | |

**CO-SURETY**

| Name and Physical Address (including legal description and state of incorporation) | Surety Number | Agent ID Number | |
| --- | --- | --- | --- |
| | N/A | N/A | |
| | Signature | | |
| N/A | N/A | | N/A |
| | | | ☐ Check Box |

Page 2 of 2   CBP Form 301 (06/11)

# EXHIBIT B

INDEMNITY TO:

| | |
|---|---|
| AMERICAN CASUALTY CO. OF READING, PA<br>ASPEN AMERICAN INSURANCE COMPANY<br>CONTINENTAL CASUALTY COMPANY<br>PHILADELPHIA INDEMNITY INSURANCE CO.<br>TRAVELERS CASUALTY AND SURETY COMPANY<br>WESTERN SURETY COMPANY | ARGONAUT INSURANCE COMPANY<br>ATLANTIC SPECIALTY INSURANCE COMPANY<br>FEDERAL INSURANCE COMPANY<br>RLI INSURANCE COMPANY<br>WESTCHESTER FIRE INSURANCE COMPANY |

By __Hollander Sleep Products, LLC__ , Address __6501 Congress Avenue, Suite 300__

__Boca Raton, FL 33487__

on behalf of __Hollander Sleep Products, LLC__ , Address __6501 Congress Avenue, Suite 300__

__Boca Raton, FL 33487__

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ 21 _____ day of _____ May _____ 20 14

| WITNESS | SIGNATURE(S) OF INDEMNITOR(S) | Affix Corp Seal |
|---|---|---|
| | Hollander Sleep Products, LLC | (L.S.) |
| _____ | Viral Gandhi | (L.S.) |
| _____ | Vice President of Finance | (L.S.) |

*(This form is to be notarized or signed by two witnesses)*

NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

Dena Fisher 5/21/14

140516002

# EXHIBIT C

INDEMNITY TO:

| **AMERICAN CASUALTY CO. OF READING, PA** | **ARGONAUT INSURANCE COMPANY** |
|---|---|

**AMERICAN CASUALTY CO. OF READING, PA**
**ATLANTIC SPECIALTY INSURANCE COMPANY**
**MASSACHUSETTS BAY INSURANCE CO**
**NATIONALWIDE MUTUAL INS. CO.**
**RLI INSURANCE COMPANY**
**WESTCHESTER FIRE INSURANCE COMPANY**

**ARGONAUT INSURANCE COMPANY**
**FEDERAL INSURANCE COMPANY**
**NATIONAL CASUALTY COMPANY**
**PHILADELPHIA INDEMNITY INSURANCE CO.**
**TRAVELERS CASUALTY AND SURETY COMPANY**
**WESTERN SURETY COMPANY**

By **Dream II Holdings, LLC**          . Address **6501 CONGRESS AVE, # 300, BOCA RATON 33487 FL**

on behalf of **Dream II Holdings, LLC**          , Address **6501 CONGRESS AVE, # 300, BOCA RATON 33487 FL**

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ day of __JULY__ 20 _15_

WITNESS                                        SIGNATURE OF INDEMNITOR

*(This form is to be notarized or signed by two witnesses)*          Dream II Holdings, LLC

Signature: _____                              Signature: _____          Affix Corp Seal
Name: _Dena Fisher_                            Name: _JAMES ALLEN_
Signature: _____                              Corporate Title: _CFO_

Name: NOTARY PUBLIC-STATE OF FLORIDA                                    140516002
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

# EXHIBIT D

INDEMNITY TO:

| AMERICAN CASUALTY CO. OF READING, PA | ARGONAUT INSURANCE COMPANY |
|---|---|
| ASPEN AMERICAN INSURANCE COMPANY | ATLANTIC SPECIALTY INSURANCE COMPANY |
| CONTINENTAL CASUALTY COMPANY | FEDERAL INSURANCE COMPANY |
| PHILADELPHIA INDEMNITY INSURANCE CO. | RLI INSURANCE COMPANY |
| TRAVELERS CASUALTY AND SURETY COMPANY | WESTCHESTER FIRE INSURANCE COMPANY |
| WESTERN SURETY COMPANY | |

By  Hollander Home Fashions Holdings, LLC        . Address  6501 Congress Avenue, Suite 300

Boca Raton, FL 33487

on behalf of  Hollander Sleep Products, LLC      , Address  6501m Congress Avenue, Suite 300

Boca Raton, FL 33487

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this ____21____ day of ____May____ 20_14_

| WITNESS | SIGNATURE(S) OF INDEMNITOR(S) | Affix Corp Seal |
|---|---|---|
| | Hollander Home Fashions Holdings, LLC | (L.S.) |
| _____ | Viral Gandhi | (L.S.) |
| _____ | Vice President of Finance | (L.S.) |

*(This form is to be notarized or signed by two witnesses)*

NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

Dena Fisher  5/21/14

140316002

# EXHIBIT H

Debtor: Hollander Home Fashions Holdings, LLC.

UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

Case Number: 19-11609

**FILED**

Claim No. 19

**July 26, 2019**

By Omni Claims Agent

For U.S. Bankruptcy Court

Southern District of New York

Official Form 410

**Proof of Claim**

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

Carefully read instructions included with this Proof of Claim before completing.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Argonaut Insurance Company

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No
[ ] Yes    From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Law Office of Michael W. Starr, LLC

1 Mill Ridge Lane

Suite 206

Chester, NJ 07930

Where should payments to the creditor be sent? (if different)

Contact Phone   9088882513

Contact email   mstarr@michaelstarrlaw.com

Contact Phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one)

_____

**4. Does this claim amend one already filed?**

[X] No
[ ] Yes    Claim Number on court claims registry (if known) _____    Filed On _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No
[ ] Yes    Who made the earlier filing? _____

Official Form 410                          **Proof of Claim**

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

[X] No

[ ] Yes    Last 4 digits of the debtor's account or any number you use to identify the debtor:    _____

**7. How much is the claim?**    $ _____$7,800,000.00_____    **Does this amount include interest or other charges?**

[X] No

[ ] Yes    Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information

Claimant was surety on U.S. Customs Bond

**9. Is all or part of the claim secured?**

[X] No

[ ] Yes    The claim is secured by a lien on property

**Nature of property:**

[ ] Real Estate    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*

[ ] Motor Vehicle

[ ] Other    Describe:    _____

**Basis for perfection:**    _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.

**Value of Property:**    $ _____

**Amount of the claim that is secured:**    $ _____

**Amount of the claim that is unsecured:**    $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7).

**Amount necessary to cure any default as of the date of the petition:**    $ _____

**Annual Interest Rate:**    (when case was filed)    _____%

[X] Fixed

[ ] Variable

**10. Is this claim based on a lease?**

[X] No

[ ] Yes    **Amount necessary to cure any default as of the date of the petition.**    $ _____

**11. Is this claim subject to a right of setoff?**

[X] No

[ ] Yes    Identify the property:    _____

**12. Is this claim for the value of goods received by the debtor within 20 days before the commencement date of this case (11 U.S.C. § 503(b)(9)).?**

[X] No

[ ] Yes    Amount of 503(b)(9) Claim:    $ _____

Official Form 410                    **Proof of Claim**

**13. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☒ Yes    *Check all that apply*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it.**

**FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am the guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  7/26/2019
                  MM / DD / YYYY

Christopher C. Flagg
_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name    Christopher C. Flagg
        First Name        Middle Name        Last Name

Title    Attorney-in-Fact for Argonaut Insurance Company

Company
        Identify the corporate servicer as the company if the authorized agent is a servicer.
        6 Mill Ridge Lane

Address

        Chester, NJ 07930

Contact Phone  9088882513        Email    chrisflagg@cashea.com

Official Form 410                **Proof of Claim**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | **Chapter 11** |
|  | **Case No. 19-11608** |
| **HOLLANDER SLEEP PRODUCTS, LLC,** | **(Hollander Sleep Products, LLC)** |
| *et al.,* | **Case No 19-11607** |
|  | **(Dream II Holdings, LLC)** |
| **Debtors.** | **Case No. 19-11609** |
|  | **(Hollander Home Fashions Holdings, LLC)** |

## ATTACHMENT TO PROOF OF CLAIM ON
## BEHALF OF ARGONAUT INSURANCE COMPANY

1.   Prior to the commencement of the above-captioned Chapter 11 case, Argonaut Insurance Company ("Argonaut") issued U.S. Customs Bond Nos. 9914L2864 and 9914L2875 (together, the "Bonds") to Debtor Hollander Sleep Products, LLC ("Hollander Sleep"). True and accurate copies of the Bonds are attached as **Exhibit A**.

2.   In the event that Hollander Sleep fails to make payments to U.S. Customs and Border Protection ("CBP") covered by the Bonds, Argonaut is required to make such payments on behalf of Hollander Sleep to the CBP subject to the terms of the Bonds.

3.   The Bonds were initially issued on June 17, 2014 and renewed annually for one-year periods thereafter through June 16, 2018.

4.   The Bonds were terminated on June 16, 2018.

5.   Bond No. 9914L2864 requires Argonaut to pay up to Fifty Thousand Dollars ($50,000.00) that may become due subject to the terms of the Bond in any one-year period. Argonaut's potential and future liability under Bond No. 9914L2864 is

1

cumulative so that its total potential and future liability is Fifty Thousand Dollars ($50,000.00) multiplied by the number of years that Bond 9914L2864 was in effect.

6.      Bond No. 9914L2875 requires Argonaut to pay up to One Million and Nine Hundred Thousand Dollars ($1,900,000.00) that may become due subject to the terms of the Bond in any one-year period. Argonaut's potential and future liability under Bond No. 9914L2875 is cumulative so that its total potential and future liability is One Million and Nine Hundred Thousand Dollars ($1,900,000.00) multiplied by the number of years that Bond No. 9914L2875 was in effect.

7.      Argonaut's total potential and future liability under the Bonds is Seven Million and Eight Hundred Thousand Dollars ($7,800,000.00).

8.      In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Hollander Sleep is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest. A true and accurate copy of the Indemnity Agreement requiring Hollander Sleep to make such payments to Argonaut is attached as **Exhibit B**.

9.      In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Dream II Holdings, LLC ("Dream II") is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest. A true and accurate copy of the Indemnity Agreement requiring Dream II to make such payments to Argonaut is attached as **Exhibit C**.

10.     In the event that Argonaut makes payments to the CBP on behalf of Hollander Sleep, Hollander Home Fashions Holdings, LLC ("Hollander Home") is required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees

2

and interest. A true and accurate copy of the Indemnity Agreement requiring Hollander Home to make such payments to Argonaut is attached as **Exhibit D**.

11.     As of July 25, 2019, the CBP has made demands for liquidated damages in the amount of Thirty-Eight Thousand, Nine Hundred and Forty-Seven Dollars and 65/100 ($38,947.65), which has been mitigated to Four Hundred and Forty-Eight Dollars and 86/100 ($448.86). Argonaut will be obligated to and will pay this amount on behalf of Hollander Sleep. As a result, this amount is due and owing from Hollander Sleep, Dream II and Hollander Hope to Argonaut pursuant to the terms of the Indemnity Agreements.

12.     In addition to the demands received to date, there may be additional entries and/or other obligations owed by Hollander Sleep to the CBP and covered by the Bonds that are not known or certain at this time. Argonaut's total potential and contingent liability under the Bonds is Seven Million and Eight Hundred Thousand Dollars ($7,800,000.00). In the event that any payments are made by Argonaut to the CBP under the Bonds, Hollander Sleep, Dream II and Hollander Home are required to indemnify and pay Argonaut for all such payments, plus costs, attorneys' fees and interest.

13.     No judgment has been rendered on this claim.

14.     This claim is not subject to any setoff or counterclaim.

15.     No security interest is held for this claim.

16.     The amount of all payments on this claim, if any, has been credited and deducted for the purpose of making this Proof of Claim.

17.     This claim may be, in whole or part, a priority claim pursuant to section 503 and/or 507 of Title 11 of the United States Bankruptcy Code, depending on the events which give rise to claims under the Bond.

3

18.    Argonaut reserves the right to amend this Proof of Claim from time to time to the extent that there is any further liquidation of this claim, and for any other lawful or permitted purpose.

19.    The filing of this Proof of Claim is not intended as, and shall not be construed as, (i) an admission of liability or waiver of any defense by Argonaut with respect to the Bonds or Indemnity Agreements; (ii) a waiver or release by Argonaut of any right of exoneration and/or other right it may have against Hollander Sleep, Dream II and/or Hollander Home; and/or (iii) a waiver or release by Argonaut of its right to be subrogated to the rights of any party pursuant to the terms of the Bonds and/or applicable law.

20.    All notices and communications regarding this Proof of Claim shall be addressed to the Law Office of Michael W. Starr, 1 Mill Ridge Lane, Suite 206, Chester, New Jersey 07930.

/s/ Christopher C. Flagg

DATED: July 26, 2019                    Christopher C. Flagg, Attorney-in Fact for
                                        Argonaut Insurance Company

4

# EXHIBIT A

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB No. 1651-0050 Exp. 03/31/2014

## CUSTOMS BOND
19 CFR Part 113

| CBP USE ONLY | BOND NUMBER (Assigned by CBP) |
|---|---|
| | 9914L2864 |

Broker Filer Code: WY8    Surety Reference Number: ████003/SUR████88

| In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below name principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below. | Execution Date 05/29/2014 |
|---|---|

**SECTION I** – Select Single Transaction OR Continuous Bond (not both) and fill in the applicable blank spaces.

| ☐ SINGLE TRANSACTION BOND | Identification of transaction secured by this bond (e.g., entry number, seizure number, etc.) XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | Transaction Date XXXXXXXXXXXX | Port Code |
|---|---|---|---|

| ☒ CONTINUOUS BOND | Effective Date 06/17/2014 | This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated. This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period. The intention to terminate this bond must be conveyed within the period and manner prescribed in the CBP Regulations. |
|---|---|---|

**SECTION II** – This bond includes the following agreements. Check one box only. (Except 3a may be checked independently or with 3.)

| Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability | Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability |
|---|---|---|---|---|---|
| ☐ 1 | Importer or broker ........................§113.62 | XXXXXXXXXXX | ☐ 8 | Detention of Copyrighted Material ........................§113.70 *-Single Transaction Only-* | XXXXXXXXXXX |
| ☒ 1a | Drawback Payments Refunds ........§113.65 | 50,000.00 | ☐ 9 | Neutrality ........................§113.71 *-Single Transaction Only-* | XXXXXXXXXXX |
| ☐ 2 | Custodian of Bonded Merchandise §113.63 (Includes bonded carriers, freight forwarders, cartmen and lightermen, all classes of warehouse, container station operators) *-Continuous Bond Only-* | XXXXXXXXXXX | ☐ 10 | Court Costs for Condemned Goods ........................§113.72 *-Single Transaction Only-* | XXXXXXXXXXX |
| ☐ 3 | International Carrier........................§113.64 | XXXXXXXXXXX | ☐ 11 | Airport Security Bond........Part 113 App A | XXXXXXXXXXX |
| ☐ 3a | Instruments of International Traffic... §113.66 *-Continuous Bond Only-* | XXXXXXXXXXX | ☐ 12 | International Trade Commission (ITC) Exclusion Bond.............Part 113 App B | XXXXXXXXXXX |
| ☐ 4 | Foreign Trade Zone....................§113.73 *-Continuous Bond Only-* | XXXXXXXXXXX | ☐ 14 | In-Bond Export Consolidation Bond | XXXXXXXXXXX |
| ☐ 5 | Public Gauger.............................§113.67 | XXXXXXXXXXX | ☐ 15 | Intellectual Property Rights (IPR) | XXXXXXXXXXX |
| ☐ 6 | Wool & Fur Products....................§113.68 Labeling Acts Importation *-Single Transaction Only-* | XXXXXXXXXXX | ☐ 16 | Importer Security Filing (ISF) ........................Part 113 App D | XXXXXXXXXXX |
| ☐ 7 | Bill of Lading.............................§113.69 *-Single Transaction Only-* | XXXXXXXXXXX | ☐ 17 | Marine Terminal Operator *-Continuous Bond Only-* | XXXXXXXXXXX |

| **PRINCIPAL** | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 ▶ | AFFIX SEAL **or** Check Box |
|---|---|---|
| *Name and Physical Address (including legal description and state of incorporation)* Hollander Sleep Products, LLC 6501 Congress Avenue Suite 300 Boca Raton, FL 33487 (FL Corporation) | CBP Identification Number: 27-█████00 Signature *[signature]* Viral Gandhi Vice President of Finance | ☒ Check Box |

| Principal and surety agree that any charge against the bond under any of the listed names is as though it was made by the principal(s). Principal and surety agree that they are bound to the same extent as if they executed a separate bond covering each set of conditions incorporated by reference to the CBP regulations into this bond. If the surety fails to appoint an agent under Title 31, United States Code, Section 9306, surety consents to service on the Clerk of any United States District Court or the U.S. Court of International Trade, where suit is brought on this bond. That clerk is to send notice of the service to the surety at: ▶ | Mailing Address Requested by the Surety 6 Mill Ridge Lane Chester, NJ 07930 |
|---|---|

| **SURETY** | | | |
|---|---|---|---|
| *Name and Physical Address (including legal description and state of incorporation)* Argonaut Insurance Company 225 West Washington 6th Floor Chicago, IL 60606 (IL Corporation) | Surety Number 110 Signature *[signature]* Kevin J. Daily, Atty-in-Fact | Agent ID Number ████████06 | *[SEAL]* ☐ Check Box |

Page 1 of 2    CBP Form 301 (06/11)

Broker Filer Code: **WY8**     Surety Reference Number: ▓002/SUR▓▓

Principal Name: **Hollander Sleep Products, LLC**     CBP Identification Number: 27-▓00

| | | **AFFIX SEAL** or **Check Box** |
|---|---|---|
| | | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 |

**CO-PRINCIPAL**

| Name and Physical Address (including legal description and state of incorporation) | CBP Identification Number: N/A | |
|---|---|---|
| | Signature | |
| N/A | N/A | N/A |
| | | ☐ Check Box |

**SECTION III** – List below the complete name of all trade names or unincorporated divisions that will be permitted to obligate this bond in the principal's name including their CBP Identification Number(s).

| CBP Identification Number | Name | CBP Identification Number | Name |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | Total Number of Importer Names listed in Section III: | 00 |

**CO-SURETY**

| Name and Physical Address (including legal description and state of incorporation) | Surety Number N/A | Agent ID Number N/A | |
|---|---|---|---|
| | Signature | | |
| N/A | | N/A | N/A |
| | | | ☐ Check Box |

Page 2 of 2 CBP Form 301 (06/11)

DEPARTMENT OF HOMELAND SECURITY
U.S. Customs and Border Protection

OMB No. 1651-0050 Exp. 03/31/2014

**CUSTOMS BOND**
19 CFR Part 113

| CBP USE ONLY | BOND NUMBER (Assigned by CBP) |
|---|---|
| | **9914L2875** |

Broker Filer Code: **WY8**    Surety Reference Number: 14XXXXX/SURXXXXXXX

| In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below name principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below. | Execution Date 05/29/2014 |
|---|---|

**SECTION I** – Select Single Transaction OR Continuous Bond (not both) and fill in the applicable blank spaces.

| ☐ SINGLE TRANSACTION BOND | Identification of transaction secured by this bond (e.g., entry number, seizure number, etc.) XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | Transaction Date XXXXXXXXXXX | Port Code |
|---|---|---|---|

| ☒ CONTINUOUS BOND | Effective Date 06/17/2014 | This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated. This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period. The intention to terminate this bond must be conveyed within the period and manner prescribed in the CBP Regulations. |
|---|---|---|

**SECTION II** – This bond includes the following agreements. Check one box only. (Except 3a may be checked independently or with 3.)

| Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability | Activity Code | Activity Name and CBP Regulations in which conditions codified | Limit of Liability |
|---|---|---|---|---|---|
| ☒ 1 | Importer or broker .................§113.62 | 1,900,000.00 | ☐ 8 | Detention of Copyrighted Material ...............................§113.70 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 1a | Drawback Payments Refunds ........§113.65 | XXXXXXXXXXX | ☐ 9 | Neutrality ...........................§113.71 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 2 | Custodian of Bonded Merchandise §113.63 (Includes bonded carriers, freight forwarders, cartmen and lightermen, all classes of warehouse, container station operators) -Continuous Bond Only- | XXXXXXXXXXX | ☐ 10 | Court Costs for Condemned Goods ...............................§113.72 -Single Transaction Only- | XXXXXXXXXXX |
| ☐ 3 | International Carrier.....................§113.64 | XXXXXXXXXXX | ☐ 11 | Airport Security Bond......Part 113 App A | XXXXXXXXXXX |
| ☐ 3a | Instruments of International Traffic... §113.66 -Continuous Bond Only- | XXXXXXXXXXX | ☐ 12 | International Trade Commission (ITC) Exclusion Bond.............Part 113 App B | XXXXXXXXXXX |
| ☐ 4 | Foreign Trade Zone......................§113.73 -Continuous Bond Only- | XXXXXXXXXXX | ☐ 14 | In-Bond Export Consolidation Bond | XXXXXXXXXXX |
| ☐ 5 | Public Gauger............................ §113.67 | XXXXXXXXXXX | ☐ 15 | Intellectual Property Rights (IPR) | XXXXXXXXXXX |
| ☐ 6 | Wool & Fur Products....................§113.68 Labeling Acts Importation -Single Transaction Only- | XXXXXXXXXXX | ☐ 16 | Importer Security Filing (ISF) ...............................Part 113 App D | XXXXXXXXXXX |
| ☐ 7 | Bill of Lading.............................§113.69 -Single Transaction Only- | XXXXXXXXXXX | ☐ 17 | Marine Terminal Operator -Continuous Bond Only- | XXXXXXXXXXX |

**PRINCIPAL**

By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 ▶

**AFFIX SEAL or Check Box**

Name and Physical Address (including legal description and state of incorporation)
Hollander Sleep Products, LLC
6501 Congress Avenue
Suite 300
Boca Raton, FL 33487
(FL Corporation)

CBP Identification Number:
27-XXXXXXX0

Signature

Viral Gandhi
Vice President of Finance    ☒ Check Box

| Principal and surety agree that any charge against the bond under any of the listed names is as though it was made by the principal(s). Principal and surety agree that they are bound to the same extent as if they executed a separate bond covering each set of conditions incorporated by reference to the CBP regulations into this bond. If the surety fails to appoint an agent under Title 31, United States Code, Section 9306, surety consents to service on the Clerk of any United States District Court or the U.S. Court of International Trade, where suit is brought on this bond. That clerk is to send notice of the service to the surety at: ▶ | Mailing Address Requested by the Surety 6 Mill Ridge Lane Chester, NJ 07930 |
|---|---|

**SURETY**

| Name and Physical Address (including legal description and state of incorporation) Argonaut Insurance Company 225 West Washington 6th Floor Chicago, IL 60606 (IL Corporation) | Surety Number 110 Signature | Agent ID Number XXXXXXXX06 Kevin J. Daily, Atty-in-Fact | INSURANCE CORPORATE SEAL ARGONAUT ILLINOIS ☐ Check Box |
|---|---|---|---|

Page 1 of 2    CBP Form 301 (06/11)

Broker Filer Code: **WY8**      Surety Reference Number: 14███/SUR█████

Principal Name: <u>**Hollander Sleep Products, LLC**</u>    CBP Identification Number: 27-█████800

| | | **AFFIX SEAL**<br>or<br>**Check Box** |
|---|---|---|
| | | By checking the box you agree that you have a seal in accordance with 19 CFR 113.25 |

**CO-PRINCIPAL**

| *Name and Physical Address (including legal description and state of incorporation)* | CBP Identification Number: | |
|---|---|---|
| | N/A | |
| | Signature | |
| N/A | N/A | N/A |
| | | ☐ Check Box |

---

**SECTION III** – List below the complete name of all trade names or unincorporated divisions that will be permitted to obligate this bond in the principal's name including their CBP Identification Number(s).

| CBP Identification Number | Name | CBP Identification Number | Name |
|---|---|---|---|
| N/A | N/A | N/A | N/A |
| | | Total Number of Importer Names listed in Section III: 00 | |

**CO-SURETY**

| Name and Physical Address *(including legal description and state of incorporation)* | Surety Number | Agent ID Number | |
|---|---|---|---|
| | N/A | N/A | |
| | Signature | | |
| N/A | N/A | | N/A |
| | | | ☐ Check Box |

# EXHIBIT B

INDEMNITY TO:

| | |
|---|---|
| AMERICAN CASUALTY CO. OF READING, PA | ARGONAUT INSURANCE COMPANY |
| ASPEN AMERICAN INSURANCE COMPANY | ATLANTIC SPECIALTY INSURANCE COMPANY |
| CONTINENTAL CASUALTY COMPANY | FEDERAL INSURANCE COMPANY |
| PHILADELPHIA INDEMNITY INSURANCE CO. | RLI INSURANCE COMPANY |
| TRAVELERS CASUALTY AND SURETY COMPANY | WESTCHESTER FIRE INSURANCE COMPANY |
| WESTERN SURETY COMPANY | |

By **Hollander Sleep Products, LLC** , Address **6501 Congress Avenue, Suite 300**

**Boca Raton, FL 33487**

on behalf of **Hollander Sleep Products, LLC** , Address **6501 Congress Avenue, Suite 300**

**Boca Raton, FL 33487**

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ 21 _____ day of _____ May _____ 20 14

WITNESS

SIGNATURE(S) OF INDEMNITOR(S)

**Hollander Sleep Products, LLC**

Affix Corp Seal (L.S.)

_____

_____ Viral Gandhi (L.S.)

Vice President of Finance (L.S.)

*(This form is to be notarized or signed by two witnesses)*

NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

Dena Fisher 5/21/14

140516002

# EXHIBIT C

INDEMNITY TO:

| | |
|---|---|
| **AMERICAN CASUALTY CO. OF READING, PA** | **ARGONAUT INSURANCE COMPANY** |
| **ATLANTIC SPECIALTY INSURANCE COMPANY** | **FEDERAL INSURANCE COMPANY** |
| **MASSACHUSETTS BAY INSURANCE CO** | **NATIONAL CASUALTY COMPANY** |
| **NATIONALWIDE MUTUAL INS. CO.** | **PHILADELPHIA INDEMNITY INSURANCE CO.** |
| **RLI INSURANCE COMPANY** | **TRAVELERS CASUALTY AND SURETY COMPANY** |
| **WESTCHESTER FIRE INSURANCE COMPANY** | **WESTERN SURETY COMPANY** |

By **Dream II Holdings, LLC**                    . Address **6501 CONGRESS AVE, # 300, BOCA RATON 33487 FL**

on behalf of **Dream II Holdings, LLC**                    , Address **6501 CONGRESS AVE, # 300, BOCA RATON 33487 FL**

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____                    day of ____ J U L y ____    20 15

WITNESS                                        SIGNATURE OF INDEMNITOR

*(This form is to be notarized or signed by two witnesses)*              Dream II Holdings, LLC

Signature: _____                    Signature: _____                    Affix
                                                                                            Corp
Name: Dena Fisher                             Name: JAMES ALLEN                              Seal

Signature: _____                    Corporate Title: CFO

Name: NOTARY PUBLIC-STATE OF FLORIDA                                                         140516002
        Dena Fisher
        Commission # EE118756
        Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

# EXHIBIT D

INDEMNITY TO:

|  |  |
|---|---|
| AMERICAN CASUALTY CO. OF READING, PA<br>ASPEN AMERICAN INSURANCE COMPANY<br>CONTINENTAL CASUALTY COMPANY<br>PHILADELPHIA INDEMNITY INSURANCE CO.<br>TRAVELERS CASUALTY AND SURETY COMPANY<br>WESTERN SURETY COMPANY | ARGONAUT INSURANCE COMPANY<br>ATLANTIC SPECIALTY INSURANCE COMPANY<br>FEDERAL INSURANCE COMPANY<br>RLI INSURANCE COMPANY<br>WESTCHESTER FIRE INSURANCE COMPANY |

By  Hollander Home Fashions Holdings, LLC           , Address 6501 Congress Avenue, Suite 300

Boca Raton, FL 33487

on behalf of  Hollander Sleep Products, LLC           , Address 6501m Congress Avenue, Suite 300

Boca Raton, FL 33487

its subsidiaries and affiliates, as principal, for any Bond in favor of THE UNITED STATES OF AMERICA as Obligee.

Each undersigned person, firm and corporation, jointly and severally (also called "Indemnitor") in consideration of the execution by any of the above-captioned sureties, (called "Company") of a bond, or the continuation of any previously executed bond, of the substitution or renewal on any and all bonds, in which the Obligee is THE UNITED STATES OF AMERICA and other claimants, does undertake and agree:

1. To pay or cause to be paid to Company the agreed premium and/or collateral security for its suretyship until the undersigned shall furnish to Company competent written evidence, satisfactory to the Company, of the termination of any bond as to future liability, but with privilege to Company, at any time, to withdraw from future liability under any bond if it so elects, in which event Company's only liability to the undersigned shall be for the pro rata unearned portion of the premium paid in accordance with law. The Indemnitor expressly waives any right, if any, to interest which may be earned on collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the Company or the Company's representative, in any bank as the Company or Company's representative, as in its sole discretion, deems advisable and prudent.

2. To indemnify and save harmless Company from and against any and all liability, claim, demand, loss, damage, expense, cost, attorney's fees and expenses, included without limitation, fees and disbursements of counsel incurred by the Company in any action or proceeding between the indemnitor and the Company, or between the Company and any third party, which Company shall at any time incur by reason of its execution of any bond or its payment of or its liability to pay any claim, irrespective of whether the claim is made against the Company as a joint or several obligor and whether the indemnitor is then liable to make such payment, and to place the Company in funds to meet all its liability under any bond, promptly upon request and before Company may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the Company of any liability, claim, demand, loss, damage, expense, cost and attorney's fees, shall be prima facie evidence of the fact and amount of Indemnitor's liability to Company under this agreement. Any demand upon the Company by the Obligee shall be sufficient to conclude that a liability exists and the Indemnitor shall then place the Company with sufficient funds in a form and amount deemed acceptable in the Company's sole discretion, as collateral security to cover the liability.

The Company may make or consent to any modification in any bond and may execute renewals or substitute obligation in any instrument, contract or agreement concerned, without notice to any Indemnitor (notice being expressly waived) and, in such case, each Indemnitor shall be liable to the Company as fully and to the same extent that the Company shall be liable under such modified bond or renewal or substitute obligation, in lieu thereof.

Each Indemnitor and the heirs, legal representatives, successors and assigns of each Indemnitor are, jointly and severally, bound by the provisions of this agreement, and the liability of each Indemnitor shall not be dependent upon the execution of this agreement or any instrument referred to by any other Indemnitor, and that if the Company procures any co-surety or reinsurance or other surety on said bond or bonds this agreement shall be deemed extended to and for the benefit of the co-surety, reinsuring company or other surety.

It is mutually agreed that this contract is deemed made in the State of New York, regardless of the order in which the signatures of the parties shall have been affixed and shall be interpreted, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York. In consideration for the surety being so bound, the Indemnitor agrees that all actions or proceedings arising directly or indirectly from this agreement shall be litigated only in courts having situs within the State of New York, and consents to the personal jurisdiction and venue of any local, state or Federal Court located therein.

Signed and Sealed this _____ 21 _____ day of _____ May _____ 20 14

|  |  |
|---|---|
| WITNESS | SIGNATURE(S) OF INDEMNITOR(S)<br>Hollander Home Fashions Holdings, LLC |

Affix Corp Seal

_____     _____ (L.S.)

_____     Viral Gandhi (L.S.)

Vice President of Finance (L.S.)

*(This form is to be notarized or signed by two witnesses)*

NOTARY PUBLIC-STATE OF FLORIDA
Dena Fisher
Commission # EE118756
Expires: AUG. 19, 2015
BONDED THRU ATLANTIC BONDING CO., INC.

X _____

Dena Fisher 5/21/14

140916002

Case 1:20-cv-10434   Document 1-1   Filed 12/10/20   Page 89 of 208

# EXHIBIT I

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM INDEX NO. 656014/2020

NYSCEF DOC. NO. 11 19-11608-mew Doc 356-34 Filed 09/05/19 Entered 09/05/19 12:38:13 Main Document RECEIVED NYSCEF: 11/04/2020

Pg 1 of 97

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING DEBTORS' MODIFIED FIRST AMENDED JOINT PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (collectively, the "Debtors") having:

a. commenced, on May 19, 2019 (the "Petition Date"), these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

b. filed, on the Petition Date, the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 21];[2]

c. continued to operate and manage their businesses and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

d. filed, on June 19, 2019, the *Debtors' Motion for Entry of an Order (I) Approving (A) the Adequacy of Information in the Disclosure Statement, (B) Solicitation and Notice Procedures, and (C) Certain Dates with Respect to Plan Confirmation, and (II) Granting Related Relief* [Docket No. 107]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477). The location of the Debtors' service address is: 901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

[2] All capitalized terms used but otherwise not defined in these findings of fact, conclusions of law, and order (the "Confirmation Order") have the meanings given to them in the *Debtors' Modified First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (as supplemented from time to time, the "Plan"). The rules of interpretation set forth in Article I of the Plan shall apply to the Confirmation Order.

(the "Disclosure Statement Motion") and the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 108] (the "Disclosure Statement");

e.    obtained, on July 3, 2019, the *Order (I) Approving the Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Approving the Form and Manner of Notice Thereof, (IV) Scheduling Hearings and Objection Deadlines with Respect to the Sale, and (V) Granting Related Relief* [Docket No. 180] (the "Bidding Procedures Order") and the bidding procedures attached thereto as Exhibit 1 (the "Bidding Procedures");

f.    served, on July 3, 2019, the Bidding Procedures and otherwise complied with the notice requirements and procedures set forth in the Bidding Procedures Order, as set forth in the *Affidavit of Service* [Docket No. 204] (the "Bidding Procedures Mailing Affidavit");

g.    published, on July 11, 2019, notice of the Bidding Procedures in the national edition of the *New York Times*, in *USA Today* (national edition), and in *The Globe and Mail Inc.* (national edition in Canada), as set forth in the *Affidavits of Publication* [Docket Nos. 206, 207, 208] (with the Bidding Procedures Mailing Affidavit, the "Bidding Procedures Affidavits");

h.    filed, on July 21, 2019, the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 233] and the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 234];

i.    obtained, on July 25, 2019, the *Order (I) Approving (A) the Adequacy of Information in the Disclosure Statement, (B) Solicitation and Notice Procedures, and (C) Certain Dates with Respect to Plan Confirmation, and (II) Granting Related Relief* [Docket No. 247] (the "Disclosure Statement Order"), which approved, among other things, solicitation procedures and related notices (the "Solicitation Procedures"), forms and ballots (collectively the "Solicitation Packages");

j.    filed, on July 25, 2019, the solicitation version of the *Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 248] and the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 249];

k.    caused, on July 31, 2019, the Solicitation Packages and notice of the Confirmation Hearing to be distributed in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and the Disclosure Statement Order, as evidenced by, among other things, the *Affidavit of Service* [Docket No. 290] (the "Solicitation Affidavit");

l.      caused, on August 1, 2019, notice of the Confirmation Hearing (the "Confirmation Hearing Notice") to be published in *The New York Times*, *USA Today* (national edition), and *The Globe and Mail* (national edition in Canada), as evidenced by the *Affidavits of Publication* [Docket No. 278] (the "Publication Affidavit"), consistent with the Disclosure Statement Order;

m.      extended, on August 7, 2019, the bid deadline for the sale process authorized under the Bidding Procedures Order to August 15, 2019 [Docket No. 289], which extension was consistent with the reservation of rights in the Bidding Procedures;

n.      obtained, on August 15, 2019, entry of the *Order (I) Authorizing the Debtors to Assume the Restructuring Support and Settlement Agreement, (II) Approving the Settlements and Compromises Contained Therein, and (III) Granting Related Relief* [Docket No. 298] (the "RSA Order");

o.      filed, on August 16, 2019, a notice of the Winning Bidder, which was the only bidder to submit a Qualified Bid (as defined in the Bidding Procedures) and made the highest or otherwise best bid for the Acquired Assets and the Assumed Liabilities (each as set forth in the Asset Purchase Agreement), and cancellation of auction [Docket No. 301];

p.      caused, on August 16, 2019, notice of the Winning Bidder and cancellation of auction to be served, as set forth in the *Affidavit of Service* [Docket No. 307] (the "Winning Bidder Affidavit");

q.      filed, on August 21, 2019, September 2, 2019, and September 3, 2019, the plan supplements to the Plan [Docket Nos. 308, 328, 347] (collectively and as modified, supplemented, or otherwise amended from time to time, the "Plan Supplement");

r.      caused, on August 21, 2019, and September 3, 2019, notices of the Plan Supplement to be served as set forth in the affidavits of service [Docket Nos. 313, 350, 355] (collectively, the "Plan Supplement Affidavits");

s.      filed, on August 30, 2019, the *Debtors' Modified First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 326];

t.      filed, on September 3, 2019, a further modified version of the *Debtors' Modified First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 346];

u.      caused, on August 30, 2019, and September 3, 2019, notices of the modified Plan to be served as set forth in the affidavits of service [Docket Nos. 327, 355] (collectively with the Bidding Procedures Affidavits, the Solicitation Affidavit, the Publication Affidavit, the Winning Bidder Affidavit, and the Plan Supplement Affidavits, the "Affidavits");

       v.       filed, on September 3, 2019, the *Declaration of Paul Deutch Regarding Analysis of Ballots for Accepting or Rejecting the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 329] (the "Voting Report"), which detailed the results of the Plan voting process; and

       w.      filed, on September 3, 2019, (i) the *Memorandum of Law in Support of Confirmation of the Debtors' Modified First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 330] (the "Confirmation Brief"), (ii) the *Declaration of Marc Pfefferle in Support of Confirmation of the Debtors' Modified First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 331] (the "Pfefferle Declaration"), and (iii) the *Declaration of David Salemi in Support of Entry of an Order Approving the Sale of Substantially All of the Debtors' Assets to the Winning Bidder* [Docket No. 332] (the "Salemi Declaration").

The Court having:

       a.       entered, on July 3, 2019, the Bidding Procedures Order and approved the Bidding Procedures;

       b.       entered, on July 25, 2019, the Disclosure Statement Order and approved the Solicitation Procedures and Solicitation Packages;

       c.       entered, on August 15, 2019, the RSA Order;

       d.       set September 4, 2019, at 11:00 a.m., prevailing Eastern Time, as the date and time for the Confirmation Hearing, pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code, as set forth in the Disclosure Statement Order;

       e.       reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Pfefferle Declaration, the Salemi Declaration, the Voting Report, the Affidavits, the Ballots, and all filed pleadings, exhibits, statements, and comments regarding Confirmation of the Plan, including all objections, statements, and reservations of rights;

       f.       held, on September 4, 2019, at 11:00 a.m., prevailing Eastern Time, the Confirmation Hearing;

       g.       heard the statements and arguments made by counsel in respect of Confirmation of the Plan and the objections thereto; and

       h.       considered all oral representations, affidavits, testimony, documents, filings, and other evidence regarding Confirmation of the Plan and the objections thereto.

NOW, THEREFORE, it appearing to the Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation of the Plan has been

adequate and appropriate, and the legal and factual bases set forth in the documents filed in support of Confirmation of the Plan and other evidence presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact and conclusions of law, and orders:

## DEEMED MODIFICATIONS TO THE PLAN

**Various provisions of the Plan provide that certain contemplated payments will be made in full satisfaction, settlement, compromise, and/or release of the obligations with respect to which the payments are to be made. However, the Plan contemplates a liquidation of the Debtors, and, in light of the liquidation, the Debtors are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code. Certain "Releasing Parties" (including creditors who voted in favor of the Plan and persons who "opted into" the releases set forth in the Plan) have consented to releases pursuant to Article VIII.D of the Plan and will be bound by those releases. As to other persons, however, the proposal that payments will be made in "full" or "final" satisfaction, "settlement," "compromise," or "release" of the underlying obligations would (if approved) be the same as granting a discharge. If section 1141 does not permit a discharge, the Court may not grant the same thing just by using different words that have the same effect. Accordingly:**

(a)    "Releasing Parties" (as defined in the Plan) have consented to the release provisions in Article VIII.D of the Plan and shall be bound thereby;

(b)    The provisions of the Plan that state that payments are made in full, complete, or final satisfaction, settlement, and/or release of the underlying obligations shall not be applicable except as specified in subparagraph (a) above; and

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM INDEX NO. 656014/2020

NYSCEF DOC. NO. 8 19-11608 Case 1:19-cv-08034 Document 1-1 New Doc 356 Filed 09/05/19 Entered 09/05/19 12:38:12 Main Document RECEIVED NYSCEF: 11/04/2020

Pg 6 of 97

(c)     The proposed Injunction in Article VIII.F of the Plan is hereby deemed to have been modified to state as follows:

> The assets of the Debtors and of the Wind-Down Trust shall be used for the satisfaction of expense obligations and the payment of Claims only in the manner set forth in this Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Trust, or the Debtors' chapter 11 cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.

> In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim that is subject to the releases and exculpations set forth in Article VIII.D and Article VIII.E of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims, except for the receipt of the payments or distributions that are contemplated by the Plan.

Nothing in the modifications set forth in subparagraphs (a) and (b) above is intended to foreclose an argument that as a matter of non-bankruptcy law the payment, in full, of a claim or expense obligation constitutes a "satisfaction" of that claim or expense obligation. For the avoidance of doubt and as set forth above: notwithstanding the technical issue as to whether certain claims or obligations are fully settled, released, or satisfied, all assets of the Debtors and the Wind-Down Trust shall be applied to the payment of claims and expenses only in the manner and in the order set forth in the Plan, and creditors shall be enjoined from interfering with the distributions and payments contemplated by the Plan.

The foregoing changes are hereby deemed to have been incorporated in the Plan, and all references in this Confirmation Order to the "Plan" are to the Plan as modified by the foregoing terms.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**A.    Findings and Conclusions.**

1.      The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

**B.    Jurisdiction, Venue, and Core Proceeding.**

2.      The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court has jurisdiction to enter a Final Order determining that the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  Venue is proper before the Court pursuant to 28 U.S.C. § 1408.

**C.    Eligibility for Relief.**

3.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

**D.    Objections.**

4.      Any resolution of objections to Confirmation explained on the record at the Confirmation Hearing is hereby incorporated by reference.   All unresolved objections,

statements, informal objections, and reservations of rights (except with respect to unresolved cure amounts), if any, related to the Confirmation of the Plan are overruled on the merits.

### E.     Burden of Proof—Confirmation of the Plan.

5.      The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation of the Plan.

### F.     Notice; Joinder/Intervention.

6.      As evidenced by the Affidavits, the Debtors have provided due, adequate, and sufficient notice of the Plan, the Sale Transaction, the Plan Supplement, and the Confirmation Hearing, to known and unknown Holders of Claims and Interests and other Entities with an interest in the Debtors' property and otherwise complied with the notice requirements of the Bankruptcy Code, the Bankruptcy Rules, and the procedures set forth in the Disclosure Statement Order.  Such notice was adequate and sufficient pursuant to section 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, and 3020, and other applicable law and rules, and no other or further notice is or shall be required.

### G.     Voting Report.

7.      Only Holders of Claims or Interests in Class 4 (Term Loan Claims) and Class 5 (General Unsecured Claims) were eligible to vote on the Plan (the "Voting Classes").  The Ballots the Debtors used to solicit votes to accept or reject the Plan from Holders in the Voting Classes adequately addressed the particular needs of the Chapter 11 Cases and were appropriate for Holders in the Voting Classes to vote to accept or reject the Plan.  The form of the Ballots were approved by the Court as part of the Disclosure Statement Order.  Holders of Claims or Interests in Classes 1, 2, 3, 7, 8, and 9 were either Unimpaired or Impaired under the Plan and were not entitled to vote to accept or reject the Plan (collectively, the "Non-Voting Classes").

Thus, Holders of Claims or Interests in the Non-Voting Classes were conclusively presumed to have accepted, or deemed to have rejected, the Plan, as applicable. Based on the foregoing, and as evidenced by the Voting Report, Class 4 (Holders of Term Loan Claims) and Class 5 (Holders of General Unsecured Claims) voted to accept the Plan in accordance with the requirements of sections 1124, 1126, and 1129 of the Bankruptcy Code.

### H. Solicitation.

8. As described in the Voting Report, the solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and any other applicable rules, laws, and regulations.

9. As described in the Voting Report and the Affidavits, as applicable, the Solicitation Packages were transmitted and served, including to all Holders in the Voting Classes, in compliance with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules, the Disclosure Statement Order, and any applicable nonbankruptcy law. Transmission and service of the Solicitation Packages was timely, adequate, and sufficient. No further notice is required.

10. As set forth in the Voting Report, the Solicitation Package was distributed to Holders in the Voting Classes that held a Claim against or Interest in the Debtors, as of July 24, 2019 (the "Voting Record Date"). The establishment and notice of the Voting Record Date were approved by the Disclosure Statement Order.

11. Under sections 1126(f) and 1126(g) of the Bankruptcy Code, the Debtors were not required to solicit votes from the Holders of Claims or Interests, as applicable, in the

Non-Voting Classes, each of which is conclusively presumed to have accepted, or deemed to have rejected, the Plan.

### I.        Plan Supplement.

12.       The Plan Supplement complies with the Bankruptcy Code and the terms of the Plan, and the filing and notice of such documents are good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable nonbankruptcy law and no other or further notice is required.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan (including Article X of the Plan), the Debtors' right to alter, amend, update, or modify the Plan Supplement before the Effective Date is reserved.

### J.        Compliance with Bankruptcy Code Requirements—Section 1129(a)(1).

13.       The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code.  In addition, the Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).

### (i)        Proper Classification—Sections 1122 and 1123.

14.       The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into nine Classes, based on differences in the legal nature or priority of such Claims and Interests (other than DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, which are addressed in Article II of the Plan and which are not required to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).  Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims

19-11608    Doc 356    Filed 09/05/19    Entered 09/05/19 12:38:13    Main Document
Pg 11 of 97

and Interests created under the Plan, the classifications were not promulgated for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.  In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  The Plan, therefore, satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

(ii)      **Specified Unimpaired Classes—Section 1123(a)(2).**

15.     Article III of the Plan specifies that Claims in Classes 1, 2, and 3 are Unimpaired under the Plan.  The Plan, therefore, satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

(iii)      **Specified Treatment of Impaired Classes—Section 1123(a)(3).**

16.     Article III of the Plan specifies the treatment of each Impaired Class of Claims or Interests under the Plan, including Classes 4, 5, 6, 7, 8, and 9.  The Plan, therefore, satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

(iv)      **No Discrimination—Section 1123(a)(4).**

17.     Article III of the Plan provides the same treatment for each Claim or Interest within a particular class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest.  The Plan, therefore, satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

(v)      **Adequate Means for Plan Implementation—Section 1123(a)(5).**

18.     The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate means for the Plan's implementation, including (a) the consummation of the Sale Transaction in accordance with the Asset Purchase Agreement, (b) the distribution of the Sale Proceeds and any cash on hand in accordance with the Plan, (c) the

funding of the GUC Sale Transaction Recovery Pool and the Last Out Loans Turnover Amount, and (d) the appointment of the Plan Administrator to take any action necessary to wind down and dissolve the Estates, among others. The Plan, therefore, satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

(vi)    <b>Non-Voting Equity Securities—Section 1123(a)(6).</b>

19. The Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code prohibiting the issuance of nonvoting equity securities. On the Effective Date, (a) all remaining assets shall vest in the Wind-Down Trust; *provided* that (i) any such assets that cannot be transferred to the Wind-Down Trust on the Effective Date shall be held by the Post-Effective Date Debtors for the benefit of the Wind-Down Trust for purposes of winding down the Debtors' Estates and implementing the terms of the Plan and (ii) any Canadian Assets shall continue to be owned by Hollander Canada, and the shares of which shall be owned by the Wind-Down Trust for purposes of winding down the Debtors' Estates and implementing the terms of the Plan and (b) all the fiduciary duties, authority, power, and incumbency of any and all persons acting as managers, directors, and officers of the Debtors shall be deemed to have been terminated, and vest in the Plan Administrator. The Plan Administrator shall be responsible for: (a) winding down the Debtors' businesses; (b) resolving Disputed Claims; (c) making all distributions to Holders of Allowed Claims; (d) litigating any causes of action; (e) filing tax returns; and (f) administering the Plan. Accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code are inapplicable to confirmation of the Plan.

(vii)    <b>Directors and Officers—Section 1123(a)(7).</b>

20. The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. The Plan provides that, on the Effective Date, the term of the current members of the board of managers or directors and officers of the Debtors and non-Debtor subsidiaries shall expire and

the Plan Administrator will be appointed. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

**(viii)   Claims and Executory Contracts—Section 1123(b)(1)–(2).**

21.    Article III of the Plan leaves Impaired or Unimpaired, as the case may be, each Class of Claims and Interests, and Article V of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (c) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date; or (d) are a contract, release, or other agreement or document entered into in connection with the Plan. The Debtors provided sufficient notice to each non-Debtor counterparty to an Executory Contract or Unexpired Lease assumed, assumed and assigned, or rejected by the Debtors pursuant to the Plan, the Plan Supplement, or otherwise during the Chapter 11 Cases.

**(ix)    Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action—Section 1123(b)(3).**

22.    The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code. Article VIII.C of the Plan describes certain releases granted by the Debtors (the "Debtor Release"), Article VIII.D of the Plan provides for the release of the Released Parties by the Releasing Parties (the "Third-Party Release"), Article VIII.E of the Plan provides for exculpation for the Exculpated Parties (the "Exculpation"), and Article VIII.F of the Plan, as

13

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM          INDEX NO. 656014/2020

NYSCEF DOC. NO. 80    19-11608    Case 1:39-cv-35604-FM   Filed 09/05/19   Entered 09/05/19 12:38:19   Main Document    RECEIVED NYSCEF: 11/04/2020

Pg 14 of 97

modified above, provides for an injunction (the "Injunction"). The Bankruptcy Court has jurisdiction under sections 1334(a) and 1334(b) of the Judicial Code and authority under section 105 of the Bankruptcy Code to approve each of the Debtor Release, the Third-Party Release, the Exculpation, and the Injunction. As has been established based upon the evidence presented at the Confirmation Hearing, such provisions (a) were given in exchange for good, valuable, and adequate consideration after due notice and opportunity for hearing, (b) are appropriately tailored under the facts and circumstances of the Chapter 11 Cases, (c) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy Code, (d) confer substantial benefits on the Estates, (e) are fair, equitable, and reasonable, and (f) are in the best interests of the Debtors, the Estates, and parties in interest. These releases are also consistent with those releases that the Court previously granted pursuant to settlements incorporated in the RSA Order. Further, the failure to implement the Debtor Release, Third-Party Release, Exculpation and Injunction would impair the Debtors' ability to confirm and implement the Plan.

23. The Debtor Release represents a valid exercise of the Debtors' business judgment. The Released Parties provided good and valuable consideration in exchange for the releases—including services, substantial DIP funding, and the consensual waiver of claims, as the case may be—and otherwise facilitated the Chapter 11 Cases and the implementation of the Sale Transaction contemplated by the Plan.

24. The Third-Party Release is consensual with respect to the Releasing Parties. Specifically, the Confirmation Hearing Notice sent to all Notice Parties (including those not entitled to vote on the Plan) and published in *The New York Times*, *USA Today* (national edition), and *The Globe and Mail* (national edition in Canada) on August 1, 2019, and the Ballots sent to

all Holders of Impaired Claims in the Voting Classes, in each case, unambiguously stated that the Plan contains the Third-Party Release, and allowed such parties to "opt into" such Third-Party Release and otherwise conformed to the Solicitation Procedures. Accordingly, in light of all of the circumstances, the Third-Party Release are consensual, are fair to the Releasing Parties, and are otherwise appropriate.

25.    The Exculpation appropriately affords protection to those parties who constructively participated in and contributed to the Debtors' chapter 11 process consistent with this Court's orders, and it is appropriately tailored to protect the Exculpated Parties from inappropriate litigation. The Exculpation granted under the Plan is reasonable in scope as it does not relieve any party of liability for an act or omission to the extent such act or omission is determined by final order to constitute actual fraud, willful misconduct, or gross negligence.

26.    The Injunction is essential to the Plan and is necessary to implement the Plan and to preserve and enforce the Debtor Release, the Third-Party Release, the Exculpation, and discharge provisions in Article VIII of the Plan. The Injunction is appropriately tailored to achieve those purposes.

27.    The release of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.B of the Plan (the "Lien Release") is necessary to implement the Plan. The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, Holders of Claims and Interests, and other Entities with an interest in the Debtors' property.

28.    The record of the Confirmation Hearing is sufficient to support the Debtor Release, Third-Party Release, Exculpation, and Injunction. Accordingly, based upon the

representations of the parties and the evidence proffered, adduced, or presented at the Confirmation Hearing, the Debtor Release, Third-Party Release, Exculpation, and Injunction are consistent with the Bankruptcy Code and applicable law.

29. The provisions regarding the preservation of Causes of Action in the Plan (including Article IV.M), including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

### (x) Additional Plan Provisions—Section 1123(b)(6).

30. The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.

### K. Debtor Compliance with the Bankruptcy Code—Section 1129(a)(2).

31. The Debtors have complied with the applicable provisions of the Bankruptcy Code and, thus, satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code. Specifically, each Debtor:

    a. is an eligible debtor under section 109 of the Bankruptcy Code and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code;

    b. has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court; and

    c. complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable nonbankruptcy law, rule, and regulation, the Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Package and related documents and notices, and in soliciting and tabulating the votes on the Plan.

### L. Plan Proposed in Good Faith—Section 1129(a)(3).

32. The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors proposed the Plan in good faith and not by any means forbidden by law. In so

determining, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, the process leading to Confirmation of the Plan, including the overwhelming support of Holders of Claims or Interests entitled to vote on the Plan, and the transactions to be implemented pursuant thereto. The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to effectuate a reorganization or sale process to maximize creditor recoveries and to satisfy their obligations with sufficient liquidity and capital resources.

### M. Payment for Services or Costs and Expenses—Section 1129(a)(4).

33.     The procedures set forth in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy the objectives of, and are in compliance with, section 1129(a)(4) of the Bankruptcy Code.

### N. Directors, Officers, and Insiders—Section 1129(a)(5).

34.     The Debtors have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code. Article IV.D of the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code, to the extent applicable, by providing for the appointment of the Plan Administrator.

### O. No Rate Changes—Section 1129(a)(6).

35.     Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Chapter 11 Cases. The Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission.

### P. Best Interest of Creditors—Section 1129(a)(7).

36.     The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached to the Disclosure Statement as <u>Exhibit E</u> and the other evidence

related thereto in support of the Plan that was proffered or adduced at the Confirmation Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; and (d) establishes that each Holder of an Allowed Claim or Interest in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.

**Q.    Acceptance by Certain Classes—Section 1129(a)(8).**

37.    The Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code.    Classes 1, 2, and 3 constitute Unimpaired Classes, each of which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.    Class 4 and Class 5 voted to accept the Plan.    Holders of Class 8 Claims (Interests in Dream II) and Class 9 Claims (section 510(b) Claims), if any, receive no recovery pursuant to the Plan and are deemed to have rejected the Plan.    Holders of Claims or Interests in Classes 6 and 7 either constitutes an Unimpaired or Impaired Class, and are conclusively presumed to have accepted, or deemed to have rejected, the Plan.    Notwithstanding the foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

**R.    Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code—Section 1129(a)(9).**

38.    The treatment of Administrative Claims, Professional Fee Claims, and Priority Tax Claims, under Article II of the Plan, and of Other Priority Claims, Other Secured Claims, and Secured Tax Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**S.      Acceptance By At Least One Impaired Class—Section 1129(a)(10).**

39.      The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.  As evidenced by the Voting Report, each of Class 4 (Term Loan Claims) and Class 5 (General Unsecured Claims) voted to accept the Plan by the requisite number and amount of Claims at each Debtor, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

**T.      Feasibility—Section 1129(a)(11).**

40.      The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting Confirmation of the Plan proffered or adduced by the Debtors at, or prior to, or in the Pfefferle Declaration filed in connection with, the Confirmation Hearing: (a) are reasonable, persuasive, and credible as of the dates such analysis or evidence was prepared, presented, or proffered; (b) have not been controverted by other evidence; and (c) establish that the Plan is feasible and that the Wind-Down Trust will have sufficient funds available to meet their obligations under the Plan.

**U.      Payment of Fees—Section 1129(a)(12).**

41.      The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.  Article XII.C of the Plan provides for the payment of all fees payable by the Debtors under section 1930(a) of the Judicial Code.

**V.      Continuation of Employee Benefits—Section 1129(a)(13).**

42.      The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.  Article V.H of the Plan provides that from and after the Effective Date, the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue in accordance with applicable law.

**W.**      **Non-Applicability of Certain Sections—Sections 1129(a)(14), (15), and (16).**

43.      Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases. The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

**X.**      **"Cram Down" Requirements—Section 1129(b).**

44.      The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code because (a) at least one Voting Class of Claims at each Debtor voted to accept the Plan and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Claims and Interests in the Classes that are deemed to reject the Plan. The Plan may therefore be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

**Y.**      **Only One Plan—Section 1129(c).**

45.      The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed in each of the Chapter 11 Cases.

**Z.**      **Principal Purpose of the Plan—Section 1129(d).**

46.      The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

**AA.**      **Good Faith Solicitation—Section 1125(e).**

47.      The Debtors, the Released Parties, and the Exculpated Parties have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to support of the Plan and this Confirmation Order, including the solicitation of acceptances of the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM INDEX NO. 656014/2020

NYSCEF DOC. NO. 80 19-11608 Case 1 Doc 356 04 Filed 09/05/19 Entered 09/05/19 12:38:11 Main Document RECEIVED NYSCEF: 11/04/2020

Pg 21 of 97

**BB.    Satisfaction of Confirmation Requirements.**

48.    Based on the foregoing, the Plan satisfies the requirements for Confirmation thereof set forth in section 1129 of the Bankruptcy Code.

**CC.    Likelihood of Satisfaction of Conditions Precedent to the Effective Date.**

49.    Each of the conditions precedent to the Effective Date, as set forth in Article IX.A of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Article IX.B of the Plan.

**DD.    Implementation.**

50.    All documents necessary to implement the Plan and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.

**EE.    Sale Transaction.**

51.    The Asset Purchase Agreement was negotiated, proposed, and entered into by the Debtors and the Winning Bidder without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor the Winning Bidder have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under Bankruptcy Code section 363(n).  The Winning Bidder is consummating the Sale Transaction in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  The Winning Bidder has proceeded in good faith in all respects in connection with the Sale Transaction.  The Winning Bidder is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

52.    The Debtors' marketing process with respect to the Sale Transaction afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer.  No other person or entity or group of entities has offered to purchase the assets for greater

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM    INDEX NO. 656014/2020

NYSCEF DOC. NO. 608    19-11608-scc    Doc 356    Filed 09/05/19    Entered 09/05/19 12:38:11    Main Document    RECEIVED NYSCEF: 11/04/2020

Pg 22 of 97

overall value to the Debtors' Estates than the Winning Bidder.  The Asset Purchase Agreement constitutes the highest and best offer, and will provide a greater recovery for the Debtors' Estates than would be provided by any other available alternative.  The Debtors' determination that the Asset Purchase Agreement constitutes the highest and best offer constitutes a valid and sound exercise of the Debtors' business judgment.  Approval of the Asset Purchase Agreement and the consummation of the Sale Transaction is in the best interests of the Debtors' Estates, their creditors, and other parties in interest.

53.     The consideration provided by the Winning Bidder pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) is the highest or best offer for the purchased assets, and (c) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

54.     The Winning Bidder is not a mere continuation or substantial continuation of the Debtors or their Estates and there is no continuity of enterprise or common identity between the Winning Bidder and any of the Debtors.  The Winning Bidder is not holding itself out to the public as a continuation of any of the Debtors.  The Winning Bidder is not a successor to the Debtors or their Estates by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, merger, or *de facto* merger of the Winning Bidder with or into any of the Debtors.  The Winning Bidder has entered into the Asset Purchase Agreement in material reliance on and with fair consideration provided for the Sale Transaction being free and clear of all claims and interests relating to the Debtors arising prior to the closing of the Sale Transaction, including any successor or vicarious liabilities of any kind or nature, as set forth herein and in the

Asset Purchase Agreement, and would not have entered into the Asset Purchase Agreement or the Sale Transaction without such terms and the findings herein.

55. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell assets and property pursuant to the Asset Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever other than as expressly provided under the Asset Purchase Agreement. In addition to and without limiting the foregoing, the proposed Sale Transaction is to be consummated under the Plan, and the assets and property to be sold pursuant to the Sale Transaction are dealt with by the Plan; therefore, except as expressly provided under the Asset Purchase Agreement, the Debtors may sell assets and property pursuant to the Asset Purchase Agreement free and clear of any claims, liens, encumbrances, or other interests of any kind or nature whatsoever pursuant to section 1141(c) of the Bankruptcy Code.

56. The Debtors may sell such assets free and clear of all claims, liens, encumbrances, and other interests of any kind or nature whatsoever (other than as expressly permitted under the Asset Purchase Agreement) because, in each case, one or more of the standards set forth in sections 363(f)(l)–(5), 1129(b)(2)(A)(ii), 1141(a), or 1141(c) of the Bankruptcy Code has been satisfied. All holders of such claims, liens, encumbrances, or other interests against the Debtors, their Estates, or any of the assets subject to the Sale Transaction (a) who did not object, or who withdrew their objections, to the Sale Transaction are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code and (b) are bound by the Plan pursuant to section 1141(a) of the Bankruptcy Code. All holders of such claims, liens, encumbrances, or other interests are adequately protected by having their claims, liens, encumbrances, or other interests, if any, in each instance against the Debtors, their Estates, or any of the assets subject to

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM
NYSCEF DOC. NO. 608
INDEX NO. 656014/2020
RECEIVED NYSCEF: 11/04/2020

19-11608 Case 1:19-cv-35504-PM Doc 356 Filed 09/05/19 Entered 09/05/19 12:38:13 Main Document
Pg 24 of 97

the Sale Transaction, attach to the net cash proceeds of the Sale Transaction ultimately attributable to the assets in which such creditor alleges a claim, lien, encumbrance, or other interest, in the same order of priority, with the same validity, force, and effect that such claim, lien, encumbrance, or other interest had prior to consummation of the Sale Transaction, subject to any claims and defenses the Debtors and their Estates may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan, including Article II.C, Article IV.E.1, and Article VIII.B thereof.

### FF. Disclosure of Facts.

57.     The Debtors have disclosed all material facts regarding the Plan, the Plan Supplement, and the adoption, execution, and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Debtors.

### GG. Good Faith.

58.     The Debtors, the Released Parties, and the Releasing Parties have acted in good faith in negotiating and proposing the Plan.  The Debtors, the Released Parties, and the Releasing Parties will continue to be acting in good faith if they proceed to consummate the Plan and the agreements, transactions, and transfers contemplated thereby and take the actions authorized and directed by this Confirmation Order.

### <u>ORDER</u>

IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

59.     The Plan, including (a) all of the modifications to the Plan filed with the Court prior to or during the Confirmation Hearing and (b) all documents incorporated into the Plan through the Plan Supplement (including the final forms thereof), is confirmed pursuant to section 1129 of the Bankruptcy Code.

60. Any and all objections to the Plan that have not been withdrawn or resolved prior to or during the Confirmation Hearing are hereby overruled.

61. The documents contained in the Plan Supplement (including the final forms thereof) are an integral part of the Plan, and the Debtors and the Plan Administrator, as applicable, are authorized to take all actions required under the Plan and the Plan Supplement documents to effectuate the Plan.

62. The terms of the Plan, the Plan Supplement, and the final forms of the exhibits thereto are incorporated herein by reference, and are an integral part of this order (the "Confirmation Order"). The terms of the Plan, the Plan Supplement, and the exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date. The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision, it being the intent of the Court that the Plan, the Plan Supplement, and the exhibits thereto be confirmed in their entirety.

63. Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and will be immediately effective on the Effective Date without further order or action by the Court, any of the parties to such releases, or any other Entity: (a) Release of Liens (Article VIII.B), (b) Debtor Release (Article VIII.C), (c) Third-Party Release (Article VIII.D), (d) Exculpation (Article VIII.E), and (e) as modified above, Injunction (Article VIII.F).

64. The Asset Purchase Agreement and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved. Pursuant to sections 105(a), 363(b), and 1123(b)(4) of the Bankruptcy Code, on the Effective Date, the Debtors are authorized and

empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement and the Plan, (b) close the Sale Transaction as contemplated in the Asset Purchase Agreement and the Plan, and (c) execute and deliver, perform under, consummate, implement, and fully close the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Sale Transaction. Any non-Cash consideration of the Sale Transaction shall only be allocated to non ABL Priority Collateral (as defined in the DIP ABL Order) in accordance with the DIP Intercreditor Agreement (as defined in the DIP ABL Order) and the Bidding Procedures Order.

65. Pursuant to sections 105(a), 363(f), 365(f), 1129(b)(2)(A)(ii), 1141(a), and 1141(c) of the Bankruptcy Code, on the Effective Date, subject to the closing of the Sale Transaction, and except as expressly provided for in the Asset Purchase Agreement, all Acquired Assets shall be sold and transferred to and vested in the Winning Bidder free and clear of any and all liens, claims, encumbrances, and other interests to the fullest extent permitted by section 363(f) or section 1141(c) of the Bankruptcy Code, and all such liens, claims, encumbrances, or other interests shall attach to the net cash proceeds of the Sale Transaction ultimately attributable to the property against or in which such liens, claims, encumbrances, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such liens, claims, encumbrances, or other interests now have, subject to any rights, claims, and defenses the Debtors or their Estates, as applicable, may possess with respect thereto, and with such claims, liens, encumbrances, or other interests being treated in accordance with the Plan.

66.     The transfer of assets to the Winning Bidder pursuant to the Asset Purchase Agreement, the Plan, and this Confirmation Order does not require any consents other than as expressly provided for in the Asset Purchase Agreement.  Each and every federal, state, province, county, and local governmental agency or department, whether foreign or domestic, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

67.     After the Effective Date, a certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder of any federal, state, province, county, or local authority, whether foreign or domestic, to act to cancel any of the Claims, Liens, and other encumbrances of record except those expressly assumed under the Asset Purchase Agreement.

68.     Except as expressly provided for in the Asset Purchase Agreement, the Winning Bidder shall not assume or have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets.  Without limiting the generality of the foregoing, the Sale Transaction shall be free and clear of successor, vicarious, or transferee liabilities to the Winning Bidder to the fullest extent permitted by section 363(f) or section 1141(c) of the Bankruptcy Code.

69.     As of the Effective Date, and subject to the provisions of the Plan and this Confirmation Order, all persons and entities are hereby forever prohibited and permanently enjoined from taking any action that would adversely affect or interfere with the consummation of the Sale Transaction.  Without limiting the generality of the foregoing or the Injunction, (a) all persons or entities are hereby forever prohibited and permanently enjoined from asserting against the Winning Bidder, its successor and assigns, or the Acquired Assets, any liabilities, liens, claims, encumbrances, or other interests, or successor or transferee liabilities, that the Winning

Bidder has not expressly assumed under the Asset Purchase Agreement and to which the Winning Bidder is or the Acquired Assets are not subject by virtue of the provisions of paragraphs 65 and 68 of this Confirmation Order, and (b) each non-Debtor party to an Executory Contract or Unexpired Lease being assumed and assigned to the Winning Bidder pursuant to the Asset Purchase Agreement, the Plan, and this Confirmation Order is hereby forever prohibited and permanently enjoined from imposing or charging against the Winning Bidder any rent accelerations, assignment fees, increases, or any other fees in connection with the specific assumed and assigned Executory Contract or Unexpired Lease by reason of the Debtors' assumption and assignment of such Executory Contract and Unexpired Lease, and the validity of such assumption and assignment, which shall in all events be effective as of the Effective Date, shall not be affected by the pendency or resolution of any dispute between the Debtors and any non-Debtor party to any such assigned Executory Contract or Unexpired Lease.

70.     Pursuant to section 363(m) of the Bankruptcy Code, the reversal or modification on appeal of the authorization provided herein to effectuate the Sale Transactions and consummate the transactions contemplated by the Asset Purchase Agreement shall not affect the validity of such transactions (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such transactions are duly stayed pending such appeal.

71.     The provisions governing the treatment of Executory Contracts and Unexpired Leases set forth in Article V of the Plan (including the procedures regarding any disputes concerning the assumption, assumption and assignment, or rejection, as applicable, of such Executory Contracts and Unexpired Leases) are hereby approved in their entirety. Notwithstanding any provision of this Confirmation Order or in the Plan to the contrary, all

objections to assumption and/or assignment that have been timely Filed and not yet resolved, and all objections to assumption and/or assignment that are not yet due, are hereby preserved, including in each case all objections to the Debtors' ability to assume and assign, all objections as to whether adequate assurance of performance is provided, and all objections as to whether cure amounts have been properly calculated.

72.     With respect to each Executory Contract or Unexpired Lease to be assumed and assigned under the Plan, and except as otherwise provided in paragraph 71:  (a) the applicable assignee of such Executory Contract or Unexpired Lease has provided adequate assurance of future performance under the relevant Executory Contract or Unexpired Lease within the meaning of section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code and (b) the applicable assignee of such Executory Contract or Unexpired Lease shall be deemed to be substituted for the Debtors as a party to the applicable Executory Contract or Unexpired Lease and the Debtors, the Post-Effective Date Debtors, the Estates, the Plan Administrator, and the Wind-Down Trust shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under such Executory Contract or Unexpired Lease.

73.     On the Effective Date, immediately after consummation of the Sale Transaction, the Wind-Down Trust will be formed pursuant to the Wind-Down Trust Agreement.  The Wind-Down Trust will be established for the primary purpose of liquidating the Wind-Down Trust Assets and winding down the Debtors' Estates, subject to and in accordance with the Plan.  The Plan Administrator shall act as the Wind-Down Trustee in accordance with the Wind-Down Trust Agreement.  The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that are necessary to assist the Plan Administrator in the performance of his or her duties in accordance with the Plan and the Wind-Down Trust

Agreement. The Plan Administrator, among other things, may maintain appropriate reserves, including Disputed Claim Reserves, such as to hold amounts for payment with respect to Disputed Claims if and after they become Allowed Claims. The Plan Administrator may elect to treat all or certain of such reserves as "disputed ownership funds" governed pursuant to Treasury Regulation section 1.468B-9, which treatment also may be applied to the extent possible for state and local tax purposes. The Plan Administrator shall also consult with the Information Officer in respect of (a) winding down the Debtors' businesses and administering the liquidation of the Post-Effective Date Debtors and any assets held by the Wind-Down Trust, (b) resolving Disputed Claims, (c) making distributions to Holders of Allowed Claims, (d) performing pursuant to the Asset Purchase Agreement, (e) litigating any causes of action, (f) filing tax returns; and (g) administering the Plan, as any such matters also relate to Canada.

74. The Debtors, the Post-Effective Date Debtors, and the Plan Administrator are authorized to take all actions, necessary, appropriate, or desirable to enter into, implement, and consummate the contracts, instruments, releases, agreements, or other documents created or executed in connection with the Plan. In accordance with section 1142 of the Bankruptcy Code and applicable nonbankruptcy law, such actions may be taken without further action by stockholders, managers, or directors.

75. The offering, issuance, exchange, or distribution of any securities pursuant to the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and any state or local law requiring registration prior to such activities, in each case to the fullest extent available under section 1145 of the Bankruptcy Code.

76.    This Confirmation Order is and shall be binding upon and shall govern the acts of all persons or entities including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, provincial, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Asset Purchase Agreement, the Plan, and this Confirmation Order shall not be subject to any stamp or similar tax.  Pursuant to sections 105(a), 1141(a), and 1142(b) of the Bankruptcy Code, each and every federal, state, provincial, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without payment of any stamp tax or similar tax, recordation fee, or governmental assessment imposed by law.

77.    For the avoidance of doubt, nothing in the Plan or this Confirmation Order shall alter the rights of Dallas County set forth in paragraph 58 of the DIP Term Loan Order.

78.    The assets of the Debtors and of the Wind-Down Trust shall be used for the satisfaction of expense obligations and the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Trust, or the Debtors' chapter 11 cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or

this Confirmation Order, shall be precluded and permanently enjoined on and after the Effective

Date from interfering with the use and distribution of the Debtors' assets in the manner

contemplated by the Plan.

79.     As of the Effective Date and subject to the occurrence of the Effective Date,

except as otherwise specifically provided in the Plan or this Confirmation Order, all Persons and

Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to

the Plan, or any Claim that is subject to the releases and exculpations set forth in Article VIII.D

and Article VIII.E of the Plan, shall be precluded and permanently enjoined on and after the

Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such

Claims, except for the receipt of the payments or distributions that are contemplated by the Plan.

80.     The Debtors must file with the Court and serve a notice of the entry of this

Confirmation Order and occurrence of the Effective Date, substantially in the form attached

hereto as **Exhibit 2**, upon (a) all parties listed in the creditor matrix maintained by Omni

Management Group and (b) such additional persons and entities as deemed appropriate by the

Debtors, no later than five business days after the Effective Date, and will cause Omni

Management Group to file an affidavit of service with the Court.  The Debtors will publish the

notice of the occurrence of the Effective Date in the *New York Times* (national edition), *USA

Today* (national edition), and *The Globe and Mail* (national edition in Canada) within seven

business days after the Effective Date, and will cause an affidavit of service to be filed with the

Court.

81.     Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this

Confirmation Order will be immediately effective and enforceable upon its entry.   This

Confirmation Order is a final order, and the period in which an appeal must be filed shall commence immediately upon the entry hereof.

82.    The Debtors and the Plan Administrator are authorized to take all actions necessary to effectuate the relief granted in this Confirmation Order in accordance with the Plan.

83.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Confirmation Order.

Dated:  New York, New York
        September 5, 2019

s/Michael E. Wiles
HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

19-11608 Case 1:18-cv-10174 Doc 356 Filed 09/05/19 Entered 09/05/19 12:38:12 Main Document
Pg 34 of 97

**Exhibit 1**

**The Plan**

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM INDEX NO. 656014/2020
NYSCEF DOC. NO. 80 19-11608-mew Doc 356 Filed 09/05/19 Entered 09/05/19 12:38:12 Main Document RECEIVED NYSCEF: 11/04/2020

Pg 35 of 97

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|   |   |   |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' MODIFIED FIRST AMENDED JOINT
## PLAN PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated: September 3, 2019

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477). The location of the Debtors' service address is: 901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

KE 63539087

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW ...........................................................................................................................1

    A.    Defined Terms ...................................................................................................................1
    B.    Rules of Interpretation .....................................................................................................15
    C.    Computation of Time .......................................................................................................16
    D.    Governing Law .................................................................................................................16
    E.    Reference to Monetary Figures ........................................................................................16
    F.    Non-Consolidated Plan ....................................................................................................16

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS ..............................17

    A.    Administrative Claims ......................................................................................................17
    B.    Professional Fee Claims ...................................................................................................17
    C.    DIP Claims .......................................................................................................................19
    D.    Priority Tax Claims ...........................................................................................................20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................................20

    A.    Classification of Claims and Interests ...............................................................................20
    B.    Treatment of Claims and Interests ...................................................................................21
    C.    Special Provision Governing Unimpaired Claims .............................................................24
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .....24
    E.    Subordinated Claims ........................................................................................................24
    F.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes .................25
    G.    Intercompany Interests ....................................................................................................25
    H.    Controversy Concerning Impairment ...............................................................................25

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ...............................................................25

    A.    General Settlement of Claims and Interests .....................................................................25
    B.    Restructuring Transactions...............................................................................................26
    C.    Sources of Consideration for Plan Distributions ...............................................................26
    D.    Plan Administrator and Post-Effective Date Debtors........................................................27
    E.    Wind-Down......................................................................................................................27
    F.    Term Loan Deficiency Claim Waiver ................................................................................29
    G.    Avoidance Actions Waiver ...............................................................................................30
    H.    Cancellation of Existing Securities and Agreements .........................................................30
    I.    Corporate Action ..............................................................................................................30
    J.    Effectuating Documents; Further Transactions.................................................................31
    K.    Exemption from Securities Act Registration......................................................................31
    L.    Exemption from Certain Taxes and Fees ..........................................................................31
    M.    Preservation of Causes of Action .....................................................................................31

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............................32

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases .......................32
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases...........................33
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.......................33
    D.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases...........33
    E.    Insurance Policies and Surety Bonds ................................................................................34
    F.    Director, Officer, Manager, and Employee Liability Insurance..........................................34
    G.    Indemnification Obligations.............................................................................................35
    H.    Employee and Retiree Benefits ........................................................................................35
    I.    Collective Bargaining Agreements ...................................................................................35
    J.    Workers Compensation Program ......................................................................................35

|   |   |   |
|---|---|---|
| K. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 36 |
| L. | Reservation of Rights | 36 |
| M. | Nonoccurrence of Effective Date | 36 |
| N. | Contracts and Leases Entered Into After the Petition Date | 36 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ........................................ 36

|   |   |   |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed | 36 |
| B. | Distributions on Account of Obligations of Multiple Debtors | 37 |
| C. | Disbursing Agent | 37 |
| D. | Rights and Powers of Disbursing Agent | 37 |
| E. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 37 |
| F. | Distributions on Account of Claims or Interests Allowed After the Effective Date | 39 |
| G. | Compliance with Tax Requirements | 39 |
| H. | Allocations Between Principal and Accrued Interest | 39 |
| I. | No Postpetition Interest on Claims | 39 |
| J. | Foreign Currency Exchange Rate | 40 |
| K. | Setoffs and Recoupment | 40 |
| L. | Claims Paid or Payable by Third Parties | 40 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** .......................................................................................... 41

|   |   |   |
|---|---|---|
| A. | Allowance of Claims | 41 |
| B. | Claims Administration Responsibilities | 41 |
| C. | Estimation of Claims | 41 |
| D. | Adjustment to Claims Without Objection | 42 |
| E. | Time to File Objections to Claims | 42 |
| F. | Disallowance of Claims | 42 |
| G. | Amendments to Claims | 42 |
| H. | No Distributions Pending Allowance | 42 |
| I. | Distributions After Allowance | 43 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ........................ 43

|   |   |   |
|---|---|---|
| A. | Settlement, Compromise, and Release of Claims and Interests | 43 |
| **B.** | **Release of Liens** | 43 |
| **C.** | **Debtor Release** | 44 |
| **D.** | **Third-Party Release** | 45 |
| **E.** | **Exculpation** | 45 |
| **F.** | **Injunction** | 46 |
| G. | Protections Against Discriminatory Treatment | 46 |
| H. | Document Retention | 47 |
| I. | Reimbursement or Contribution | 47 |
| J. | Term of Injunctions or Stays | 47 |
| K. | Subordination Rights | 47 |

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN** .......................... 47

|   |   |   |
|---|---|---|
| A. | Conditions Precedent to the Effective Date | 47 |
| B. | Waiver of Conditions | 48 |
| C. | Substantial Consummation | 48 |
| D. | Effect of Failure of Conditions | 48 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** .................... 48

|   |   |   |
|---|---|---|
| A. | Modification and Amendments | 48 |
| B. | Effect of Confirmation on Modifications | 49 |

C. Revocation or Withdrawal of Plan ..................................................................49

ARTICLE XI. RETENTION OF JURISDICTION ..................................................................49

ARTICLE XII. MISCELLANEOUS PROVISIONS ..................................................................51

 A. Immediate Binding Effect ..................................................................51
 B. Additional Documents ..................................................................51
 C. Payment of Statutory Fees ..................................................................51
 D. Statutory Committee and Cessation of Fee and Expense Payment ..................51
 E. Reservation of Rights ..................................................................51
 F. Successors and Assigns ..................................................................52
 G. Notices ..................................................................52
 H. Entire Agreement ..................................................................53
 I. Exhibits ..................................................................53
 J. Non-Severability of Plan Provisions ..................................................................54
 K. Votes Solicited in Good Faith ..................................................................54
 L. Closing of Chapter 11 Cases ..................................................................54
 M. Conflicts ..................................................................54

## INTRODUCTION

Hollander Sleep Products, LLC and its Debtor affiliates in the above-captioned Chapter 11 Cases propose this joint chapter 11 plan pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A. This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

A. *Defined Terms*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1. "*ABL Agent*" means Wells Fargo Bank, National Association, in its capacity as agent under the ABL Credit Agreement, solely in its capacity as such.

2. "*ABL Claims*" means any and all Claims relating to, arising out of, arising under, or arising in connection with the ABL Credit Facility.

3. "*ABL Credit Agreement*" means that certain Third Amended and Restated Credit Agreement, dated as of June 9, 2017, by and among Hollander Home Fashions, LLC, Hollander Sleep Products, LLC, Hollander Sleep Products Kentucky, LLC, Hollander Sleep Products Canada Limited, Pacific Coast Feather Company, and Pacific Coast Feather Cushion Co., as borrowers, Dream II, as parent, the lenders party thereto, and the ABL Agent, as modified and amended on August 31, 2017, October 19, 2018, and November 27, 2018, and as may be further amended, modified, restated, or supplemented from time to time.

4. "*ABL Credit Facility*" means, collectively, the senior secured revolving credit facility, swing loans, and letters of credit provided for by the ABL Credit Agreement.

5. "*ABL Lenders*" means the banks, financial institutions, and other lenders party to the ABL Credit Agreement from time to time, each letter of credit issuer thereunder, and each bank product provider thereunder, each solely in their capacity as such.

6. "*ABL Priority Collateral*" has the meaning set forth in the DIP Intercreditor Agreement.

7. "*Administration Charge*" means the charge granted by the Canadian Court in the Recognition Proceedings on the Canadian Assets to secure the professional fees and disbursements of the Information Officer and its counsel, in each case incurred in respect of the Recognition Proceedings.

8. "*Administrative Claim*" means a Claim for the costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) amounts owing pursuant to the DIP Orders.

9. "*Administrative Claim Bar Date*" means the deadline for filing requests for payment of Administrative Claims (other than (x) Professional Fee Claims, (y) Administrative Claims arising in the ordinary

KE 63539087

course of business, or (z) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code, which are required to be filed in accordance with the Bar Date Order), which shall be 30 days after the Effective Date.

10. "*Administrative Claim Objection Bar Date*" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the later of (a) 60 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of the Administrative Claims; *provided* that the Administrative Claim Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

11. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

12. "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan: (a) a Claim that is evidenced by a Proof of Claim Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. For the avoidance of doubt: (x) a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

13. "*Acquired Assets*" means those "Acquired Assets" as defined in the Asset Purchase Agreement.

14. "*APA Post Closing Obligations*" means those certain obligations of the Debtors (or any successor thereto) under the Asset Purchase Agreement that may become due and payable after the closing of the Sale Transaction, including the payment of certain tax obligations relating to periods prior to the closing and payment of certain cure amounts with respect to Executory Contracts or Unexpired Leases assigned to the Winning Bidder.

15. "*Asset Purchase Agreement*" means that certain asset purchase agreement dated as of August 15, 2019, executed by and between the Debtors and the Winning Bidder for the sale of certain of the Debtors' assets to the Winning Bidder, a copy of which has been filed with the Plan Supplement, together with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time.

16. "*Auction*" means the auction, if any, for some or all of the Debtors' assets, conducted in accordance with the Bidding Procedures.

17. "*Avoidance Actions*" mean any and all avoidance, recovery, or subordination actions or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code, CCAA, BIA, or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code.

KE 63539087

18.    "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 100–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

19.    "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code and/or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of New York.

20.    "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

21.    "***Bar Date Order***" means the *Order (A) Setting Bar Dates for Filing Proofs of Claim, (B) Approving Procedures for Submitting Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief* [Docket No. 120], entered by the Bankruptcy Court on June 21, 2019.

22.    "***BIA***" means the Bankruptcy and Insolvency Act, R.S.C., 1985, c. B-3, as amended.

23.    "***Bidding Procedures***" means the procedures governing the Auction and sale of all or substantially all of the Debtors' assets, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with their terms.

24.    "***Business Day***" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

25.    "***Canadian Assets***" means the assets, undertakings, and properties of Hollander Canada at the applicable time.

26.    "***Canadian Court***" means the Ontario Superior Court of Justice (Commercial List).

27.    "***Canadian Intercompany Claim***" means (i) the Claim of Hollander Canada in respect of the aggregate amount loaned by Hollander Canada to the Debtors other than Hollander Canada during the Chapter 11 Cases pursuant to and in accordance with the DIP Orders, *less* (ii) the aggregate amount reasonably incurred by the Debtors other than Hollander Canada during the Chapter 11 Cases in providing selling, general, and administrative services to Hollander Canada.

28.    "***Cash***" or "***$***" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

29.    "***Causes of Action***" means any actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise. For the avoidance of doubt, "Causes of Action" include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

30.    "***CCAA***" means Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended.

KE 63539087

31.   "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

32.   "**Claim**" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, or as defined in the CCAA, as applicable, against a Debtor or an Estate.

33.   "**Claims Bar Date**" means the dates established by the Bankruptcy Court by which Proofs of Claim must have been Filed with respect to such Claims (other than Claims required to be Filed by the Administrative Claims Bar Date), pursuant to (a) the Bar Date Order, (b) a Final Order of the Bankruptcy Court, or (c) the Plan.

34.   "**Claims Objection Bar Date**" means the later of:  (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing upon a motion either Filed on or before the day that is 180 days after the Effective Date or filed thereafter, for cause.

35.   "**Claims Register**" means the official register of Claims maintained by the Notice and Claims Agent.

36.   "**Class**" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

37.   "**Collective Bargaining Agreement**" means those certain Collective Bargaining Agreements by and between Debtor Hollander Sleep Products, LLC, on the one hand, and, as applicable, the Southwest Regional Joint Board Workers United, the Southern Regional Joint Board of Workers United, SEIU on Behalf of Local 2420, the Mid-Atlantic Joint Board of Workers United, or the Workers United, Western States Regional Joint Board, on the other hand, as the same may have been amended from time to time.

38.   "**Commercial Tort Claims**" means any commercial tort claims or Causes of Action owned by the Debtors arising on or before the Petition Date that remained outstanding as of the Petition Date.

39.   "**Commercial Tort Proceeds**" means the Cash proceeds, if any, of any Commercial Tort Claims, *less* any fees, expenses, and disbursements of the Plan Administrator in excess of the $1.0 million reserved in the Wind-Down Trust for purposes set forth in Article IV.E.1 of the Plan, including any fees, expenses, and disbursements associated with the prosecution of Commercial Tort Claims, if any.

40.   "**Committee**" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on May 30, 2019, pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 61].

41.   "**Committee Advisors**" means, collectively, Pachulski Stang Ziehl & Jones LLP, Alvarez & Marsal North America, LLC, and Gowling WLG.

42.   "**Committee Monthly Fee Cap**" means, the sum of $300,000 per month for the period commencing on August 1, 2019, through the Effective Date which amount represents the maximum aggregate amount of (a) professional fees and expenses that may be incurred by professionals retained by the Committee in the Chapter 11 Cases (including the Committee Advisors) for which reimbursement is sought and (b) expenses incurred by the members of the Committee for which reimbursement is sought, each pursuant to and in accordance with section 1103 of the Bankruptcy Code, *provided* that any unused amount from a prior month may be used for fees and expenses incurred in a subsequent month on a rolling basis.

43.   "**Confirmation**" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

44.   "**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM          INDEX NO. 656014/2020
NYSCEF DOC. NO. 6 19-11608 Case 1 Doc 356-1 Filed 09/05/19 Entered 09/05/19 12:38:13 Main Document RECEIVED NYSCEF: 11/04/2020

Pg 43 of 97

45. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code, including any adjournments thereof.

46. "*Confirmation Recognition Order*" means the order granted by the Canadian Court recognizing the Confirmation Order in the Recognition Proceedings.

47. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order must be reasonably acceptable to the Debtors, the Committee, the Required Term Lenders, the Term Loan Agent, the DIP ABL Agent (solely with respect to the economic and non-economic treatment of the DIP ABL Agent and DIP ABL Lenders pursuant to such order), the ABL Agent (solely with respect to the economic and non-economic treatment of the ABL Agent and ABL Lenders pursuant to such order), the Winning Bidder (solely with respect to the Sale Transaction), and the Sponsor.

48. "*Consenting Term Loan Lenders*" means the Term Loan Lenders that are party to the RSA, together with their respective successors and permitted assigns and any subsequent Term Loan Lenders that become party to the RSA in accordance with the terms of the RSA.

49. "*Consummation*" means the occurrence of the Effective Date.

50. "*Contingent Amounts*" means any (a) Sale Proceeds or other amounts that any Debtor, Post-Effective Date Debtor, or the Wind-Down Trust receives from the Sale Transaction (i) pursuant to the Asset Purchase Agreement or the Confirmation Order, whether received immediately upon the consummation of the Sale Transaction or on a later date, that the Debtors will not distribute under the Plan on the Effective Date due to such proceeds being escrowed, earmarked, reserved, or otherwise set aside to satisfy a Claim with a higher priority than the DIP Claims in accordance with the DIP Intercreditor Agreement or pursuant to the Bankruptcy Code or as otherwise provided under the Plan and/or (ii) on a date after the Effective Date in accordance with the Asset Purchase Agreement or the Confirmation Order and/or (b) any proceeds or other amounts that any Debtor or Post-Effective Date Debtor receives from any other source after the Effective Date but excluding the GUC Sale Transaction Recovery Pool, the Last Out Loans Turnover Amount, and the Commercial Tort Proceeds.

51. "*D&O Liability Insurance Policies*" means, collectively, (a) all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', members', trustees', managers', and officers' liability as of the Petition Date, and (b) all insurance policies (including any "tail policy") for directors', members', trustees', managers', and officers' liability maintained by the Debtors, the Estates, or the Post-Effective Date Debtors as of the Effective Date.

52. "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

53. "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.C of the Plan

54. "*Debtors*" means, collectively: (a) Dream II, (b) Hollander Home Fashions Holdings, LLC, (c) Hollander Sleep Products, LLC, (d) Hollander Sleep Products Kentucky, LLC, (e) Pacific Coast Feather, LLC, (f) Pacific Coast Feather Cushion, LLC, and (g) Hollander Sleep Products Canada Limited.

55. "*DIP ABL Agent*" means the administrative agent under the DIP ABL Credit Agreement, solely in its capacity as such.

56. "*DIP ABL Claims*" means any and all Claims derived from or based upon the DIP ABL Credit Facility, including all Claims for any fees and expenses of the DIP ABL Agent.

57. "*DIP ABL Credit Agreement*" means that certain debtor-in-possession credit agreement by and among the Debtors, the DIP ABL Agent, and the DIP ABL Lenders, as may be amended, modified, restated, or supplemented from time to time.

58.    "*DIP ABL Credit Facility*" means the senior secured revolving credit facility provided for under the DIP ABL Credit Agreement.

59.    "*DIP ABL Lenders*" means the banks, financial institutions, and other lenders party to the DIP ABL Credit Agreement from time to time, each letter of credit issuer thereunder, and each bank product provider thereunder, each solely in their capacity as such.

60.    "*DIP ABL Order*" means collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP ABL Credit Agreement and incur postpetition obligations thereunder.

61.    "*DIP Agents*" means collectively, the DIP ABL Agent and the DIP Term Loan Agent.

62.    "*DIP Claims*" means any and all Claims arising under or related to the DIP Facilities, including the Last Out DIP Loan Claims.

63.    "*DIP Credit Agreements*" means collectively, the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement.

64.    "*DIP Facilities*" means the DIP ABL Credit Facility and the DIP Term Loan Facility.

65.    "*DIP Intercreditor Agreement*" means the amended and restated intercreditor agreement, by and among the ABL Agent and the Term Loan Agent, which amended and restated the prepetition intercreditor agreement in its entirety, and is binding and enforceable against the Borrowers (as such term is defined in the DIP Orders), the other "Grantors" thereunder, the Prepetition Secured Parties, and the DIP Lenders in accordance with its terms.

66.    "*DIP Lenders*" means the banks, financial institutions, and other lenders party to the DIP Credit Agreements from time to time and the bank product providers thereunder.

67.    "*DIP Orders*" means collectively, the DIP ABL Order and the DIP Term Loan Order.

68.    "*DIP Term Loan Agent*" means the administrative agent under the DIP Term Loan Credit Agreement, solely in its capacity as such.

69.    "*DIP Term Loan Claims*" means any and all Claims derived from or based upon the DIP Term Loan Credit Facility, including all Claims for any fees and expenses of the DIP Term Loan Agent.

70.    "*DIP Term Loan Credit Agreement*" means that certain debtor-in-possession credit agreement by and among the Debtors, the DIP Term Loan Agent, and the DIP Term Loan Lenders, as may be amended, modified, restated, or supplemented from time to time.

71.    "*DIP Term Loan Credit Facility*" means the credit facility provided for under the DIP Term Loan Credit Agreement.

72.    "*DIP Term Loan Distributable Cash*" means any Cash proceeds or other Sale Proceeds of a Sale Transaction or the Wind-Down Trust Assets, including Contingent Amounts, in excess of amounts necessary to (a) satisfy all Claims senior in priority to the Term Loan Claims (including the ABL Claims and DIP ABL Claims secured by the ABL Priority Collateral), other than the DIP Term Loan Claims, in full in Cash, as provided herein, (b) fund the GUC Sale Transaction Recovery Pool, and (c) fund the $1.0 million reserved in the Wind-Down Trust for purposes set forth in Article IV.E.1 of the Plan.

73.    "*DIP Term Loan Distributable Cash Deductions*" means the payment or funding, or the reserving of estimates for such payments or funding, of Administrative Claims (other than DIP Term Loan Claims), Professional Fee Claims, the DIP ABL Claims, the Last Out DIP Loan Claims, the Priority Tax Claims, the Other Priority Claims, the Secured Tax Claims, the Other Secured Claims, any Cash amounts necessary to cover any cure payments not covered by the Asset Purchase Agreement, the payment of the statutory fees described in Article XII.C hereof, the

KE 63539087

$1.0 million reserved in the Wind-Down Trust for purposes set forth in Article IV.E.1 of the Plan, any reserves necessary to cover the reasonable estimated costs for the APA Post Closing Obligations (with such reasonable estimates to be developed in consultation with and subject to the reasonable approval of the Debtors, the DIP Term Loan Agent (acting at the direction of the Required DIP Lenders), and the Winning Bidder, which approvals shall not be unreasonably withheld, conditioned, or delayed), and the initial $600,000 of the GUC Sale Transaction Recovery Pool (as described in subsection (a) of the definition thereof).

74.     "**DIP Term Loan Documents**" means the DIP Term Loan Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, as may be amended, modified, restated, or supplemented from time to time.

75.     "**DIP Term Loan Lenders**" means the banks, financial institutions, and other lenders party to the DIP Term Loan Credit Agreement from time to time, each solely in their capacity as such.

76.     "**DIP Term Loan Order**" means collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Term Loan Credit Agreement and incur postpetition obligations thereunder.

77.     "**Disbursing Agent**" means, as applicable, the Debtors or the Plan Administrator (as applicable) or any Entity or Entities selected by the Debtors or the Plan Administrator to make or facilitate distributions contemplated under the Plan (in consultation with the DIP Term Loan Agent with respect to distributions made to the Holders of DIP Term Loan Claims and in consultation with the Term Loan Agent with respect to distributions made to the Holders of Term Loan Claims).

78.     "**Disclosure Statement**" means the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of July 21, 2019, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which must be reasonably acceptable to the Debtors, the Committee, the Required Term Lenders, the Term Loan Agent, the ABL Agent, and the Sponsor.

79.     "**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

80.     "**Disputed Claim Reserve**" means amounts in a bank account or accounts reserved for Disputed Claims.

81.     "**Distribution Record Date**" means the date for determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the Effective Date or such other date as is designated in a Final Order of the Bankruptcy Court.

82.     "**Dream II**" means Dream II Holdings, LLC.

83.     "**Effective Date**" means the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B of the Plan and (b) no stay of the Confirmation Order is in effect, which shall be the day Consummation occurs.

84.     "**Entity**" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

85.     "**Estate**" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

KE 63539087

86.    "*Excess Distributable Cash*" means any Cash proceeds or other Sale Proceeds of a Sale Transaction or the Wind-Down Trust Assets in excess of amounts necessary to satisfy the $1.0 million reserved in the Wind-Down Trust for purposes set forth in Article IV.E.1 of the Plan, and all Claims senior in priority to General Unsecured Claims, including the DIP Claims, the ABL Claims, and the Term Loan Claims, in full, in Cash, as provided herein.

87.    "*Exculpated Party*" means collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Committee and each of its respective members; (d) the DIP Agents; (e) the DIP Lenders; (f) the Put Purchasers; (g) the ABL Agent; (h) the ABL Lenders; (i) the Term Loan Agent; (j) the Term Loan Lenders; (k) the Sponsor; (l) the parties to the RSA; (m) the Plan Administrator; and (n) with respect to each of the foregoing entities, such Entity and its current and former Affiliates, and such Entities' and their current Affiliates' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

88.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

89.    "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

90.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

91.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be Filed relating to such order shall not cause such order to not be a Final Order.

92.    "*General Unsecured Claim*" means any Claim that is not Secured and is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) an Other Secured Claim, (c) a Priority Tax Claim, (d) an Other Priority Claim, (e) an ABL Claim, (f) a Term Loan Claim, or (g) a DIP Claim. Any Term Loan Deficiency Claim shall be waived and shall not constitute a General Unsecured Claim.

93.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

94.    "*GUC Sale Transaction Recovery Pool*" means, in a Sale Transaction, from the first available proceeds of the Term Loan Priority Collateral: (a) Cash in the amount of $600,000, plus (b) if the Term Loan Lenders receive more than a 30% recovery on account of their Term Loan Claims (based on the full amount of each such Holder's Term Loan Claim), 5% of each dollar in excess thereof, plus (c) if the Term Loan Lenders receive more than a 50% recovery on account of their Term Loan Claims (based on the full amount of each such Holder's Term Loan Claim), 7.5% of each dollar in excess thereof, less (d) any fees, expenses, and disbursements of the Plan Administrator in excess of the $1.0 million reserved in the Wind-Down Trust for purposes set forth in Article IV.E.1 of the Plan and any fees, expenses, disbursements associated with the prosecution of Commercial Tort Claims, if any.

95.    "*Holder*" means an Entity holding a Claim or an Interest in any Debtor.

8

96.     "*Hollander Canada*" means Hollander Sleep Products Canada Limited.

97.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

98.     "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, members, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors.

99.     "*Information Officer*" means the information officer appointed by the Canadian Court in the Recognition Proceedings.

100.    "*Initial Distribution Date*" means the date on which the Disbursing Agent shall make initial distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date but in no event shall be later than 30 days after the Effective Date.

101.    "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate of a Debtor against another Debtor arising before the Petition Date and excludes, for the avoidance of doubt, the Canadian Intercompany Claim.

102.    "*Intercompany Interest*" means an Interest in any Debtor, or a direct or indirect subsidiary of any Debtor, other than an Interest in Dream II.

103.    "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of June 9, 2017, by and among the Prepetition Agents, as amended, restated, supplemented, or otherwise modified in accordance with its terms.

104.    "*Interest*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

105.    "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 179], entered by the Bankruptcy Court on July 3, 2019, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

106.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

107.    "*Last Out DIP Loan Claims*" means any and all Claims derived from or based upon the Last Out DIP Loans.

108.    "*Last Out DIP Loans*" means those Last Out Loans that upon entry of the final DIP ABL Order were deemed refinanced or replaced by, or otherwise converted into, Last Out Loans under the DIP ABL Credit Facility.

109.    "*Last Out Loans*" means those "Last Out Loans" as defined in the ABL Credit Agreement.

KE 63539087

110.    "**_Last Out Loans Reduction Amount_**" means the reduction of $350,000 in the aggregate that would otherwise be paid to the Holders of the Last Out DIP Loan Claims on the Effective Date, which amount shall be deemed to first include the reduction of postpetition interest incurred in connection with the Last Out DIP Loans, _provided_ that such reduction shall not diminish the requirement to pay the Last Out Loans Turnover Amount.

111.    "**_Last Out Loans Turnover_**" means the turnover of the Last Out Loans Turnover Amount in accordance with the terms of the Plan.

112.    "**_Last Out Loans Turnover Amount_**" means an amount up to $650,000 in the aggregate to be paid for the benefit of Holders of General Unsecured Claims, which shall be paid from (i) the first $200,000 of any proceeds distributed to Holders of Last Out DIP Loan Claims on account of such Claims, plus (ii) 50 percent of each dollar received in excess of the first $200,000 of any such proceeds distributed to the Holders of Last Out DIP Loan Claims up to a total maximum amount of $650,000 (inclusive of the first $200,000 of proceeds paid).

113.    "**_Lien_**" means any lien, as such term is defined in section 101(37) of the Bankruptcy Code.

114.    "**_Notice and Claims Agent_**" means Omni Management Group in its capacity as notice and claims agent for the Debtors and any successor.

115.    "**_Other Priority Claim_**" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

116.    "**_Other Secured Claim_**" means any Secured Claim that is not a DIP Claim, an ABL Claim, a Term Loan Claim, or a Secured Tax Claim, and includes (i) any Claim secured by the Administration Charge, and (ii) the Canadian Intercompany Claim.

117.    "**_Payoff Letter_**" means the payoff letter in respect of any payment in full of the DIP ABL Claims and ABL Claims (including Last Out DIP Loan Claims) in accordance with Section 1.4 of the DIP ABL Credit Agreement, to be agreed upon by the Debtor and the DIP ABL Agent prior to the Effective Date.

118.    "**_Person_**" means a person as such term as defined in section 101(41) of the Bankruptcy Code.

119.    "**_Petition Date_**" means the date on which each of the Debtors commenced the Chapter 11 Cases.

120.    "**_Plan_**" means this _Debtors' Joint Plan of Reorganization of Hollander Sleep Products, LLC and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code_, as may be altered, amended, modified, or supplemented from time to time in accordance with Article X hereof, including the Plan Supplement (as modified, amended or supplemented from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein.

121.    "**_Plan Administrator_**" means (a) if the Holders of Class 5 Claims vote to accept the Plan, a person or Entity designated by the Committee in consultation with the Debtors and the DIP Term Loan Agent (acting at the direction of the Required DIP Lenders), or (b) if the Holders of Class 5 Claims vote to reject the Plan, a person or Entity designated by the Debtors in consultation with the Committee and the DIP Term Loan Agent (acting at the direction of the Required DIP Lenders), who will be disclosed prior to the Confirmation Hearing and will serve as the trustee and administrator for the Wind-Down Trust and have all power and authorities as set forth in Article IV.D of the Plan.

122.    "**_Plan Administrator Certificate_**" means a certification Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made under the Plan.

123.    "**_Plan Settlement_**" means the good faith compromise and settlement of all Claims, Interests, and controversies as described in Article IV.A of the Plan.

10

124.    "***Plan Supplement***" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, the initial draft of certain of such documents shall be Filed by the Debtors fourteen calendar days before the first day of the Confirmation Hearing, and additional documents Filed with the Bankruptcy Court prior to the Effective Date, as may be amended, supplemented, altered, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including: (a) the Asset Purchase Agreement; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Schedule of Retained Causes of Action; (e) the Payoff Letter; (f) the identity and terms of compensation of the Plan Administrator; (g) the Wind-Down Trust Agreement; and (h) any necessary documentation related to the Sale Transaction, which shall be reasonably acceptable to the Debtors, the Sponsor, the Term Loan Agent, the Required Term Lenders, and the Winning Bidder.

125.    "***Post-Effective Date Debtor***" means any Debtor, or any successor thereto after the Effective Date.

126.    "***Prepetition Agents***" means the ABL Agent and the Term Loan Agent.

127.    "***Prepetition Facilities***" means the ABL Credit Facility and the Term Loan Facility.

128.    "***Prepetition Secured Lenders***" means the ABL Lenders and Term Loan Lenders.

129.    "***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

130.    "***Pro Rata***" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

131.    "***Professional***" means an Entity retained in the Chapter 11 Cases pursuant to and in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code, *provided* that, for the avoidance of doubt, the advisors to the Term Loan Agent, the DIP Agents, and the ABL Agent shall not constitute a "Professional."

132.    "***Professional Fee Claims***" mean all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court and regardless of whether a monthly fee statement or interim fee application has been Filed for such fees and expenses.  To the extent a Bankruptcy Court or higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

133.    "***Professional Fee Escrow Account***" means an interest-bearing escrow account to be funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount, *provided* that the Professional Fee Escrow shall be increased with Cash held by the Post-Effective Date Debtors or by the Wind-Down Trust to the extent applications are filed after the Effective Date in excess of the amount of Cash funded into the escrow as of the Effective Date, *provided* that any such incremental funding will not reduce the GUC Sale Transaction Recovery Pool or the $1.0 million reserved in the Wind-Down Trust for purposes set forth in Article IV.E.1 of the Plan.

134.    "***Professional Fee Escrow Amount***" means the total amount of Professional fees and expenses estimated pursuant to Article II.B.3 of the Plan.

135.    "***Proof of Claim***" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

136.    "***Proof of Interest***" means a written proof of Interest Filed against any of the Debtor in the Chapter 11 Cases.

KE 63539087

137.    "**Put Purchasers**" means Sentinel Capital Partners V, L.P., Sentinel Dream Blocker, Inc., and Sentinel Capital Investors V, L.P.

138.    "**Quarterly Distribution Date**" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date, or as soon thereafter as is reasonably practicable.

139.    "**Recognition Proceedings**" means the proceedings commenced by the Debtors under Part IV of the CCAA in the Canadian Court to recognize the Chapter 11 Cases as "foreign main proceedings" in Canada.

140.    "**Reinstate**," "**Reinstated**," or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest not Impaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

141.    "**Released Party**" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Prepetition Secured Lenders; (d) the Prepetition Agents; (e) the DIP Lenders; (f) the Put Purchasers; (g) the DIP Agents; (h) the Plan Administrator; (i) the Winning Bidder; (j) the Sponsor; (k) the parties to the RSA; (l) the Committee; and (m) with respect to each of the foregoing in clauses (a) through (l), such Entity and its current and former Affiliates, and such Entities' and their current Affiliates' directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members (other than members of the Committee), management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any of the foregoing that does not consent to the releases shall not be a "Released Party."

142.    "**Releasing Parties**" means, collectively, each of the following: (a) the Debtors; (b) the Post-Effective Date Debtors; (c) the Prepetition Secured Lenders; (d) the Prepetition Agents; (e) the DIP Lenders; (f) the Put Purchasers; (g) the DIP Agents; (h) the Winning Bidder; (i) the Sponsor; (j) the parties to the RSA; and (k) the Committee; (l) with respect to each of the foregoing in clauses (a) through (k), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, affiliates, managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members (other than members of the Committee), financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such and solely to the extent of such Entity's authority to bind any of the foregoing, including pursuant to agreement or applicable non-bankruptcy law; (m) all Holders of Claims that vote to accept the Plan; (n) all Holders of Claims that vote to reject the Plan but elect on their ballot to opt into the Third-Party Release; and (o) all Holders of Claims or Interests not described in the foregoing clauses (a) through (n) who elect to opt into the Third-Party Release.

143.    "**Required DIP Lenders**" means the "Required Lenders" as defined in the DIP Term Loan Credit Agreement.

KE 63539087

144.    "*Required Term Lenders*" means the "Required Consenting Term Loan Lenders" as defined in the RSA.

145.    "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan.

146.    "*RSA*" means that certain restructuring support agreement, dated as of May 19, 2019, by and among the Debtors, the Consenting Term Loan Lenders, and the Sponsor, as amended and restated by that certain amended and restated restructuring support and settlement agreement, dated as of July 21, 2019, by and among the Debtors, the Consenting Term Loan Lenders, the Committee, and the Sponsor, as may be amended, restated, supplemented, or modified from time to time, which RSA was approved by the Bankruptcy Court on August 15, 2019 [Docket No. 298].

147.    "*Sale Proceeds*" means all proceeds of the Sale Transaction, including the Cash proceeds and the Warrants, that the Debtors or the Plan Administrator shall receive in accordance with the Asset Purchase Agreement.

148.    "*Sale Transaction*" means the sale of certain of the Debtors' assets to the Winning Bidder to be consummated in accordance with the Plan and the Asset Purchase Agreement.

149.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means that certain schedule filed with the Plan Supplement of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, or assumed by the Debtors and assigned to the Winning Bidder pursuant to the Plan and in accordance with the Asset Purchase Agreement, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which shall be reasonably acceptable to the Debtors, the Term Loan Agent, the Required Term Lenders, and the Winning Bidder.

150.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means that certain schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which shall be reasonably acceptable to the Debtors, the Term Loan Agent, the Required Term Lenders, and the Winning Bidder and shall be included in the Plan Supplement.

151.    "*Schedule of Retained Causes of Action*" means that certain schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan or the Asset Purchase Agreement, as such schedule may be amended, modified, or supplemented from time to time by the Debtors, which shall be reasonably acceptable to the Debtors, the Term Loan Agent, the Required Term Lenders, and the Winning Bidder, and shall be included in the Plan Supplement.

152.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules may be amended, modified, or supplemented from time to time.

153.    "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; *provided* that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

154.    "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court or Canadian Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, which value shall be determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

155.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

KE 63539087

156.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

157.    "**Security**" means a security as defined in section 2(a)(1) of the Securities Act.

158.    "**Sponsor**" means Sentinel Capital Partners on behalf of itself and each of its affiliated investment funds or investment vehicles managed or advised by it, and its Affiliates, each solely in their capacity as Holders of direct or indirect equity interests in Dream II.

159.    "**Term Loan Agent**" means Barings Finance LLC, in its capacity as administrative agent under the Term Loan Credit Agreement, solely in its capacity as such.

160.    "**Term Loan Claims**" means any and all Claims relating to, arising out of, arising under, or arising in connection with the Term Loan Facility and the Term Loan Documents.

161.    "**Term Loan Credit Agreement**" means that certain term loan credit agreement dated as of June 9, 2017, by and among Hollander Sleep Products, LLC, as borrower, Dream II and Hollander Home Fashions Holdings, LLC, as guarantors, the Term Loan Lenders, and the Term Loan Agent, as amended, modified, restated, or supplemented from time to time prior to the Petition Date.

162.    "**Term Loan Deficiency Claim**" means a Term Loan Claim that is not a Secured Claim, which Term Loan Deficiency Claim shall be, subject to the occurrence of the Effective Date, waived pursuant to the Plan.

163.    "**Term Loan Distributable Cash**" means any Cash proceeds or other Sale Proceeds of a Sale Transaction or the Wind-Down Trust Assets, including Contingent Amounts, in excess of amounts necessary to (i) satisfy all Claims senior in priority to the Term Loan Claims (including the ABL Claims and DIP ABL Claims secured by the ABL Priority Collateral) in full, in Cash, as provided herein, (ii) fund the GUC Sale Transaction Recovery Pool, and (iii) fund the $1.0 million reserved in the Wind-Down Trust for purposes set forth in Article IV.E.1 of the Plan.

164.    "**Term Loan Documents**" means the Term Loan Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements, in each case, as amended, modified, restated, or supplemented from time to time prior to the Petition Date.

165.    "**Term Loan Facility**" means the term loan facility provided for under the Term Loan Credit Agreement.

166.    "**Term Loan Lenders**" means the banks, financial institutions, and other lenders party to the Term Loan Credit Agreement from time to time, each solely in their capacity as such.

167.    "**Term Loan Priority Collateral**" means "Term Loan Priority Collateral" as defined in the Intercreditor Agreement

168.    "**Third-Party Release**" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.D of the Plan.

169.    "**U.S. Trustee**" means the Office of the United States Trustee for the Southern District of New York.

170.    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

171.    "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

KE 63539087

172.    "*Voting Deadline*" means 4:00 p.m., prevailing Eastern Time, on August 28, 2019.

173.    "*Warrants*" means the warrants to be issued to Dream II upon the consummation of the Sale Transaction by the Winning Bidder in accordance with the terms of the Asset Purchase Agreement, which warrants shall grant the holders of such warrants the right to purchase 7.5% of the fully diluted common equity in the Winning Bidder on the terms set forth in the warrant agreement, which warrants and warrant agreement shall be in form and substance reasonably acceptable to the DIP Term Loan Agent (acting at the direction of the Required DIP Lenders), and shall be assignable and distributed in accordance with the terms of this Plan, *provided* that the DIP Term Loan Agent and the DIP Term Loan Lenders, by their execution and delivery of the Third Amendment to the DIP Term Loan Credit Agreement, dated as of September 3, 2019, are deemed to have acknowledged and agreed that the economic terms of the warrants, and not any other terms of the warrants or warrant agreement, as set forth on section 2.1 of the Asset Purchase Agreement in effect as of September 3, 2019, are acceptable.

174.    "*Wind-Down Trust*" means that certain trust to be created on the Effective Date, as described in Article IV.E of the Plan.

175.    "*Wind-Down Trust Account*" means the bank account or accounts used to fund all expenses and payments required to be made by the Plan Administrator, which shall be established by the Plan Administrator on or after the Effective Date.

176.    "*Wind-Down Trust Agreement*" means that certain agreement establishing the Wind-Down Trust, which shall be reasonably acceptable to the Debtors, the Committee, the DIP Term Loan Agent, the Required DIP Lenders, the Term Loan Agent, and the Required Term Lenders and the form of which shall be included in the Plan Supplement.

177.    "*Wind-Down Trust Assets*" means all of the assets of the Debtors' Estates remaining after the closing of the Sale Transaction, which assets shall be treated as transferred to and beneficially owned by the Wind-Down Trust as of the Effective Date; *provided* that (a) any such assets that cannot be transferred to the Wind-Down Trust on the Effective Date shall be held by the Post-Effective Date Debtors for the benefit of the Wind-Down Trust for purposes of winding down the Debtors' Estates and implementing the terms of the Plan and (b) any Canadian Assets shall continue to be owned by Hollander Canada, and the shares of which shall be owned by the Wind-Down Trust for purposes of winding down the Debtor's Estates and implementing the terms of the Plan.

178.    "*Winning Bidder*" means Bedding Acquisition, LLC and its successors and permitted assigns, as the purchaser of certain of the Debtors' assets in accordance with the Asset Purchase Agreement.

B.    *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) the words "include" and "including," or variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (9) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect

KE 63539087

to the principles of conflict of laws; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any effectuating provisions may be interpreted by the Debtors or Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (19) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Post-Effective Date Debtors shall mean the Debtors and the Post-Effective Date Debtors, as applicable, to the extent the context requires.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate or limited liability company governance matters relating to the Debtors or the Post-Effective Date Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the applicable Debtor or the Post-Effective Date Debtors, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    *Non-Consolidated Plan*

Although for purposes of administrative convenience and efficiency the Plan has been filed as a joint plan that addresses the reorganization of each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors and the Plan is a separate Plan for each Debtor.

KE 63539087

# ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Professional Fee Claims and DIP Claims (which are addressed in Article II.B and Article II.C, respectively), and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Post-Effective Date Debtors and the Plan Administrator no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the Post-Effective Date Debtors (if the Post-Effective Date Debtors are not the objecting party), the Plan Administrator, and the requesting party on or before the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims and DIP Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, the Estates, the Plan Administrator, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors or the Plan Administrator or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

B.      *Professional Fee Claims*

1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 30 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Plan Administrator shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

KE 63539087

19-11608    Case 1:19-cv-0504    Doc 356    Filed 09/05/19    Entered 09/05/19 12:38:13    Main Document
Pg 56 of 97

2.      Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, the Plan Administrator, or the Post-Effective Date Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Plan Administrator, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Plan Administrator's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Trust without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

3.      Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Plan Administrator shall use Cash from the Wind-Down Trust or the Post-Effective Date Debtors to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.      Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by (a) the Debtors after the Confirmation Date, and (b) the Committee after the Confirmation Date through and including the Effective Date, in the ordinary course of business. The Debtors and the Plan Administrator, as applicable, shall pay within ten business days after submission of a detailed invoice to the Debtors or the Plan Administrator, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors, as applicable.  If the Debtors dispute the reasonableness of any such invoice, the Debtors or the Plan Administrator, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

KE 63539087

C.      *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, costs, other charges, and expenses. Upon the indefeasible payment or satisfaction in full in Cash of the Allowed DIP Claims in accordance with the terms of this Plan, or other such treatment as contemplated by this Article II.C of the Plan, on the Effective Date all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

1.      DIP ABL Claims

Except as set forth in Article II.C.2 and to the extent that a Holder of an Allowed DIP ABL Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed DIP ABL Claim, each such Holder of an Allowed DIP ABL Claim shall receive on the Effective Date payment in full in Cash of such Holder's Allowed DIP ABL Claim pursuant to the Payoff Letter. Notwithstanding anything to the contrary in this Plan, the Post-Effective Date Debtors shall be and remain bound by the indemnification and expense reimbursement provisions of the Payoff Letter in favor of the DIP ABL Agent and DIP ABL Lenders.

Pursuant to the DIP ABL Credit Agreement, all distributions pursuant to this Article II.C.1 shall be made to the DIP ABL Agent for distributions to the DIP ABL Lenders in accordance with the DIP ABL Credit Agreement and DIP ABL Loan Documents. The DIP ABL Agent shall hold or direct distributions for the benefit of the Holders of DIP ABL Claims. The DIP ABL Agent shall retain all rights as DIP ABL Agent under the DIP ABL Documents in connection with the delivery of the distributions to the DIP ABL Lenders. The DIP ABL Agent shall not have any liability to any person with respect to distributions made or directed to be made by such DIP ABL Agent, except for liability arising from gross negligence, willful misconduct, or actual fraud of the DIP Term Loan Agent. All cash distributions to be made hereunder to the DIP ABL Agent on account of the DIP ABL Claims shall be made by wire transfer.

2.      Last Out DIP Loan Claims

Subject to the Last Out Loans Turnover and the Last Out Loans Reduction Amount, each Holder of an Allowed Last Out DIP Loan Claim (or to the extent the Last Out Loans are not rolled into the Last Out DIP Loans, the Holders of Last Out Loans) shall receive payments in accordance with the waterfall provisions of the DIP ABL Credit Agreement, the DIP Intercreditor Agreement, and the final DIP ABL Order and final DIP Term Loan Order.

3.      DIP Term Loan Claims

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed DIP Term Loan Claim, each such Holder of an Allowed DIP Term Loan Claim shall receive (a) on the Effective Date, its Pro Rata share of (1) DIP Term Loan Distributable Cash (after the DIP Term Loan Distributable Cash Deductions) and (2) the Warrants and (b) after the Effective Date, until its Allowed DIP Term Loan Claim has been repaid in full in Cash (without taking into account the receipt of the Warrants) its Pro Rata share of all DIP Term Loan Distributable Cash constituting Contingent Amounts (after the DIP Term Loan Distributable Cash Deductions), if and when received by the Plan Administrator, which such DIP Term Loan Distributable Cash constituting Contingent Amounts shall be distributed by the Plan Administrator to the DIP Term Loan Agent for distributions to the DIP Term Loan Lenders in accordance with the DIP Term Loan Credit Agreement and DIP Term Loan Documents. The DIP Term Loan Claims shall be Allowed in the aggregate amount outstanding under the DIP Term Loan Credit Facility as of the Effective Date; *provided*, *however*, that the DIP Term Loan Claims in respect of contingent and unliquidated obligations of the Debtor under the DIP Term Loan Credit Agreement shall survive the Effective Date on an unsecured basis and shall not be released pursuant to the Plan or Confirmation Order, and shall be paid by the Plan Administrator as and when due under the DIP Term Loan Documents.

KE 63539087

Pursuant to the DIP Term Loan Credit Agreement, all Cash distributions pursuant to this Article II.C.3 shall be made to the DIP Term Loan Agent for distributions to the DIP Term Loan Lenders in accordance with the DIP Term Loan Credit Agreement and DIP Term Loan Documents. The DIP Term Loan Agent shall hold or direct distributions for the benefit of the Holders of DIP Term Loan Claims. The DIP Term Loan Agent shall retain all rights as DIP Term Loan Agent under the DIP Term Loan Documents in connection with the delivery of the distributions to the DIP Term Loan Lenders. The DIP Term Loan Agent shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Term Loan Agent, except for liability arising from gross negligence, willful misconduct, or actual fraud of the DIP Term Loan Agent. All cash distributions to be made hereunder to the DIP Term Loan Agent on account of the DIP Term Loan Claims shall be made by wire transfer.

D.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.F hereof. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, except that Class 8 shall be vacant at each Debtor other than Dream II. Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Term Loan Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM
INDEX NO. 656014/2020
NYSCEF DOC. NO. 68
RECEIVED NYSCEF: 11/04/2020
19-11608 Case 1:19-cv-50411 Doc 356 Filed 09/05/19 Entered 09/05/19 12:38:13 Main Document
Pg 59 of 97

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 7 | Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Interests in Dream II | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests*

Subject to Article IV hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Priority Claims

(a)     *Classification*: Class 1 consists of all Other Priority Claims.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Post-Effective Date Debtor:

(i)     payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or

(ii)    such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)     *Voting*: Class 1 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of an Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Secured Claims

(a)     *Classification*: Class 2 consists of all Other Secured Claims.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Post-Effective Date Debtor:

(i)     payment in full in Cash of such Holder's Allowed Other Secured Claim;

(ii)    the collateral securing such Holder's Allowed Other Secured Claim;

KE 63539087

(iii)    Reinstatement of such Holder's Allowed Other Secured Claim; or

(iv)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

(c)    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of an Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 – Secured Tax Claims

(a)    *Classification*:  Class 3 consists of all Secured Tax Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim and the applicable Debtor or Post-Effective Date Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, each such Holder shall receive, at the option of the applicable Debtor or Post-Effective Date Debtor, as applicable:

(i)    payment in full in Cash of the unpaid portion of such Holder's Allowed Secured Tax Claim on the later of the Effective Date and such date such Secured Tax Claim becomes an Allowed Secured Tax Claim; or

(ii)    equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years from the Petition Date, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c)    *Voting*:  Class 3 is Unimpaired under the Plan.  Each Holder of a Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Secured Tax Claim is not entitled to vote to accept or reject the Plan.

4.    Class 4 – Term Loan Claims

(a)    *Classification*:  Class 4 consists of all Term Loan Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Term Loan Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Term Loan Claim, each Holder of an Allowed Term Loan Claim shall receive its Pro Rata share of the Term Loan Distributable Cash up to the full amount of such Holder's Allowed Term Loan Claim or such other treatment rendering such Holder's Allowed Term Loan Claim Unimpaired.

(c)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of Term Loan Claims are entitled to vote to accept or reject the Plan.

22

5.    <u>Class 5 – General Unsecured Claims</u>

(a)    *Classification*:  Class 5 consists of all General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such Holder's Allowed General Unsecured Claim, its Pro Rata share of:

(i)    the Last Out Loans Turnover Amount;

(ii)    the Commercial Tort Proceeds, if any;

(iii)    the GUC Sale Transaction Recovery Pool; and

(iv)    the Excess Distributable Cash, if any.

(c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 6 – Intercompany Claims</u>

(a)    *Classification*:  Class 6 consists of all Intercompany Claims.

(b)    *Treatment*:  Holders of Intercompany Claims shall not receive any distribution on account of such Intercompany Claims.  On or after the Effective Date, the Plan Administrator may reconcile such Intercompany Claims as may be advisable in order to avoid the incurrence of any past, present, or future tax or similar liabilities by the Debtors.

(c)    *Voting*:  Class 6 is Impaired under the Plan.  Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 – Intercompany Interests</u>

(a)    *Classification*:  Class 7 consists of all Intercompany Interests.

(b)    *Treatment*:  Intercompany Interests shall be, at the option of the Debtors, in consultation with the Term Loan Agent and the Required Term Lenders, either:

(i)    Reinstated in accordance with Article III.G of the Plan;

(ii)    cancelled and released without any distribution on account of such Interests; or

(iii)    solely in the case of Hollander Canada, transferred to and owned by the Wind-Down Trust.

(c)    Voting:  Class 7 is Impaired or Unimpaired under the Plan.  Holders of Intercompany Interests are either (i) conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code or (ii) presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

KE 63539087

8.　　Underline{Class 8 – Interests in Dream II}

    (a)　　*Classification*: Class 8 consists of all Interests in Dream II.

    (b)　　*Treatment*: On the Effective Date, all Interests in Dream II will be cancelled, released, and extinguished, and will be of no further force or effect.

    (c)　　*Voting*: Class 8 is Impaired under the Plan. Holders of Interests in Dream II are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Interest in Dream II are not entitled to vote to accept or reject the Plan.

9.　　<u>Class 9 – Section 510(b) Claims</u>

    (a)　　*Classification*: Class 9 consists of all Section 510(b) Claims.

    (b)　　*Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

    (c)　　*Treatment*: Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

    (d)　　*Voting*: Class 9 is Impaired under the Plan. Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders (if any) of 510(b) Claims are not entitled to vote to accept or reject the Plan.

C.　　*Special Provision Governing Unimpaired Claims*

    Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired, *provided*, *however*, that the Reinstatement or other treatment of such Claims shall not be inconsistent with the Asset Purchase Agreement. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.　　*Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

    Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.　　*Subordinated Claims*

    Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination,

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM    INDEX NO. 656014/2020
19-11608    Case 1-19-05904-51    Filed 09/05/19    Entered 09/05/19 12:38:13    RECEIVED NYSCEF: 11/04/2020
NYSCEF DOC. NO. 608

Pg 63 of 97

section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Plan Administrator reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.    *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.    *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of General Unsecured Claims and (B) in exchange for the Debtors' agreement under the Plan to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors to the Holders of certain Allowed Claims. For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Post-Effective Date Debtor.

H.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims and Interests*

As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and applicable, law, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, including (1) the Debtors' agreement to (A) turnover any Commercial Tort Proceeds for the benefit of the Holders of General Unsecured Claims and (B) waive Avoidance Actions, (2) the DIP Term Loan Lenders agreement to consent to the treatment of the DIP Term Loan Claims set forth in Article II.C hereof in the event such treatment does not repay the DIP Term Loan Claims in full, (3) the Term Loan Lenders' agreement to (A) consent to the Debtors' funding of the GUC Sale Transaction Recovery Pool and the $1.0 million reserved in the Wind-Down Trust for purposes set forth in Article IV.E.1 of the Plan and (B) subject to the occurrence of the Effective Date, forgo any Term Loan Deficiency Claim, (4) the Sponsor's agreement to fund the Last Out Loans Turnover Amount, and (5) the Committee's agreement to (A) support and take, and refrain from taking, actions set forth in the RSA, including taking those actions necessary to obtain Bankruptcy Court approval of the Plan and Disclosure Statement and (B) abide by the Committee Monthly Fee Cap, upon the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including (i) any challenge to the amount, validity, perfection, enforceability, priority, or extent of all Term Loan Claims, DIP Claims, and all ABL Claims (including any liens related to the foregoing), (ii) any Avoidance Actions, and (iii) any claims or Causes of Action against the Holders of Term Loan Claims, DIP Claims, ABL Claims, or Interests. The Plan shall be deemed a motion to approve the Plan Settlement pursuant to Bankruptcy Rule 9019, and

the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

B.      *Restructuring Transactions*

On the Effective Date, the Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the Debtors and the Winning Bidder determine to be necessary or appropriate in connection with the consummation of the Sale Transaction, including making filings or recordings that may be required by applicable law in connection with the Plan.

C.      *Sources of Consideration for Plan Distributions*

On and after the Effective Date, the Debtors or the Plan Administrator, as applicable, will fund the Debtors' distributions and obligations under the Plan with Cash on hand, as well as the following sources of consideration. After the Effective Date, to the extent not held in the Professional Fee Escrow Account, the amounts held by the Wind-Down Trust shall be held in the Wind-Down Trust Account.

1.      <u>Sale Transaction and Sale Proceeds</u>

The Debtors selected the Winning Bidder to consummate the Sale Transaction after a marketing process that was approved in and conducted in accordance with the Bidding Procedures Order.  The Sale Transaction was the highest and otherwise best offer for the Debtors' assets.  On the Effective Date, the Debtors shall consummate the Sale Transaction and, among other things, the Acquired Assets shall be transferred to and vest in the Winning Bidder free and clear of all Liens, Claims, charges, interests or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Confirmation Recognition Order, the Plan, and the Asset Purchase Agreement, each as applicable.  In exchange, the Winning Bidder shall pay to the Debtors the Sale Proceeds in accordance with the Asset Purchase Agreement.

Notwithstanding anything to the contrary in this Plan: (a) all APA Post Closing Obligations shall be treated in accordance with the Asset Purchase Agreement and paid from the Sale Proceeds, Wind-Down Trust Assets, or the Canadian Assets without the need for the filing of any Proof of Claim or request for payment with respect to such obligations, *provided* that such payments shall not be paid from any of the Wind-Down Trust Assets that constitute the Last Out Loans Turnover Amount or the GUC Sale Transaction Recovery Pool under the terms of this Plan, and shall be (i) appropriately estimated and reserved for prior to any distribution of the Sale Proceeds from the Debtors or their Estates, *provided* that the Debtors must make the distributions set forth in Article II.C.1, Article II.C.2, and Article II.C.3 hereof on the Effective Date, and (ii) paid in the ordinary course as and when due and payable; and (b) the Debtors, Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall remain obligated to satisfy such post-closing obligations.

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM     INDEX NO. 656014/2020

NYSCEF DOC. NO. 608    19-11608-scc    Doc 356-1    Filed 09/05/19    Entered 09/05/19 12:38:12    Main Document    RECEIVED NYSCEF: 11/04/2020

Pg 65 of 97

2.      <u>Last Out Loans Turnover Amount</u>

The Sponsor shall cause to be delivered the Last Out Loans Turnover Amount to fund recoveries for the Holders of General Unsecured Claims. The Last Out Loans Turnover Amount shall be funded solely from the Cash proceeds, if any, received by the Sponsor on account of the Last Out DIP Loan Claims.

D.      *Plan Administrator and Post-Effective Date Debtors*

The Plan Administrator shall act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers (or, in the case of Hollander Canada, directors) and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, articles of incorporation or amendment by-laws, and related documents, as applicable, are deemed amended pursuant to the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers (or, in the case of Hollander Canada, directors) and officers for the Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager and sole officer for the Post-Effective Date Debtors and shall succeed to the powers of the Post-Effective Date Debtors' managers and officers (or, in the case of Hollander Canada, directors). From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for the Post-Effective Date Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Plan Administrator to continue the employment of any former manager, director, or officer, including pursuant to any transition services agreement or other agreement entered into on or after the Effective Date by and between the Plan Administrator and the Winning Bidder.

Among other things, the Plan Administrator shall be responsible for: (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and administering the liquidation of the Post-Effective Date Debtors and any assets held by the Wind-Down Trust (including any assets held on its behalf by the Post-Effective Date Debtors while the Post-Effective Date Debtors are being wound down and any remaining Canadian Assets held by Hollander Canada) after the Effective Date and after consummation of the Sale Transaction, (2) resolving any Disputed Claims, (3) paying Allowed Claims, (5) performing pursuant to the Asset Purchase Agreement, including satisfying any liabilities owed to the Winning Bidder in accordance with the Asset Purchase Agreement, (6) filing appropriate tax returns, and (7) administering the Plan, and the Plan Administrator shall consult with the Information Officer in respect of any matters relating to the foregoing as such matters also relate to Canada. Without limiting the foregoing, the Plan Administrator shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court or Canadian Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court or Canadian Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

The Plan Administrator shall be named prior to Confirmation. The Plan Administrator shall represent the Wind-Down Trust and shall have the right to retain the services of attorneys, accountants, and other professionals that the Plan Administrator determines, in its sole discretion, are necessary to assist the Plan Administrator in performing his or her duties. The Plan Administrator shall pay the reasonable fees and expenses of such professionals upon the monthly submission of statements to the Plan Administrator. The Plan Administrator shall also pay the reasonable fees and disbursements of the Information Officer and its counsel upon the submission of invoices on a monthly basis to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals and of the Information Officer and its counsel shall be made promptly and shall not be subject to the approval of the Bankruptcy Court. The fees and expenses of the Information Officer and its counsel shall remain subject to the approval of the Canadian Court in the Recognition Proceedings.

E.      *Wind-Down*

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court and Canadian Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Estates.

On and after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Asset Purchase Agreement and take such other actions as the Plan Administrator may determine

KE 63539087

to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the liquidation and wind-down of any remaining assets or operations, from and after the Effective Date, the Debtors (1) for all purposes, shall be deemed to have withdrawn their business operations from any state or province in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action to effectuate such withdrawal, (2) shall be deemed to have cancelled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly operating or disbursement report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator, and copies of all such reports shall be provided to the Information Officer as soon as reasonably practicable following their preparation and upon their filing. The Plan Administrator shall respond promptly to any reasonable information requests of the Information Officer in order to ensure the Information Officer can carry out its mandate pursuant to the orders of the Canadian Court in the Recognition Proceedings.

1.    Wind-Down Trust and Distribution of Assets of Hollander Canada

On the Effective Date, the Wind-Down Trust will be formed pursuant to the Wind-Down Trust Agreement and immediately after the consummation of the Sale Transaction to receive all of the assets of the Post-Effective Date Debtors other than Hollander Canada. Any proceeds received in the Sale Transactions in respect of the Canadian Assets and distributed to Holders of Claims against Hollander Canada shall be treated as distributed to such Holders on behalf of Hollander Canada. Until final dissolution of Hollander Canada, (a) the shares of Hollander Canada shall be owned by the Wind-Down Trust and (b) any remaining Canadian Assets shall be continued to be owned by Hollander Canada until recovered by the Plan Administrator and shall be distributed by Hollander Canada to the Wind-Down Trust in respect of such shares as part of a plan of liquidation of Hollander Canada (within the meaning of section 331 of the Internal Revenue Code of 1986, as amended), subject to any withholding requirements in accordance with Article VI.G of the Plan; *provided* that the Plan Administrator shall have authority to take any and all necessary actions to transfer or close the Debtors' existing bank accounts or open new bank accounts, subject to the documentation with the applicable bank, as necessary, for the benefit of the Wind-Down Trust; *provided, further*, that any such assets of the Post-Effective Date Debtors not transferred to the Wind-Down Trust on the Effective Date, other than the remaining Canadian Assets, shall be deemed transferred to and beneficially owned by the Wind-Down Trust for U.S. federal and all other applicable tax purposes as of the Effective Date and, to the fullest extent permitted by U.S. federal and other applicable income tax law, each of the Post-Effective Date Debtors other than Hollander Canada shall be treated as liquidated on the Effective Date. All Canadian Assets will be distributed to Holders of Claims in each case in accordance with their respective entitlements under the Plan.

The Wind-Down Trust will be established for the primary purpose of liquidating the Wind-Down Trust Assets and winding down the Estates, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Wind-Down Trust. The Debtors or Post-Effective Date Debtors will have no reversionary or further interest in or with respect to the Wind-Down Trust Assets upon the transfer of the Wind-Down Trust Assets as more fully set forth in the Wind-Down Trust Agreement. For all U.S. federal income tax purposes, the beneficiaries of the Wind-Down Trust will be treated as grantors and owners thereof, and it is intended that the Wind-Down Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, it is intended for federal income tax purposes that the beneficiaries of the Wind-Down Trust be treated as if they had received an interest in the Wind-Down Trust's assets and then contributed such interests to the Wind-Down Trust. As soon as possible after the transfer of the Wind-Down Trust Assets to the Wind-Down Trust, the Plan Administrator, in consultation with any financial advisors it deems appropriate, shall make a good faith valuation of the Wind-Down Trust Assets. This valuation will be made available from time to time as may be relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Wind-Down Trust, the Plan Administrator, and the Holders of Claims receiving interests in the Wind-Down Trust shall take consistent positions with respect to the valuation of the Wind-Down Trust Assets, and such valuation shall be utilized for all U.S. federal income tax purposes. The Wind-Down Trust will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Trusts Assets, satisfy the Debtors' or the Post-Effective Date Debtors' obligations under the Asset Purchase Agreement, make timely distributions to the beneficiaries of the Wind-Down Trust pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration.

KE 63539087

The Debtors expect that the Disputed Claims Reserve will be treated as a "disputed ownership fund" governed pursuant to section 1.468B-9 of the Treasury Regulation, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate U.S. federal income tax return shall be filed with the U.S. Internal Revenue Service for the Disputed Claims Reserve, and the Disputed Claims Reserve will be subject to tax annually on a separate entity basis. Any taxes (including with respect to interest, if any, earned in the account, or any recovery on the portion of assets allocable to such account in excess of the Disputed Claims Reserve's basis in such assets) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

On the Effective Date, any Estate non-Cash assets remaining after the Sale Transaction is consummated shall vest in the Wind-Down Trust, other than any Canadian Assets, for the purpose of facilitating the above tasks. Such assets shall be held free and clear of all Liens, Claims, and Interests, except as otherwise provided in the Plan. The Post-Effective Date Debtors, the Plan Administrator, and the Wind-Down Trust shall be deemed to be fully bound to the terms of the Plan, the Confirmation Order, and the Wind-Down Trust Agreement.

On the Effective Date or as soon as reasonably practicable thereafter, the Wind-Down Trust shall be funded with $1.0 million pursuant to the Wind-Down Trust Agreement for the purpose of (a) satisfying all fees, expenses, and disbursements that the Plan Administrator may incur in connection with the wind down and dissolution of the Estates and the Post-Effective Date Debtors, each as applicable, (b) paying fees and expenses that any attorney, accountant, or other professional that the Plan Administrator has retained to facilitate its duties, (c) compensating the Plan Administrator, each in accordance with Article IV.D and Article IV.E of the Plan and the Wind-Down Trust Agreement, and (d) paying the reasonable fees and disbursements of the Information Officer and its counsel in accordance with Article IV.D of the Plan.

2.  Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, provincial, and local tax returns for each of the Debtors and the Wind-Down Trust.

3.  Dissolution of the Post-Effective Date Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Trust shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Post-Effective Date Debtors are formed or any other jurisdiction. Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve the Post-Effective Date Debtors in, and withdraw the Post-Effective Date Debtors from applicable states and provinces to the extent required by applicable law.

4.  Termination of Recognition Proceedings

The Plan Administrator shall deliver a certified copy of each of the following to the Information Officer prior to the Information Officer seeking an order of the Canadian Court terminating the Recognition Proceedings, discharging and releasing the Information Officer and granting related relief: (a) the Plan Administrator's Certificate, which shall be delivered by the Plan Administrator to the Information Officer forthwith upon the filing thereof by the Plan Administrator with the Bankruptcy Court, and (b) the final decree of the Bankruptcy Court closing the last of the Chapter 11 Cases, which shall be delivered by the Plan Administrator to the Information Officer forthwith upon the entry thereof by the Bankruptcy Court.

F.  *Term Loan Deficiency Claim Waiver*

The Holders of Term Loan Deficiency Claims shall not receive any distribution on account of such Claims and, subject to the occurrence of the Effective Date, such Term Loan Deficiency Claims shall be deemed waived.

KE 63539087

G.     *Avoidance Actions Waiver*

The Debtors and the Post-Effective Date Debtors waive all Avoidance Actions.

H.     *Cancellation of Existing Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the ABL Credit Agreement, the Term Loan Credit Agreement, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and their Affiliates, and the Post-Effective Date Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released. Notwithstanding the foregoing, no executory contract or unexpired lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, except that (a) the ABL Credit Agreement and Term Loan Credit Agreement shall continue in effect solely for the purpose of (I) allowing Holders of the ABL Claims and Term Loan Claims, as applicable, to receive the distributions provided for under the Plan, (II) allowing the ABL Agent and Term Loan Agent to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, and (III) preserving the ABL Agent's and Term Loan Agent's right to indemnification pursuant and subject to the terms of the ABL Credit Agreement and Term Loan Credit Agreement in respect of any Claim or Cause of Action asserted against the ABL Agent or Term Loan Agent, as applicable, *provided* that any Claim or right to payment on account of such indemnification shall be an Administrative Claim, and (b) the foregoing shall not affect the cancellation of shares issued pursuant to the Plan nor Intercompany Interests, which shall be treated as set forth in Article III.B.7.

I.     *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) consummation of the Sale Transaction; (4) performance under the Asset Purchase Agreement and related documentation; (5) execution of the Asset Purchase Agreement, and any and all other agreements, documents, securities, and instruments relating thereto, if applicable; (6) the entry into the Payoff Letter with respect to the DIP ABL Claims; and (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan or corporate structure of the Debtors or Post-Effective Date Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Plan Administrator.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Plan Administrator, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtor, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Sale Transaction, and the Securities issued pursuant to the Plan in the name of and on behalf of the Post-Effective Date Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

K.      *Exemption from Securities Act Registration*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder, the offering, issuance, exchange, or distribution of any securities pursuant to the Plan is or shall be conducted in a manner that is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.

L.      *Exemption from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to a Post-Effective Date Debtor or to any other Person) of property under the Plan (including pursuant to the Asset Purchase Agreement) or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Post-Effective Date Debtor, including in accordance with the Asset Purchase Agreement, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Sale Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to this Article IV and Article VIII hereof and the Asset Purchase Agreement, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) acquired by the Winning Bidder in accordance with the Sale Transaction or (b) released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII, which shall be deemed released and waived by the Debtors, the Post-Effective Date Debtors, and the Wind-Down Trust as of the Effective Date, *provided* that Commercial Tort Claims shall be preserved for the sole benefit of the Holders of General Unsecured Claims and only the Plan Administrator shall have an obligation to commence, prosecute, or settle such Commercial Tort Claims, if any.

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM
INDEX NO. 656014/2020

NYSCEF DOC. NO. 8 19-11608 Case 1:38-md-356 Filed 09/05/19 Entered 09/05/19 12:38:13 Main Document RECEIVED NYSCEF: 11/04/2020

Pg 70 of 97

The Plan Administrator may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Trust. The Plan Administrator shall retain and may exclusively enforce any and all such Causes of Action. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Winning Bidder in accordance with the Asset Purchase Agreement or otherwise expressly provided in the Plan, including this Article IV and Article VIII of the Plan.** Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned or transferred to the Winning Bidder in accordance with the Asset Purchase Agreement, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Post-Effective Date Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) have been previously assumed or rejected by the Debtors pursuant to a Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date; or (4) are a contract, release, or other agreement or document entered into in connection with the Plan.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases assumed, assumed and assigned, or rejected pursuant to the Plan and in accordance with the Asset Purchase Agreement. Any Filed motions to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases (or Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Plan Administrator, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date, *provided*, *however*, that with respect to any such Filed objection to an Executory Contract assumed and assigned to the Winning Bidder in accordance with the Asset Purchase Agreement, the Winning Bidder may revoke the proposed assumption and assignment of the subject Executory Contract prior to 10 days after entry of an Order by the Bankruptcy Court adjudicating the objection with respect to such Executory Contract, with such revocation to be accomplished by filing a notice with the Bankruptcy Court and serving a copy on the counterparty(ies) to such Executory Contract, and any such Executory Contract shall be deemed rejected as of the Effective Date.

Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the Plan Administrator in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

KE 63539087

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Estates, the Plan Administrator, the Winning Bidder, or the property of any of the foregoing Entities without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, of the applicable cure amount identified on the Schedule of Assumed Executory Contracts or Unexpired Leases or other applicable Filed motion, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Post-Effective Date Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, any such dispute shall be resolved as set forth in Article V.A above with any related cure payments required by section 365(b)(1) of the Bankruptcy Code to be made following the entry of a Final Order resolving the dispute and approving the assumption. For any Executory Contract or Unexpired Lease being assumed, the applicable cure payment shall be made, in full in Cash, by the Winning Bidder if so provided by the Asset Purchase Agreement or otherwise by the Debtors or the Post-Effective Date Debtors. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary,

the Post-Effective Date Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases, and, to the extent that such rights are Acquired Assets, such rights shall be assigned to and enforceable by the Winning Bidder.

E.      *Insurance Policies and Surety Bonds*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed or assumed and assigned to the Winning Bidder, solely to the extent set forth in the Asset Purchase Agreement and explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases, all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided* that any insurance policies that are not assumed and assigned to the Winning Bidder shall be assumed by the Debtors for the sole purpose of resolving any Claims covered by such insurance policies, resolving any Causes of Action retained in connection with such insurance policies, and collecting any and all outstanding deposits, restricted cash, and letters of credit related thereto to the extent reasonably necessary to implement the wind down of the Estates in accordance with the Plan and the Wind-Down Trust Agreement.

Except as set forth in Article V.F of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or the Plan Administrator (or the Winning Bidder, solely to the extent assumed and assigned to the Winning Bidder under the Asset Purchase Agreement) or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

Without limiting the foregoing, on the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Plan Administrator or the Winning Bidder, as applicable, (2) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Post-Effective Date Debtor or the Winning Bidder, as applicable, and will survive and remain unaffected by entry of the Confirmation Order, and (3) the Plan Administrator shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, to the extent reasonably necessary to implement the wind down of the Estates in accordance with the Plan and the Wind-Down Trust Agreement.

F.      *Director, Officer, Manager, and Employee Liability Insurance*

On or before the Effective Date, the Debtors, on behalf of the Post-Effective Date Debtors, shall be authorized to and shall purchase and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date for the benefit of the Debtors' current and former directors, managers, officers, and employees on terms no less favorable to such persons than their existing coverage under the D&O Liability Insurance Policies with available aggregate limits of liability upon the Effective Date of no less than the aggregate limit of liability under the existing D&O Liability Insurance Policies.

After the Effective Date, none of the Debtors or the Post-Effective Date Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring on or prior to the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full six-year term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

G.    *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Provision will be assumed and irrevocable and will survive the effectiveness of the Plan.  None of the Post-Effective Date Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any of the Post-Effective Date Debtors' obligations to provide such indemnification rights or such directors,' officers,' employees,' or agents' indemnification right.

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Post-Effective Date Debtors, as applicable, shall be assumed by the Post-Effective Date Debtors and otherwise remain unaffected by the Chapter 11 Cases.

H.    *Employee and Retiree Benefits*

Unless otherwise provided herein, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed and shall remain in place as of the Effective Date and, without limiting any authority provided to the board of directors or managers or members of the Post-Effective Date Debtors under the Post-Effective Date Debtors' respective formation and constituent documents, the Post-Effective Date Debtors will continue to honor such agreements, arrangements, programs, and plans in the ordinary course of business. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  For the avoidance of doubt and without limiting the foregoing, the liabilities described in this Article V.H are not being assigned to or otherwise assumed by the Winning Bidder, except to the extent set forth in the Asset Purchase Agreement and explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases.

I.    *Collective Bargaining Agreements*

Unless otherwise provided in the Plan, the Collective Bargaining Agreements and any agreements, documents, or instruments relating thereto, are treated as and deemed to be an Executory Contract under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed the Collective Bargaining Agreements and any agreements, documents, and instruments related thereto or assumed and assigned such contracts to the Winning Bidder solely to the extent set forth in the Asset Purchase Agreement and explicitly provided in the Schedule of Assumed Executory Contracts and Unexpired Leases.  All Proofs of Claim Filed for amounts due under the Collective Bargaining Agreements shall be considered satisfied by the assumption (and assignment, as applicable) and cure in the ordinary course as provided herein.  On the Effective Date, any Proofs of Claim Filed with respect to the Collective Bargaining Agreements shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

J.    *Workers Compensation Program*

Unless otherwise provided in the Plan, as of the Effective Date, the Plan Administrator shall continue to honor obligations under all applicable workers' compensation laws in states and provinces in which the Debtors operated, as applicable, and the Plan Administrator shall honor obligations under the Debtors' (1) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (2) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation, and (3) workers' compensation insurance for the sole purpose of resolving any Claims covered by such workers' compensation insurance, resolving any Causes of Action retained in connection with such insurance policies, and collecting any and all outstanding deposits, restricted cash, and letters of credit related thereto to the extent reasonably necessary to implement the wind down of the Estates in accordance with the Plan and the Wind-Down Trust Agreement.

All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, *however*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors', the Post-Effective Date Debtors', the Plan

Administrator's, or the Winning Bidder's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

K.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

L.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Post-Effective Date Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

M.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

N.    *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed or assumed and assigned by such Debtor, will be performed by the Debtor, the Plan Administrator, or the Winning Bidder, as applicable, in the ordinary course of business. Accordingly, such contracts and leases (including any assumed or assumed and assigned Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Initial Distribution Date, on the next Quarterly Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interests (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests (as applicable) in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims

36

or Disputed Interests shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, *provided* that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor. Any such Claims shall be released pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

C.      *Disbursing Agent*

Except as otherwise provided herein, distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Trust.

D.      *Rights and Powers of Disbursing Agent*

1.      <u>Powers of the Disbursing Agent</u>

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash from the Wind-Down Trust.

E.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      <u>Record Date for Distribution</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM    INDEX NO. 656014/2020
NYSCEF DOC. NO. 68

19-11608    Case 1-18-cv-02504-EA    Doc 356    Filed 09/05/19    Entered 09/05/19 12:38:13    Main Document
RECEIVED NYSCEF: 11/04/2020

Pg 76 of 97

2.    <u>Delivery of Distributions</u>

(a)    Initial Distribution Date

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records or the register or related document maintained by, as applicable, the DIP Agents, the ABL Agent, or the Term Loan Agent as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided*, *further*, that the address for each Holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such Holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

(b)    Quarterly Distribution Date

Except as otherwise determined by the Plan Administrator in its sole discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims and Interests under the Plan on such date.  Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim or Interest on such date, shall be distributed on the first Quarterly Distribution Date after such Claim or Interest is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.I of the Plan.

(c)    Distributions to Holders of Term Loan Claims

Except as set forth in this Article VI.E.2(c), the Term Loan Agent shall be deemed to be the Holder of all Term Loan Claims for purposes of distributions to be made hereunder, and all distributions on account of such Term Loan Claims shall be made to or on behalf of the Term Loan Agent.  The Term Loan Agent shall hold or direct such distributions for the benefit of the Holders of Term Loan Claims.  As soon as practicable following compliance with the requirements set forth in this Article VI, the Term Loan Agent shall arrange to deliver or direct the delivery of such distributions for which it is the deemed Holder to or on behalf of such Holders of Allowed Term Loan Claims.

Notwithstanding anything to the contrary herein, the Term Loan Agent shall be entitled to maintain a record of Holders of Term Loan Claims in the ordinary course of business and shall be entitled without regard to the general occurrence of the Distribution Record Date, to make distributions that it receives under the Plan to Holders of Term Loan Claims based upon its books and records.  The Term Loan Agent shall not be held liable to any person with respect to distributions made or directed to be made by the Term Loan Agent except for liability arising from gross negligence, willful misconduct, or actual fraud of the Term Loan Agent.

3.    <u>Minimum Distributions</u>

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value (whether cash or otherwise), and each such Claim to which this limitation applies shall be released pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting such Claim against the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or their property.

4.    <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Trust

38

automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be released and forever barred.

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Plan Administrator of an intent to accept a particular distribution; (c) responded to the Debtors' or Plan Adminstrator's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

F.      *Distributions on Account of Claims or Interests Allowed After the Effective Date*

1.      <u>Payments and Distributions on Disputed Claims</u>

Distributions made after the Effective Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Effective Date, but which later become Allowed Claims or Interests, as applicable, shall be deemed to have been made on the applicable Quarterly Distribution Date after they have actually been made, unless the Plan Administrator and the applicable Holder of such Claim or Interest agree otherwise. No interest shall accrue or be paid on a Disputed Claim before it becomes and Allowed Claim in accordance with Article VI.I of the Plan.

2.      <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Plan Administrator, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until the Disputed Claim or Interest has become an Allowed Claim or Interest, as applicable, or has otherwise been resolved by settlement or Final Order; *provided* that if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan.

G.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors or the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Plan Administrator, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.      *Allocations Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

J.     *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date.

K.     *Setoffs and Recoupment*

Except as expressly provided in this Plan, each Post-Effective Date Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Post-Effective Date Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Post-Effective Date Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Post-Effective Date Debtor or its successor of any and all claims, rights, and Causes of Action that such Post-Effective Date Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Plan Administrator, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, all rights of counterparties to unexpired leases of nonresidential real property that have been rejected for setoff, recoupment, and subrogation are preserved and shall continue unaffected by Confirmation or the occurrence of the Effective Date.

L.     *Claims Paid or Payable by Third Parties*

1.     <u>Claims Paid by Third Parties</u>

The Debtors or the Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Plan Administrator.  To the extent that such Claim payment was made by the Winning Bidder to satisfy an obligation of the Debtors or the Post-Effective Date Debtors under the Asset Purchase Agreement, the Winning Bidder shall be promptly reimbursed for such payment in full in Cash from the Sale Proceeds or Wind-Down Trust Assets (other than the Wind-Down Trust Assets that constitute the GUC Sales Transaction Recovery Pool or the Last Out Loan Turnover Amount under the terms of this Plan), as applicable.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Debtor or the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  If the Debtors or the Plan Administrator, as applicable, become aware of any payment of a Claim by a third party, the Debtors or Plan Administrator, as applicable, will send a notice of wrongful payment to the Holder of such Claim requesting the return of any excess payments and advising the recipient of the provisions of the Plan requesting turnover of excess estate funds.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Plan Administrator annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

40

KE 63539087

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date as long as such rights or defenses are not Avoidance Actions waived pursuant to Article IV.G hereof; except for such rights and defenses assigned or transferred to the Winning Bidder in accordance with the Asset Purchase Agreement.

B.      *Claims Administration Responsibilities*

After the Effective Date, the Plan Administrator will (a) oversee the Claim administration process and (b) administer Commercial Tort Claims and Commercial Tort Proceeds, if any, for the benefit of Holders of General Unsecured Claims.  Except as otherwise specifically provided in the Plan, the Plan Administrator shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Interests and Commercial Tort Claims; (2) to settle or compromise any Disputed Claim or Commercial Tort Claims without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims*

Before or after the Effective Date, the Plan Administrator and the Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Post-Effective Date Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date

KE 63539087

on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.     *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Post-Effective Date Debtor without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or Interest in the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Plan Administrator without the Plan Administrator having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.     *Time to File Objections to Claims*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

F.     *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, but solely to the extent that any such Cause of Action is not an Avoidance Action waived pursuant to Article IV.G hereof, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Trust. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.     *Amendments to Claims*

On or after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Plan Administrator. Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H.     *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance*

        To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Settlement, Compromise, and Release of Claims and Interests*

        Pursuant to, and to the maximum extent provided by, section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.

B.      **Release of Liens**

        **On the Effective Date, concurrently with the consummation of the Sale Transaction and to the extent required by the Asset Purchase Agreement, the Acquired Assets shall be transferred to and vest in the Winning Bidder free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Confirmation Recognition Order, the Plan, and the Asset Purchase Agreement, each as applicable.  Without limiting the foregoing, except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim (other than any Claim secured by the Administration Charge) or Secured Tax Claim, satisfaction in full of the portion of the Other Secured Claim (other than any Claim secured by the Administration Charge) or Secured Tax Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims (other than any Claim secured by the Administration Charge) that the Debtors elect to reinstate in accordance with Article III.B.2 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by**

43

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM    INDEX NO. 656014/2020
19-11608 Case 1:20-cv-05049 Doc 356 Filed 09/05/19 Entered 09/05/19 12:38:13 Main Document
NYSCEF DOC. NO. 60    RECEIVED NYSCEF: 11/04/2020

Pg 82 of 97

such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.    *Debtor Release*

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtor and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date each Released Party is deemed released and discharged by each and all of the Debtors, the Post-Effective Date Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post-Effective Date Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Post-Effective Date Debtors, or their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Chapter 11 Cases, the Recognition Proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the Prepetition Facilities, the DIP Facilities, the Sale Transaction, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the Prepetition Facilities, the DIP Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of the Winning Bidder to the Debtors relating to the Asset Purchase Agreement, (2) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including the Asset Purchase Agreement and any documents set forth in the Plan Supplement) executed to implement the Plan, and (3) any Causes of Action listed on the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Post-Effective Date Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

KE 63539087

D.    *Third-Party Release*

        Effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, on and after the Effective Date each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor, Post-Effective Date Debtor, and Released Party from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Post-Effective Date Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Post-Effective Date Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Chapter 11 Cases, the Recognition Proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the RSA, the Disclosure Statement, the DIP Facilities, the Sale Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any liabilities or obligations of any Entity to the Winning Bidder relating to the Asset Purchase Agreement or any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including the Asset Purchase Agreement and any documents set forth in the Plan Supplement) executed to implement the Plan.

        Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Post-Effective Date Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

E.    *Exculpation*

        Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Cause of Action for any Claim related to any act or omission based on the negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases, including the RSA, the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order, or created or entered into in connection with the RSA, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the

KE 63539087

Recognition Proceedings, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of any securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement, and the implementation of the Restructuring Transactions contemplated by the Plan, except for Claims related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity relating to the Asset Purchase Agreement or for any post-Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

F.  *Injunction*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.A of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of liens pursuant to Article VIII.B of the Plan), or are subject to exculpation pursuant to Article VIII.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order and granting by the Canadian Court of the Confirmation Recognition Order in the Recognition Proceedings, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F of the Plan.

G.  *Protections Against Discriminatory Treatment*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Post-Effective Date Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Effective Date Debtors, or another Entity with whom the Post-Effective Date Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or

during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention*

On and after the Effective Date, the Post-Effective Date Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Plan Administrator.

I.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

J.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

K.      *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, the Post-Effective Date Debtors, their respective property, and Holders of Claims and Interests and is fair, equitable, and reasonable.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Recognition Order shall have been granted by the Canadian Court in the Recognition Proceedings, and such orders shall not have been stayed, modified, or vacated on appeal;

KE 63539087

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3. the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

4. the payment in full of the DIP ABL Claims pursuant to the Payoff Letter; and

5. all conditions precedent to the consummation of the Sale Transaction shall have been satisfied in accordance with the terms thereof, and the closing of the Sale Transaction shall be deemed to occur concurrently with the occurrence of the Effective Date.

B.      *Waiver of Conditions*

Subject to and without limiting the rights of each party to the RSA, the conditions to Consummation set forth in Article IX may be waived by the Debtors with the reasonable consent of the Term Loan Agent, the Required Term Lenders, the DIP ABL Agent (solely with respect to the economic and non-economic treatment of the DIP ABL Agent and DIP ABL Lenders pursuant to such order), the Committee (solely with respect to the economic and non-economic treatment of General Unsecured Claims), the Sponsor (solely with respect to the economic and non-economic treatment of the Last Out Loans or the Last Out DIP Loans, as applicable), and the Winning Bidder (solely to the extent relating to or concerning the Sale Transaction as contemplated in the Asset Purchase Agreement) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.      *Substantial Consummation*

The "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date.

D.      *Effect of Failure of Conditions*

If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the reasonable consent of the Term Loan Agent, Required Term Lenders, the DIP ABL Agent (solely with respect to the economic and non-economic treatment of the DIP ABL Agent and DIP ABL Lenders pursuant to such order), the Committee (solely with respect to the economic and non-economic treatment of General Unsecured Claims), the Sponsor (solely with respect to the economic and non-economic treatment of the Last Out Loans or the Last Out DIP Loans, as applicable), or the Winning Bidder (solely to the extent relating to or concerning the Sale Transaction as contemplated in the Asset Purchase Agreement), reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the

Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. The Debtors shall not consent to any amendment, modification or supplement of the Asset Purchase Agreement that is adverse in any material respect to the interest of (i) the DIP ABL Lenders, without the consent of the DIP ABL Agent, or (ii) the DIP Term Loan Lenders, without the consent of the DIP Term Loan Agent.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans, in each case subject to any applicable consent rights as set forth in the RSA, the DIP Orders, or the DIP Facilities. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Causes of Action, or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Accrued Professional Compensation Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Plan Administrator amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.    ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

KE 63539087

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

8.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, 1141, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid in accordance with the Plan;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or, subject to any applicable forum selection clauses, any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order or any Entity's obligations incurred in connection with the Plan, including, subject to any applicable forum selection clauses, disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

KE 63539087

21.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

23.     enforce all orders previously entered by the Bankruptcy Court; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Post-Effective Date Debtors, the Plan Administrator, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Plan Administrator, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees*

Each of the Debtors (or the Disbursing Agent on behalf of each of the Debtors) shall pay all fees payable pursuant to section 1930(a)(6) of the Judicial Code, together with any interest thereon pursuant to 31 U.S.C. § 3717, on or before the Effective Date in Cash, based on disbursements in and outside the ordinary course of the Debtors' business and Plan payments. Thereafter, such fees and any applicable interest shall be paid by each of the Post-Effective Date Debtors (or the Disbursing Agent on behalf of each of the Post-Effective Date Debtors) until the earlier of entry of a final decree closing such Chapter 11 Case or an order of dismissal or conversion, whichever occurs first.

D.     *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, the Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Committee and its Professionals. The Post-Effective Date Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

E.     *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM INDEX NO. 656014/2020

NYSCEF DOC. NO. 58 19-11608 Case 1:19-cv-50454 Doc 350 Filed 09/05/19 Entered 09/05/19 12:38:13 Main Document RECEIVED NYSCEF: 11/04/2020

Pg 90 of 97

any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices*

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by courier or registered or certified mail (return receipt requested) or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

1.      If to the Debtors, to:

Hollander Sleep Products, LLC
901 Yamato Road, Suite 250
Boca Raton, Florida 33431
Attention: Marc L. Pfefferle
E-mail: mpfefferle@carlmarks.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Joshua A. Sussberg, P.C.
            Christopher T. Greco, P.C.
E-mail: joshua.sussberg@kirkland.com
        christopher.greco@kirkland.com

- and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: Joseph M. Graham
            Laura Krucks
E-mail: joe.graham@kirkland.com
        laura.krucks@kirkland.com

2.      If to the ABL Agent or DIP ABL Agent, to:

Goldberg Kohn Ltd.
55 East Monroe, Suite 3300
Chicago, Illinois 60603
Attention: Randall Klein
E-mail address: Randall.Klein@goldbergkohn.com

3.      If to the Term Loan Agent or the DIP Term Agent, to:

King & Spalding LLP

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM INDEX NO. 656014/2020

NYSCEF DOC. NO. 68 19-11608-scc  Doc 356  Filed 09/05/19  Entered 09/05/19 12:38:13  Main Document RECEIVED NYSCEF: 11/04/2020

Pg 91 of 97

1180 Peachtree Street, NE Suite 1600
Atlanta, Georgia  30309
Attention:  W. Austin Jowers
E-mail address:  ajowers@kslaw.com

-and -

King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
Attention:  Christopher G. Boies
           Stephen M. Blank
E-mail address:  cboies@kslaw.com
              sblank@kslaw.com

4.      If to the Committee, to:

Pachulski Stang Ziehl & Jones, LLP
780 Third Avenue, Suite 3400
New York, New York 10027
Attn:   Robert J. Feinstein
        Bradford J. Sandler
Email:  rfeinstein@pszjlaw.com
        bsandler@pszjlaw.com

After the Effective Date, the Plan Administrator may notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, claims and, defenses.  This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

I.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice and Claims Agent at www.omnimgt.com/cases/hollander  or (for a fee) the Bankruptcy Court's website at http://www.ecf.nysb.uscourts.gov/.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.  The documents contained in the Plan Supplement are an integral part

KE 63539087

of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order. For the avoidance of doubt, no provisions of the Plan Supplement may contradict the provisions under the Plan that require payment in full (in accordance with Section 1.4 of the DIP ABL Credit Agreement) of the DIP ABL Claims. Notwithstanding anything to the contrary in this Plan, in the event of any inconsistency between the Asset Purchase Agreement and this Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, the Asset Purchase Agreement shall control solely with respect to the assumption and assignment of Executory Contracts and Unexpired Leases, the Causes of Action listed on the Schedule of Retained Causes of Action, the Acquired Assets, the Assumed Liabilities (as defined in the Asset Purchase Agreement), and any other matter between or among the Winning Bidder and the Debtors or the Plan Administrator, their successors and permitted assigns, or any other Entity, relating to the Asset Purchase Agreement.

J.     *Non-Severability of Plan Provisions*

        The provisions of the Plan, including its release, injunction, exculpation, and compromise provisions, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

K.     *Votes Solicited in Good Faith*

        Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.     *Closing of Chapter 11 Cases*

        The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

M.     *Conflicts*

        Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 63539087

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM
INDEX NO. 656014/2020

NYSCEF DOC. NO. 80

19-11608 Case 1:80-cv-10412 Doc 356 Filed 09/05/19 Entered 09/05/19 12:38:12 Main Document

Pg 93 of 97

RECEIVED NYSCEF: 11/04/2020

Hollander Sleep Products, LLC

By: */s/ Marc L. Pfefferle* _____

Name: Marc L. Pfefferle

Title: Chief Executive Officer

**Exhibit 2**

**Notice of Confirmation**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HOLLANDER SLEEP PRODUCTS, LLC, *et al.*,[1] | ) | Case No. 19-11608 (MEW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF (I) ENTRY OF CONFIRMATION ORDER,
## (II) OCCURRENCE OF EFFECTIVE DATE, AND (III) RELATED BAR DATES

**PLEASE TAKE NOTICE** that on September [4], 2019, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order [Docket No. [●]] (the "Confirmation Order") confirming the *Debtors' Modified First Amended Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. [●]] (the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE** that the Effective Date, as defined in the Plan, occurred on [_____**], 2019**.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Confirmation Order, the release, injunction, and exculpation provisions in Article VIII of the Plan (as modified by the Confirmation Order) are now in full force and effect.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Article V.B of the Plan, unless otherwise provided by a Final Order of the Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Court within 30 days after the later of (1) the date of entry of an order of the Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, the Estates, the Plan Administrator, the Wind-Down Trust, or the property of any of the foregoing parties**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Dream II Holdings, LLC (7915); Hollander Home Fashions Holdings, LLC (2063); Hollander Sleep Products, LLC (2143); Pacific Coast Feather, LLC (1445); Hollander Sleep Products Kentucky, LLC (4119); Pacific Coast Feather Cushion, LLC (3119); and Hollander Sleep Products Canada Limited (3477).  The location of the Debtors' service address is:  901 Yamato Road, Suite 250, Boca Raton, Florida 33431.

[2]  Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the Plan.

**without the need for any objection by the Plan Administrator (or any other party) or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be barred.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

**PLEASE TAKE FURTHER NOTICE** that except as otherwise provided by the Confirmation Order, the Plan, or a Final Order of the Court, the deadline for filing requests for payment of Administrative Claims (other than (1) Professional Fee Claims, (2) Administrative Claims arising in the ordinary course of business, or (3) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code), which are required to be filed in accordance with the Plan) shall be the later of [          ]__, 2019__ (which is the first Business Day that is 30 days after the Effective Date). If a Holder of an Administrative Claim (other than DIP Claims, cure Claims, Professional Fee Claims, Administrative Claims arising in the ordinary course of business, and Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code) that is required to but does not file and serve a request for payment of such Administrative Claim by the Administrative Claims Bar Date, such Holder shall be forever barred from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, their Estates, the Plan Administrator, or the Wind-Down Trust.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Plan, the Deadline to file final requests for payment of Professional Fee Claims is [          ]__, 2019__ (which is the first Business Day that is 30 days after the Effective Date, the "Professional Fee Application Deadline"). All Professionals must file final requests for payment of Professional Fee Claims by no later than the Professional Fee Application Deadline to receive final approval of the fees and expenses incurred in the Chapter 11 Cases.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Confirmation Order, and all other pleadings filed in the Debtors' Chapter 11 Cases, may be obtained free of charge by: (1) contacting Omni Management Group (the "Solicitation Agent") by phone at (844) 212-9942 (toll free) or (818) 906-8300 (international); (2) contacting the Solicitation Agent by email at hollanderballots@omnimgt.com, including "Hollander" in the subject line of any such email; (3) accessing the Debtors' solicitation website at https://omnimgt.com/hollander; or (4) writing to the Solicitation Agent at the following address: Hollander Sleep Products, LLC, Ballot Processing, c/o Omni Management Group, 5955 DeSoto Avenue, Suite #100, Woodland Hills, CA 91367. Additionally, all pleadings filed in the Chapter 11 Cases may be inspected at the office of the Clerk of the Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 and accessed for a fee on the Court's website, http://www.nysb.uscourts.gov. Note that you need a PACER password and login to access documents on the Court's website (a PACER password may be obtained by accessing the PACER website, http://pacer.psc.uscourts.gov).

FILED: NEW YORK COUNTY CLERK 11/04/2020 02:19 PM     INDEX NO. 656014/2020

NYSCEF DOC. NO. 68    19-11608    Case 1:Doc-358v-04349663 Filed 09/05/19 1-Entered 09/05/19 12:38:13 Main Document RECEIVED NYSCEF: 11/04/2020

Pg 97 of 97

New York, New York
Dated:  September [●], 2019

_____

Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Joseph M. Graham (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

3

Case 1:20-cv-10434   Document 1-1   Filed 12/10/20   Page 187 of 208

# EXHIBIT J

THE LAW OFFICE OF

# MICHAEL W. STARR

LLC

November 1, 2019

**VIA EMAIL**
Gabriela Zamfir Hensley
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

       Re:   *In re Hollander Sleep Products, LLC, et al.*
            Docket No. 19-11607
            Docket No. 19-11608
            Docket No. 19-11609

Dear Ms. Hensley,

    My office represents Argonaut Insurance Company ("Argonaut") in connection with the above matter. We write with respect to certain demands that Argonaut has received from U.S. Customs and Border Protection ("CBP") on surety bonds issued to and guaranteed by the Debtors.

    By way of background, Argonaut issued U.S. Customs Bond Nos. 9914L2864 and 9914L2875 (together, the "Bonds") to Debtor Hollander Sleep Products, LLC. Each of the Debtors also entered into Indemnity Agreements with Argonaut that provided, among other things, that the Debtors are required to indemnify and pay Argonaut for all payments made under the Bonds to the CBP, plus costs, attorneys' fees and interest. In connection with this bankruptcy, Argonaut filed Proofs of Claim in all three cases detailing the parties' obligations and attaching relevant documents. (*See* Proofs of Claim Nos. 19, 22 and 309 Attached.)

Gabriela Zamfir Hensley
Kirkland & Ellis LLP
November 1, 2019
Page 2

Argonaut has received four demands on the Bonds from the CBP, dated October 22, 2019 (the "Demands").  The CBP Case Numbers for the Demands are:

- 2019550120033501
- 2019550120033401
- 2019550120031801
- 2019550120033301

(*See* Demands Attached.)

Under the terms of the Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code, as amended (the "Joint Plan"), the Debtors' obligations with respect to the Bonds were reaffirmed.  In this regard, the Joint Plan provides in relevant part:

> [O]n the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Plan Administrator or the Winning Bidder, as applicable, (2) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Post-Effective Date Debtor or the Winning Bidder, as applicable, and will survive and remain unaffected by entry of the Confirmation Order . . .

(Article V, Part E.)

Accordingly, please confirm that the Debtor's will promptly satisfy the Demands by making payment to the CBP.

If this request should be submitted to another party or different counsel for response, please provide us with his/her contact information immediately.

Thank you for your attention to this matter.

Best regards,

Michael Starr

# EXHIBIT K

THE LAW OFFICE OF

# MICHAEL W. STARR

LLC

December 6, 2019

**VIA EMAIL**
Marc Rosenberg
Drivetrain, LLC
410 Park Avenue, Suite 900
New York, NY 10022

Re:    *In re Hollander Sleep Products, LLC, et al.*
Docket Nos. 19-11607, 19-11608 and 19-11609

U.S. Customs and Border Protection Case Nos.:
- 2019550120033301
- 2019550120033401
- 2020170320031501
- 2020170320031601
- 2020550120005201
- 2020550120005301

Dear Mr. Rosenberg,

As you know, my office represents Argonaut Insurance Company ("Argonaut") in connection with the above matter. We write with respect to certain demands from U.S. Customs and Border Protection ("CBP") on surety bonds issued to and guaranteed by the Debtors. As the Debtors' continued failure to timely satisfy the demands and their obligations to the CBP may result in the imposition of fees, sanctions and/or other penalties by the CBP, we request that you address the matters set forth herein as soon as possible.

By way of background, Argonaut issued U.S. Customs Bond Nos. 9914L2864 and 9914L2875 (together, the "Bonds") to Debtor Hollander Sleep Products, LLC. Each of the Debtors also entered into Indemnity Agreements with Argonaut that provided, among other things, that the Debtors are required to indemnify and pay Argonaut for all payments made under the Bonds to the CBP, plus costs, attorneys' fees and interest. In connection

Marc Rosenberg
Drivetrain, LLC
December 6, 2019
Page 2

with this bankruptcy, Argonaut filed Proofs of Claim in all three cases detailing the parties' obligations and attaching relevant documents. (*See* Proofs of Claim Nos. 19, 22 and 309 Attached.)

Argonaut has received six demands on the above-referenced Bonds from the CBP, dated October 22, 2019 through November 15, 2019 (the "Demands"). (*See* Demands Attached.) ***The Demands require payment within sixty (60) days of the date of issue.***

Under the terms of the Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code, as amended (the "Joint Plan"), the Debtors' obligations with respect to the Bonds were reaffirmed. In this regard, the Joint Plan provides in relevant part:

> [O]n the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Plan Administrator or the Winning Bidder, as applicable, (2) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Post-Effective Date Debtor or the Winning Bidder, as applicable, and will survive and remain unaffected by entry of the Confirmation Order . . .

(Article V, Part E.)

Accordingly, please confirm that the Debtors will promptly satisfy the Demands by making payment to the CBP. If we do not receive a timely response, we will have no choice but to seek judicial intervention.

Thank you for your attention to this matter.

Best regards,

Michael Starr

# EXHIBIT L

THE LAW OFFICE OF

# MICHAEL W. STARR
LLC

February 21, 2020

**VIA EMAIL**
Marc Rosenberg
Drivetrain, LLC
410 Park Avenue, Suite 900
New York, NY 10022

Re:   *In re Hollander Sleep Products, LLC, et al.*
Docket Nos. 19-11607, 19-11608 and 19-11609

U.S. Customs and Border Protection Case Nos.:
- 2019550120033301
- 2019550120033401
- 2020170320031501
- 2020170320031601
- 2020550120005201
- 2020550120005301

Dear Mr. Rosenberg,

As you know, my office represents Argonaut Insurance Company ("Argonaut") in connection with the above matter. We write with respect to certain demands from U.S. Customs and Border Protection ("CBP") on surety bonds issued to and guaranteed by the Debtors.

On or about November 5, 2019, a copy our letter concerning the CBP's demands for payment was sent to your attention. Since that date, we have communicated several times via letter and telephone. Although you have reassured us that you are working to resolve this matter, we have not received any indication from you or the CBP that actual steps have been taken to do so.

Marc Rosenberg
Drivetrain, LLC
February 21, 2020
Page 2

By way of background, Argonaut issued U.S. Customs Bond Nos. 9914L2864 and 9914L2875 (together, the "Bonds") to Debtor Hollander Sleep Products, LLC. Each of the Debtors also entered into Indemnity Agreements with Argonaut that provided, among other things, that the Debtors are required to indemnify and pay Argonaut for all payments made under the Bonds to the CBP, plus costs, attorneys' fees and interest. In connection with this bankruptcy, Argonaut filed Proofs of Claim in all three cases detailing the parties' obligations and attaching relevant documents.

Under the terms of the Joint Plan Pursuant to Chapter 11 of the Bankruptcy Code, as amended (the "Joint Plan"), the Debtors' obligations with respect to the Bonds were reaffirmed. In this regard, the Joint Plan provides in relevant part:

> [O]n the Effective Date, (1) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Plan Administrator or the Winning Bidder, as applicable, (2) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Post-Effective Date Debtor or the Winning Bidder, as applicable, and will survive and remain unaffected by entry of the Confirmation Order . . .

(Article V, Part E.) Accordingly, the Debtors or their successors are required to make the payments to the CBP as well as honor the Bonds and related indemnification agreements.

As the Debtors' (or their successors) continued failure to timely satisfy the demands and their obligations to the CBP may result in the imposition of fees, sanctions and/or other penalties by the CBP, we request that you address the matters set forth herein by no later than **February 28, 2020**. If we do not receive a satisfactory response by that date, Argonaut will have no choice but to seek judicial intervention to enforce the parties' obligations under the Joint Plan.

Thank you for your attention to this matter.

Best regards,

Michael Starr

Marc Rosenberg
Drivetrain, LLC
February 21, 2020
Page 3

cc:   Gabriela Zamfir Hensley, Esq. (via email)
       Laura Elizabeth Krucks, Esq. (via email)

# EXHIBIT M

Case 1:20-cv-10434   Document 1-1   Filed 12/10/20   Page 198 of 208

THE LAW OFFICE OF

# MICHAEL W. STARR

LLC

March 26, 2020

**Via Email and US Mail**
Marc Rosenberg
Drivetrain, LLC
410 Park Avenue, Suite 900
New York, NY 10022

     Re:    *In re Hollander Sleep Products, LLC, et al.*
           Docket Nos. 19-11607, 19-11608 and 19-11609

           U.S. Customs and Border Protection Case Nos.:
- 2019550120033301
- 2019550120033401
- 2020170320031501
- 2020170320031601
- 2020550120005201
- 2020550120005301

Dear Mr. Rosenberg,

     As you know, my office represents Argonaut Insurance Company ("Argonaut"). We write with respect to the above-referenced demands from U.S. Customs and Border Protection ("CBP"), which arise from customs bonds issued to and guaranteed by the debtors.  Subject to the express terms of the applicable Chapter 11 plan, the debtors, winning bidders and/or their successors remain obligated to pay the amounts owed on the customs bonds.

     We have communicated several times via letter and telephone regarding this matter.  Although you have reassured us that you are working to resolve this matter, we have not received any indication from you or the CBP that actual steps have been taken to do so.

Marc Rosenberg
Drivetrain, LLC
March 27, 2020
Page 2

Please be advised that the CBP has indicated that Case Nos. 2020170320031501 and 2020170320031601 are now eligible for sanction actions. Accordingly, we request that you *immediately* confirm that these cases will be resolved and advise of us the specific steps you are taking.

Thank you for your prompt attention to this matter.

Best regards,

Michael Starr

cc: Gabriela Zamfir Hensley, Esq. (via email)
Laura Elizabeth Krucks, Esq. (via email)

# EXHIBIT N



**RIKER
DANZIG
SCHERER
HYLAND
PERRETTI**LLP

ATTORNEYS AT LAW

**Tod S. Chasin**
Counsel

Direct:
t: 212.302.8253
f: 973.451.8644
tchasin@riker.com

500 Fifth Avenue
New York, NY 10110

June 19, 2020

**Federal Express**

Marc Rosenberg
Drivetrain, LLC
410 Park Avenue, Ste. 900
New York, NY 10022

Re:     *In re Hollander Sleep Products, LLC, et al.*
        Docket Nos. 19-11607, 19-11608 and 19-11609

        U.S. Customs and Border Protection Case Nos.:
        • 2019550120033301
        • 2019550120033401
        • 2020170320031501
        • 2020170320031601
        • 2020550120005201
        • 2020550120005301

Dear Mr. Rosenberg:

        Please be advised that this firm represents Argonaut Insurance Company ("Argonaut") in connection with certain U.S. Customs Bonds in which Hollander Sleep Products, LLC ("Hollander Sleep") is the principal. More specifically, Argonaut issued two Customs Bonds to Hollander totaling $1,950,000.00, Customs Bond Nos. 9914L2864 and 9914L2875 (collectively, the "Bonds"). The Bonds secure the obligations of Hollander to the U.S. Customs and Border Protection for customs transactions while the Bonds were in effect.

        In connection with the Bonds, Indemnity Agreements were executed whereby Hollander Sleep, Dream II Holdings, LLC ("Dream Holdings"), and Hollander Home Fashions Holdings, LLC ("Hollander Home" and, collectively, "Indemnitors") agreed to, among other things, indemnify and save harmless Argonaut from and against all claims and liabilities in any way arising from the Bonds. In addition, the Indemnitors agreed

Marc Rosenberg
June 19, 2020
Page 2

that, at Argonaut's request, they would place sufficient funds with Argonaut to serve as collateral for any liability or potential liability on the Bonds.

U.S. Customs and Border Protection has made multiple demands to Argonaut for payment under the Bonds. By way of letters dated November 1, 2019, December 6, 2019, February 21, 2020, and March 26, 2020, Argonaut invoked the provisions of the Indemnity Agreements by requesting, among other things, proof of discharge of all liability or potential liability incurred in connection with the Bonds. Argonaut further advised that, if adequate and verifiable proof of discharge was not provided immediately, it would be required to take further action to invoke its rights under the Bonds and Indemnity Agreements. As of the date of this letter, Argonaut has not been provided with adequate proof of discharge.

Please note that the Indemnitors, as well as their "heirs, legal representatives, successors and assigns," are jointly and severally bound by the terms and provisions of the Indemnity Agreements. In addition, although we understand that the Indemnitors previously filed for protection under Chapter 11 of the United States Bankruptcy Code, pursuant to Article V(E) of the Debtors' Modified First Amended Joint Plan of Reorganization filed July 25, 2019, as confirmed by Order entered September 6, 2019, the Indemnitors' obligations under the Indemnity Agreements were reaffirmed by Drivetrain, LLC as the Plan Administrator of the post-confirmation Chapter 11 estates of the Debtors.

Based on the foregoing, Argonaut requests that $132,355.72 be placed in funds pursuant to the Indemnity Agreements on or before July 6, 2020. The funds shall be delivered to the undersigned by way of certified check or bank cashier's check payable to Argonaut Insurance Company. These funds will be held by Argonaut as collateral under the Indemnity Agreements until such time as adequate proof of discharge of liability for the Bonds has been provided and verified with U.S. Customs and Border Protection. Argonaut shall also have the right, at its discretion and subject to the terms of the Indemnity Agreements, to use the collateral funds to satisfy any amounts that are or may become due or owing in connection with the Bonds.

If the collateral funds are not received by the undersigned on or before July 6, 2020, legal action will be commenced against all interested parties without further notice. Said action will include, among other things, a demand for costs and attorneys' fees as provided in the Indemnity Agreements.

Finally, please be advised that nothing contained herein modifies, waives, limits or releases any of Argonaut's rights, defenses or claims under the terms of any agreement and/or applicable law. All such rights, defenses and claims are expressly reserved, including without limitation the right to seek additional collateral pursuant to the terms of the Indemnity Agreements.

Case 1:20-cv-10434   Document 1-1   Filed 12/10/20   Page 203 of 208

Marc Rosenberg
June 19, 2020
Page 3


Thank you for your attention to this matter.

Very truly yours,

*s/Tod S. Chasin*
Tod S. Chasin

TSC:
cc:    Michael W. Starr, Esq.
(29955-01)

Case 1:20-cv-10434   Document 1-1   Filed 12/10/20   Page 204 of 208

Marc Rosenberg
June 19, 2020
Page 4


bcc:    Christopher Flagg
        Vice President
        C.A. Shear & Co.

# EXHIBIT O

```
1                                                            FICHE INDEX: 110
   ACSR-CL-612                    U.S. CUSTOMS AND BORDER PROTECTION        RUN DATE: 10/01/20
                                   AUTOMATED COMMERCIAL SYSTEM              RUN TIME: 21:36:31
                                                                           SURETY PAGE:  01566

                                   FORMAL DEMAND ON SURETY
                                FOR PAYMENT OF DELINQUENT AMOUNTS DUE
                       ALL BILLS OTHER THAN FINE, PENALTY AND LIQUIDATED DAMAGE BILLS
                                        SEPTEMBER 2020
0            SURETY              SURETY NUMBER     DELINQUENT DEBTOR        IMPORTER NUMBER      BANKRUPT
0     ARGONAUT INSURANCE CO          110        HOLLANDER SLEEP PRODUCTS LLC   27-054214300      CHAPTER11
      6 MILL RIDGE LN                           901 W YAMATO RD                                  05/19/19
      CHESTER          NJ 079302486             STE 250
                                                BOCA RATON        FL 33431

0 BILL              BILLING      DOCUMENT              BILL                                   AGE CATEGORY
  NUMBER  BOND NUMBER  LOCATION    DATE    ENTRY NUMBER  DATE    AMOUNT DUE  PRINCIPAL AMT  INTEREST AMT  60 90 120 OVR

  48038453  9914L2875 SAVANNAH, GA   02/12/18 10159071612  10/11/19    4579.22    4393.06      186.16              X
  48038454  9914L2875 SAVANNAH, GA   02/12/18 10159187947  10/11/19    1459.17    1399.85       59.32              X
  48038455  9914L2875 DALLAS/FT WORTH 02/08/18 10159071463 10/11/19   24067.77   23089.32      978.45              X
  48038457  9914L2875 DALLAS/FT WORTH 03/01/18 10159508233 10/11/19   33870.49   32493.52     1376.97              X
  48038458  9914L2875 DALLAS/FT WORTH 03/02/18 10159346246 10/11/19   34018.75   32635.76     1382.99              X
  48038459  18C000M9T DALLAS/FT WORTH 03/14/18 10159596006 10/11/19    9762.33    9365.45      396.88              X
  48045835  9914L2875 DALLAS/FT WORTH 01/26/18 10158995472 10/18/19    3545.73    3402.89      142.84              X
  -           NUMBER OF BILLS -   7       IMPORTER  TOTALS   111303.46  106779.85     4523.61
```

# EXHIBIT P

C.A. Shea & Company, Inc.
10/5/2020

**Open Liquidated Damages Listing**

| Case # | Surety | Entry # | Bond # | Penalty $ | Violation Date | Violation Citation | Violation Description | Status Code | Status Date | Status Description |
|---|---|---|---|---|---|---|---|---|---|---|
| 2019550120033301 | 110 | 10159346246 | 9914L2875 | $60,055.82 | 4/5/2018 | 19 CFR 142.12, 19 CFR 113.62(a)(1)(i), 19 CFR 113.62(m)(4) | Entry Summary Filed Timely but Estimated Duties Not Paid/Entry Summary | 1585 | 9/14/2020 | Surety Sanctioning Under Review |
| 2019550120033401 | 110 | 10159508233 | 9914L2875 | $59,787.52 | 4/5/2018 | 19 CFR 142.12, 19 CFR 113.62(a)(1)(i), 19 CFR 113.62(m)(4) | Entry Summary Filed Timely but Estimated Duties Not Paid/Entry Summary | 1585 | 9/14/2020 | Surety Sanctioning Under Review |
| 2020170320031501 | 110 | 10159187947 | 9914L2875 | $2,571.18 | 4/5/2018 | 19 CFR 142.12, 19 CFR 113.62(a)(1)(i), 19 CFR 113.62(m)(4) | Entry Summary Filed Timely but Estimated Duties Not Paid/Entry Summary | 1585 | 9/14/2020 | Surety Sanctioning Under Review |
| 2020170320031601 | 110 | 10159071612 | 9914L2875 | $8,069.00 | 4/5/2018 | 19 CFR 142.12, 19 CFR 113.62(a)(1)(i), 19 CFR 113.62(m)(4) | Entry Summary Filed Timely but Estimated Duties Not Paid/Entry Summary | 1585 | 9/14/2020 | Surety Sanctioning Under Review |
| 2020550120005201 | 110 | 10159071463 | 9914L2875 | $42,386.30 | 3/29/2018 | 19 CFR 142.12, 19 CFR 113.62(a)(1)(i), 19 CFR 113.62(m)(4) | Entry Summary Filed Timely but Estimated Duties Not Paid/Entry Summary | 1585 | 9/14/2020 | Surety Sanctioning Under Review |
| 2020550120005301 | 110 | 10159086006 | 9914L2875 | $22,826.52 | 7/2/2018 | 19 CFR 142.12, 19 CFR 113.62(a)(1)(i), 19 CFR 113.62(m)(4) | Entry Summary Filed Timely but Estimated Duties Not Paid/Entry Summary | 1585 | 9/14/2020 | Surety Sanctioning Under Review |

*The above information is provided by The Bureau of Customs and Border Protection. We are not responsible for its content.*